**HEARING DATE AND TIME: February 25, 2014 at 11:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: February 18, 2014 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Petitioners Abax Lotus Ltd.*
*and Abax Nai Xin Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                            :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **CHINA NATURAL GAS, INC.,** | : | **13-10419 (SHL)** |
| | : | |
| **Debtor.** | : | |
| | : | |

-------------------------------------------------------------x

# OBJECTION OF ABAX PETITIONERS TO MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF AN ORDER FURTHER EXTENDING ITS EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

# Table of Contents

Preliminary Statement ...........................................................................................................1

Background ...........................................................................................................................4

A.  General Background and Events Leading to the Commencement of the Chapter 11 Case.....4

    a.  Corporate Structure ................................................................................................4

    b.  The Senior Notes ....................................................................................................6

    c.  The Debtor's Continuing Failure to Service the Senior Notes ...............................7

    d.  The Current Undisputed and Unresolved Defaults ..............................................8

B.  Procedural Background.....................................................................................................10

There Is No Basis for a Further Ninety-Day Extension of the Debtor's Exclusive Period...........11

A.  The Debtor Has Not Made Any Meaningful Progress in its Chapter 11 Case or Progress in
    Negotiating with Creditors to Justify a Further Ninety-Day Extension of the Exclusive
    Periods. .......................................................................................................................13

B.  The Debtor's Case is Neither Large Nor Sufficiently Complex to Warrant a Further Ninety-
    Day Extension of the Exclusive Periods. ...................................................................17

C.  The Debtor Is Seeking A Further Ninety-Day Extension of the Exclusive Periods
    as a Means of Extracting Value and Pressuring the Abax Petitioners to Accept Less Than
    They Are Entitled to on Account of the Senior Notes. ..............................................20

D.  The Legislative History and Congressional Policy Underlying Section 1121 Do Not Support
    a Further Ninety-Day Extension of the Exclusive Periods. .......................................21

E.  A More Limited Extension of the Exclusive Periods is Appropriate to Insure that the Debtor
    Aggressively Pursues Third Party Transactions. ......................................................21

Conclusion…………………………………………………………………………………24

US_ACTIVE:\44420042\7\99980.0219

# Table of Authorities

**Cases**

*In re Adelphia Commc'ns Corp.*, 352 B.R. 578 (Bankr. S.D.N.Y. 2006) ........................................12

*In re All Season Indus., Inc.*, 121 B.R. 1002 (Bankr. W.D. Ind. 1990) ...................11, 15, 16, 18, 22

*In re AMR Corp.*, Ch. 11 Case No. 11–15463 (Bankr. S.D.N.Y. 2012)...........................................19

*In re Borders Group, Inc.*, 460 B.R. 818 (Bankr. S.D.N.Y. 2011)................................11, 18, 19, 22

*In re Century Inv. Fund VII Ltd.*, 96 B.R. 884 (Bankr. E.D. Wisc. 1989)........................................15

*In re Craghead*, 57 B.R. 366 (W.D. Mo. 1985).............................................................................13

*In re Curry Co.*, 148 B.R. 754 (Bankr. S.D.N.Y. 1992)...................................................12, 15, 18, 20

*In re Enron Corp.*, Ch. 11 Case No. 01–16034 (Bankr. S.D.N.Y. 2001) ........................................19

*In re Gagel & Gagel*, 24 B.R. 674 (Bankr. D. Conn. 1982).............................................................18

*In re Gen. Bearing Corp.*, 136 B.R. 361 (Bankr. S.D.N.Y. 1992) ..............................................18, 20

*In re Gen. Growth Props., Inc.*, Ch. 11 Case No. 09–11977 (Bankr. S.D.N.Y. 2009).....................19

*In re Grossinger's Assoc.*, 116 B.R. 34 (Bankr. S.D.N.Y. 1990)................................................20, 22

*In re Lake in the Woods*, 10 B.R. 338 (Bankr. E.D. Mich. 1981)...............................................21, 22

*In re Lehman Brothers Holdings Inc.*, Ch. 11 Case No. 08–13555 (Bankr. S.D.N.Y. 2008)...........19

*In re McLean Indus., Inc.*, 87 B.R. 830 (Bankr. S.D.N.Y. 1987) ....................................................11

*In re Pine Run Trust, Inc.*, 67 B.R. 432 (Bankr. E.D. Pa. 1986) ....................................................13

*In re R.G. Pharmacy, Inc.*, 374 B.R. 484 (Bankr. D. Conn. 2007)................................12, 16, 18, 22

*In re S.W. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448
(Bankr. W.D. Tex. 1987) ......................................................................... 11-13, 15, 17, 18, 20, 22

*In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363 (5th Cir. 1987) ), *aff'd sub nom.*
*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
484 U.S. 365 (1988)........................................................................................................22

*In re Tripodi*, Ch. 11 Case No. 04-30793, 2005 WL 2589185 (Bankr. D. Conn. Oct. 9, 2005) ......16

US_ACTIVE:\44420042\7\99980.0219

*In re WorldCom, Inc.*, Ch. 11 Case No. 02–13533 (Bankr. S.D.N.Y. 2002)....................................19

**Statutes**

11 U.S.C. § 1107(a) ...................................................................................................................10

11 U.S.C. § 1108........................................................................................................................10

**Other Authorities**

Transcript of November 13, 2013 Hearing .............................................................................2, 3, 17

US_ACTIVE:\44420042\7\99980.0219

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

Abax Lotus Ltd. ("***Abax Lotus***") and Abax Nai Xin A Ltd. ("***Abax Nai Xin A***,"
and together with Abax Lotus, the "***Abax Petitioners***") hereby submit this objection (this
"***Objection***") to the motion of China Natural Gas, Inc., as debtor and debtor in possession in the
above-captioned chapter 11 case (the "***Debtor***"), seeking a further extension of its exclusive
periods to file a chapter 11 plan (the "***Exclusive Plan Period***") and to solicit acceptances thereof
(the "***Exclusive Solicitation Period***," and together with the Exclusive Plan Period, the
"***Exclusive Periods***") (ECF No. 116) (the "***Second Exclusivity Motion***[1]"), and respectfully
represent as follows:

## **Preliminary Statement**

1.      The Abax Petitioners are pleased that the Debtor has recently received
some initial indications of interest from third parties that may be interested in pursuing a
strategic transaction to maximize value for creditors and other parties in interest.  However,
given the Debtor's lack of progress thus far in its chapter 11 case, the Abax Petitioners, as the
Debtor's largest creditors, are greatly concerned that the Debtor will fail to take swift and
meaningful action to pursue these interested parties should the Court grant the Debtor's request
for another ninety-day (90) extension of the Exclusive Periods.  Based on the length of time it
has taken to reach this juncture, the Abax Petitioners believe that any further extension of the
Exclusive Periods should be limited, in order to insure that the Debtor and its management do
not waste this opportunity.

---

[1] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Second
Exclusivity Motion.

2.        At the hearing held before the Court on November 13, 2013 (the

"*November 13 Hearing*") on the Debtor's first request for an extension of its Exclusive Periods

(ECF No. 90) (the "*First Exclusivity Motion*"), Judge Peck, recognizing a lack of cooperation

and progress to date on the part of the Debtor, warned Debtor's counsel that there would be

consequences should the Debtor fail to demonstrate substantial progress and an increased level

of cooperation going forward in its chapter 11 case.  Not only did Judge Peck caution the Debtor

that there would likely be no further extensions of exclusivity, but he went further and stated that

he would consider reducing the extension that was previously granted if the Debtor delayed in

filing a joint protocol to govern an agreed approach between the Debtor and the Abax Petitioners

in dealing with potential restructuring transactions (the "*Cooperation Protocol*").   Trans. Nov.

13 Hearing, at 28:17-19.

3.        Specifically, when Judge Peck announced his decision at the November 13

Hearing, he began by stating "I'm going to extend exclusivity for ninety days. *The burden to

get another extension will be almost insurmountable*." *Id.* at 27:25 (emphasis added).  Judge

Peck then reiterated his point, warning Debtor's counsel that "[Y]our clients need to understand

that they're going to be held on a tight leash here and that ninety days is not an introduction into

another ninety days. *This is their last opportunity to get this done or I will open up

exclusivity*." *Id.* at 31:11-15 (emphasis added).

4.        To further emphasize the importance of the Debtor actively engaging with

the Abax Petitioners, the Court cautioned Debtor's counsel that "I expect you guys to work

together.  I expect you guys to treat each other as you would if Abax were running a creditors'

committee and you're running a debtor that needs the cooperation of the creditors' committee to

2

get a plan done on a consensual basis." *Id.* at 29:25-30:4. A copy of the transcript from the

November 13 Hearing is annexed hereto as **Exhibit A**.

5.    As the Debtor's largest creditors, the Abax Petitioners have no intention of

disrupting any sale or marketing process that the Debtor and its management pursue in good

faith. However, to date, the Debtor has not made progress in pursuing these transactions or

advancing its chapter 11 case that would warrant a further ninety-day extension of the Exclusive

Periods. To wit, to the best of the Abax Petitioners' knowledge, the Debtor has not even entered

into a confidentiality agreement with any of the interested parties.

6.    Nearly every issue or event cited by the Debtor in support of the Second

Exclusivity Motion was completed *months* before the Debtor even filed its First Exclusivity

Motion. Court approval of the SEC settlement, identifying and retaining a chief restructuring

officer, the filing of its Schedules and SOFAs, the filing of a motion to establish a claims bare

date – these were the very same accomplishments touted by the Debtor in its First Exclusivity

Motion. *See* First Excl. Mot., at ¶¶10, 17. Moreover, despite statements by the Debtor in its

motion suggesting that it has exchanged debt repayment proposals with its principal creditors,

the Abax Petitioners are not aware of single restructuring proposal having been exchanged by the

Debtor since early November, prior to the November 13 Hearing.

7.    The Debtor has simply not moved with enough purpose or expediency to

warrant a further ninety-day extension. Despite the Court's warning, it took the Debtor until

December 18 – approximately thirty-five (35) days after the November 13 Hearing – to actually

file the Cooperation Protocol. And, although the Cooperation Protocol was designed to, among

other things, set up Working Group calls, those calls have been few and far between. Even more

disappointing to the Abax Petitioners has been the unwillingness of the Debtor's management to

3

discuss anything of substance on those calls until after the retention of Ernst & Young has been

finalized – a process that has yet to be accomplished despite (a) the United States Trustee having

set a deadline of January 7 for the Debtor to retain a financial advisor and (b) the Debtor having

been in chapter 11 *for over a year*.  The Debtor blames its lack of progress, in part, on the recent

Chinese New Year but that cannot explain away the lack of progress that has been made during

the entirety of its ninety-day extension period.

       8.     Given the lack of meaningful progress in what should otherwise be a

manageable and straightforward chapter 11 case, there is little justification for granting the

Debtor a further extension of its Exclusive Periods.  Should the Court determine that an

extension of exclusivity is warranted, a more limited extension of exclusivity, such as 45- or 60-

days, would be more appropriate to insure that the Debtor's management takes advantage of this

limited window of opportunity to pursue interested parties in hopes of achieving a transaction

that maximizes value for the estate and all parties in interest.

<u>**Background**</u>

A.     **General Background and Events Leading to the Commencement of
the Chapter 11 Case**

a.     **Corporate Structure**

       9.     As discussed below, although the Debtor is a Delaware corporation, its

natural gas operations are held by its foreign subsidiary, Xi'an Xilan Natural Gas Company Ltd.

("***Xi'an Xilan***"), which was formed as a variable interest entity, or VIE, in the People's Republic

of China ("***PRC***").  *See Declaration of Adam P. Strochak*, dated March 20, 2013 (ECF No. 20),

Ex. F. at 2.

      10.     PRC law imposes restrictions on direct foreign ownership of certain

business enterprises, particularly in regulated industries, and a VIE structure is often utilized to

4

conform to these restrictions. In particular, when PRC entities seek capital abroad (for example,

by listing on a U.S.-based stock exchange), a foreign entity will be incorporated for purposes of

the listing and the listed foreign entity will form a wholly foreign owned enterprise, or WFOE, in

the PRC. WFOEs, as distinguished from other PRC business entities, are permitted by PRC law

to be wholly owned by foreign entities without the participation of PRC investors. The WFOE

will then enter into contractual arrangements with a VIE that holds the operating assets in the

PRC to ensure that the revenues of the PRC operating assets are paid by the VIE to the WFOE

and may ultimately be distributed to the listed foreign entity. The VIE that holds the operating

assets in the PRC is, in turn, often owned by the management of the listed foreign entity and their

affiliates.

11.    On February 21, 2006, the Debtor formed Shaanxi Xilan Natural Gas

Equipment Co., Ltd. ("**Shaanxi**"), a Chinese limited liability company, as a WFOE. As such,

Shaanxi does not directly invest in regulated businesses in the PRC. Instead, it has two key

contracts with Xi'an Xilan, which directly or indirectly holds the Debtor's operating assets in the

PRC.[2] *Id.* at 5. Pursuant to a consulting services agreement, Shaanxi provides consulting,

human resources, and other services to Xi'an Xilan in exchange for quarterly payments of all of

Xi'an Xilan's revenues. Further, pursuant to an operating agreement, Shaanxi acts as a guarantor

of Xi'an Xilan's obligations to third parties, and as a counter-guarantee Xi'an Xilan has pledged

all its assets to Shaanxi and undertaken not to transfer those assets. The operating agreement

also gives Shaanxi the right to substantially influence Xi'an Xilan's daily operations and

financial affairs, appoint senior executives, and approval all matters requiring shareholder

approval. *Id.* at 6-7. While the Debtor has not publicly disclosed the identity of all owners of

---

[2] Only a portion of the assets used in the Debtor's PRC operations are subject to regulations restricting foreign ownership. Nevertheless, most of these assets are held by Xi'an Xilan, the VIE.

US_ACTIVE:\44420042\7\99980.0219

Xi'an Xilan, the Debtor has filed agreements with the SEC indicating that, as of March 2006, the

Debtor's former Chairman, Qinan Ji, and certain other individuals held a majority of the equity

interests of Xi'an Xilan and agreed not to transfer such interests. Consequently, it appears that

the Debtor's former Chairman is among the individuals that currently control Xi'an Xilan.

### b. The Senior Notes

12.    On January 29, 2008, pursuant to that certain securities purchase

agreement between the Debtor and Abax Lotus dated December 30, 2007 (the "***Purchase***

***Agreement***") and the 5.0% Guaranteed Senior Notes due in 2014 (the "***Senior Notes***") issued

pursuant to that certain indenture dated January 29, 2008 (the "***Indenture***") between the Debtor

and DB Trustees (Hong Kong) Limited, as trustee (the "***Trustee***"), the Debtor sold Senior Notes

to the Abax Petitioners in the principal amount of $20,000,000, and warrants to purchase

2,900,000 shares of the Debtor's common stock (the "***Warrants***"). On March 3, 2008, the

Debtor issued to the Abax Petitioners an additional $20,000,000 in principal amount of Senior

Notes. The Senior Notes are denominated in renminbi ("***RMB***"), the currency of the People's

Republic of China ("***PRC***"), but are payable in U.S. dollars. As of February 8, 2013, the Debtor

owed approximately $40.4 million to the Abax Petitioners on account of the Senior Notes. A

detailed description of the amounts owed by the Debtor to the Abax Petitioners on account of the

Senior Notes and Warrants is set forth in the proofs of claim (Claim Nos. 6-10) (the "***Abax***

***Proofs of Claims***") timely filed by the Abax Petitioners in accordance with the Court's order,

dated November 25, 2013, establishing deadlines for filing proofs of claim and related

procedures (ECF No. 165) (the "***Bar Date Order***"). Copies of the Purchase Agreement and the

Indenture are annexed as exhibits to the Abax Proofs of Claim.

13. The Senior Notes are secured by a pledge of the Debtor's equity interest in the WFOE, Shaanxi, representing 65% of the outstanding equity interests of Shaanxi.[3] This security interest was memorialized in that certain Onshore Share Pledge Agreement (the "**Pledge Agreement**"), dated January 29, 2008, executed between the Debtor and the Trustee.

### c.    The Debtor's Continuing Failure to Service the Senior Notes

14. In August 2009, the Debtor required a waiver from the holders of the Senior Notes due to its failure to have its stock listed on an exchange by the deadline required in the Indenture, as extended by conditional waiver obtained by the Trustee. The Debtor sought and obtained a waiver from each holder of the Senior Notes at that time: Abax Jade, Abax Nai Xin A and Lake Street LP ("**Lake Street**"), an unrelated investment fund.

15. In the fall of 2010, the holders of the Senior Notes and the Debtor negotiated and executed two restructuring agreements to amend the terms and conditions of the Senior Notes and Warrants. On September 7, 2010, each of the then-holders of the Senior Notes executed a Restructuring Agreement with the Debtor (the "**September 2010 Restructuring Agreement**"). The September 2010 Restructuring Agreement (a) provided that the Debtor would pay certain amounts on the Senior Notes on or before October 6, 2010 and October 13, 2010; and (b) amended the Senior Notes and the Indenture to change the stated maturity date from January 30, 2014 to August 30, 2011, with the full and final payment of all interest, principal and premium due on August 30, 2011.

---

[3] Pursuant to Section 4(a) of the Pledge Agreement, the Debtor was required to submit, within ten (10) days of the execution of the Pledge Agreement, all required documents to the Ministry of Commerce of the PRC (the "**MOC**"), whose approval is required to render the Pledge Agreement enforceable. Additionally, within five (5) days of approval by the MOC, the Debtor was required to register the Pledge Agreement and the collateral described therein with the State Administration of Industry and Commerce of the PRC (the "**SAIC**"). The Abax Petitioners do not know whether the Debtor made the required submission and received the approval of the MOC or whether the Debtor registered the Pledge Agreement and the collateral described therein with the SAIC.

US_ACTIVE:\44420042\7\99980.0219

16.    After the Debtor failed to abide by any of the terms of the September 2010 Restructuring Agreement, on November 12, 2010, each of the then-holders of the Senior Notes once again executed a revised Restructuring Agreement with the Debtor (the "***November 2010 Restructuring Agreement***").  The November 2010 Restructuring Agreement (a) provided that the Debtor would pay approximately $18 million on the Senior Notes on or before November 30, 2010; and (b) amended the Senior Notes and the Indenture to change the stated maturity date from January 30, 2014 to August 30, 2011, with the full and final payment of all interest, principal and premium due on August 30, 2011.  Like the September 2010 Restructuring Agreement, the Debtor never abided by any of the terms of the November 2010 Restructuring Agreement and did not make the November 30, 2010 payment.  Copies of the September 2010 Restructuring Agreement and the November 2010 Restructuring Agreement are also attached as exhibits to the Abax Proofs of Claim.

17.    On January 30, 2012, the Debtor failed to timely pay certain obligations under the terms of the Indenture (the "***January 2012 Obligations***") thereby triggering the accrual of default interest and allowing the noteholders to declare an event of default under the Indenture.  The Debtor sought and obtained a waiver, executed March 17, 2012, by all holders of the Senior Notes, waiving the events of default caused by its failure to timely pay the January Obligations and related default interest.

### d.    The Current Undisputed and Unresolved Defaults

18.    The Indenture required the Debtor to make six semi-annual repayments of principal beginning in July 2012 (8.3333% of outstanding principal for the first two repayments, 16.6667% for the next two, and 25% each for the last two).  The Debtor failed to make the repayment due July 30, 2012, and has not paid interest on the Senior Notes since then.

US_ACTIVE:\44420042\7\99980.0219

19.     On August 21, 2012, Abax Global Capital ("**Abax Global**"), as investment manager to the Abax Petitioners, sent the Debtor a formal notice of default (the "**Default Notice**") and demanded that the Debtor make the July 2012 principal and interest payments and remedy the default.  The Debtor did not respond to the Default Notice.

20.     On September 5, 2013, Abax Global provided notice of acceleration of the principal amount of the Senior Notes, together with all accrued and unpaid interest and premium, which was immediately due and payable under the Indenture (the "**Acceleration Notice**").  The Debtor also failed to respond to the Acceleration Notice.

21.     On September 10, 2012, Abax Global provided the Debtor with a final demand for payment (the "**Demand Letter**").  The Demand Letter expressly notified the Debtor that the commencement of an involuntary bankruptcy was one of the remedies the Abax Petitioners might pursue if the company did not remedy the default.  The Debtor did not put forward any plan to remedy the defaults or repay the Senior Notes in response to the Demand Letter.[4]

22.     For several months, the Abax Petitioners sought a consensual resolution of the defaults, but the Debtor rejected or failed to act on Abax Global's proposals for repayment of the Senior Notes.  The Debtor's board of directors met in late-January 2013, before the last Chinese New Year holiday, to discuss the settlement of the pending SEC regulatory action against the company.  The Abax Petitioners made a final attempt at a negotiated resolution of the outstanding default around the same time.  Thereafter, when the Debtor failed to make any

---

[4] Copies of the Default Notice, the Acceleration Notice and the Demand Letter are annexed as exhibits to the Declaration of Xiang Dong Yang In Support of Opposition of the Abax Petitioners to the Debtor's Motion to Dismiss dated June 6, 2013 (ECF No. 31).

payment on the Senior Notes, the Abax Petitioners, together with Lake Street, filed the involuntary petition.

### B.    Procedural Background

23.    On February 8, 2013 (the "***Petition Date***"), the Abax Petitioners, together with Lake Street, filed an involuntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") against the Debtor.

24.    On June 26, 2013, the Debtor consented to entry of an order for relief, which the Court entered on July 9, 2013 (ECF No. 38) (the "***Order for Relief***").  The Debtor is operating its business and managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Abax Petitioners have refrained thus far from requesting the appointment of a trustee or examiner.

25.    Nearly four months after the Debtor consented to the entry of the Order for Relief and nearly eight months after the Petition Date, the Debtors sought Court approval for the retention of Schiff Hardin LLP as its counsel and J. Gregg Pritchard as its chief restructuring officer. The Abax Petitioners filed a limited objection to those retentions (ECF No. 80) raising concerns that the Debtor's professionals would be unable to effectively act as fiduciaries in light of the fact that the Debtor's management was running a profitable business in China but ignoring its obligations to creditors and other constituents of the Debtor.  The Court approved the Debtor's proposed retentions on October 23, 2013.[5]

26.    On October 30, 2013, the Debtor filed its First Exclusivity Motion seeking a ninety-day extension of the Exclusive Periods.  In response, the Abax Petitioners filed an

---

[5] *See* Order Authorizing Employment and Retention of Schiff Hardin LLP as Counsel for the Debtor *Nunc Pro Tunc* as of July 9, 2013, dated October 23, 2013 (ECF No. 86) and Order Authorizing Employment of Warren Street Global, Inc. and Designation of J. Gregg Pritchard as Chief Restructuring Officer of the Debtor *Nunc Pro Tunc* as of August 28, 2013, dated October 23, 2013 (ECF No. 87).

US_ACTIVE:\44420042\7\99980.0219

objection to that motion arguing that, in light of the Debtor's lack of progress in the chapter 11

case, the circumstances did not warrant an extension of the Exclusive Periods (ECF No. 93).  As

set forth above, at the November 13 Hearing, the Court granted the First Exclusivity Motion but

cautioned the Debtor that, unless significant signs of progress and cooperation on the part of the

Debtor were forthcoming, this would be the Debtor's only extension.  On November 20, 2013,

the Court entered an order (the "*First Exclusivity Extension Order*") extending the Exclusive

Plan Period and Exclusive Solicitation Period for ninety days to February 4 and April 27, 2014,

respectively (ECF No. 102).

      27.     On February 3, 2014, the Debtor filed the Second Exclusivity Motion

seeking a second ninety-day extension of the Exclusive Periods to May 5 and July 7, 2014,

respectively.

<b>There Is No Basis for a Further Ninety-Day<br><u>Extension of the Debtor's Exclusive Periods</u></b>

      28.     A chapter 11 debtor has the exclusive right to file a plan and solicit

acceptances thereof for 120 days and 180 days, respectively.  *See* 11 U.S.C. §§ 1121(b), (c).  A

court's decision to extend exclusivity is a "serious matter" and "extensions are not granted

routinely or cavalierly."  *In re Borders Group, Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011);

*see also In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re All Season

Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. W.D. Ind. 1990).

      29.     The debtor may extend its exclusive periods only upon a showing of

"cause."  11 U.S.C. § 1121(d); *see also In re S.W. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450

(Bankr. W.D. Tex. 1987) ("A court considering a motion to extend the 120-day period, during

which the debtor has an exclusive right to file a plan of reorganization, should not routinely grant

an extension.  It should act only where cause is shown.").  Section 1121(d) of the Bankruptcy

11

Code does not define "cause."  Accordingly, courts have developed a multi-factor balancing test to aid in determining whether "cause" exists to extend the debtor's exclusive periods.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (enumerating the factors of the test); *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (adopting the same multi-factor test).  The factors courts consider are the following:

> (a)   The size and complexity of the debtor's case;
>
> (b)   the existence of good faith progress towards developing a plan of reorganization;
>
> (c)   a finding that the debtor is not seeking to extend exclusivity to pressure creditors to accede to the debtor's reorganization demands;
>
> (d)   the existence of an unresolved contingency;
>
> (e)   the fact that the debtor is paying its bills as they come due;
>
> (f)   the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
>
> (g)   whether the debtor has demonstrated reasonable prospects for filing a viable plan;
>
> (h)   whether the debtor has made progress in negotiations with its creditors; and
>
> (i)   the amount of time which has elapsed in the case.

*Id*.

30.    Further, the burden of extending exclusive periods rests with the debtor, which "must make a clear showing of 'cause' to support an extension."  *Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992); *see also S.W. Oil Co.*, 84 B.R. at 450 ("A debtor seeking to extend the 120-day exclusivity period bears the burden of proof and must show that cause exists for granting an extension.").

12

31.     The Debtor here has made no showing to warrant a further ninety-day extension of the Exclusive Periods.

**A.     The Debtor Has Not Made Any Meaningful Progress in its Chapter 11 Case or Progress in Negotiating with Creditors to <u>Justify a Further Ninety-Day Extension of the Exclusive Periods</u>**

32.     The Debtor and its professionals have not made meaningful progress in this chapter 11 case since the First Exclusivity Extension Order.  *See* Sec. Excl. Mot., at ¶ 20. The Debtor overstates the progress it has made in this case and the matters it cites as a basis for requesting an extension (settling the SEC Action, filing its Schedules and SOFAs, and retaining a chief restructuring officer) are minimal administrative tasks that were accomplished well before the Debtor filed its First Exclusivity Motion.

33.     Courts have previously held that it is the Debtor's burden to demonstrate some promise of probable success in formulating a plan of reorganization to warrant an extension of the Exclusive Periods.  *See In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) ("Some promise of probable success in formulating a plan of reorganization, if the debtor is provided additional time, has been recognized as an element of cause for an extension of the exclusivity period.").  A reasonable probability "cannot be grounded solely on speculation."  *In re Craghead*, 57 B.R. 366, 370 (W.D. Mo. 1985); *see also S.W. Oil Co.*, 84 B.R. at 451 (noting that in virtually every case where an extension has been granted, the debtor has shown that "substantial progress has been made in formulating a plan during the first 120 days").

34.     The Debtor has been in chapter 11 for over a year now, with very little to show for it.  The settlement of the SEC Action was agreed in principle before commencement of the chapter 11 case in early 2013, finalized in early June prior to the entry of the Order for Relief, and approved by this Court at a hearing in early August.  Thus, the entire matter was fully

13

resolved at least 90 days before the expiration of the initial Exclusive Period.  Since that time,

the Debtor has retained counsel, employed a chief restructuring officer, filed its limited

Schedules and SOFAs (after three extensions), established a claims bar date and filed a retention

application for Ernst & Young.  These are straightforward administrative tasks and do not

explain why the Debtor has been unable to make significant progress on a chapter 11 plan.  Even

more discouraging is that the Debtor's management appears to be using the fact that it has

delayed in retaining a financial advisor for over a year as a justification both for refusing to

engage in serious and substantive restructuring discussions and for extending its Exclusive

Periods.

35.     The Abax Petitioners are concerned that the Debtor is seeking to delay this

case even further and maintain the exclusive right to propose a plan for another three months so

it can use that time to bolster its litigation position and develop expert testimony in support of a

low valuation that will minimize recoveries for creditors of the Debtor and maximize the value

retained by management and owners of the VIE operating companies in China.

36.     The Debtor has not made any meaningful proposal to the Abax Petitioners

on a workable construct for a chapter 11 plan of reorganization and, given the history of delay

that has been employed by the Debtor's management, there is little reason to believe that a viable

proposal on a consensual plan of reorganization is forthcoming.

37.     Nor has the Debtor shared any meaningful financial information with the

Abax Petitioners.  Since the parties entered into the Cooperation Protocol, the only piece of

financial information that the Debtor has shared with the Abax Petitioners is a three page six-

month cash flow projection.  On January 14, 2014, the Abax Petitioners sent the Debtor a

number of due diligence items and follow-up questions with respect to those cash flow

14

projections.  However, despite numerous requests, the Debtor has still not replied to a single one

of those diligence items.  This hardly seems like the level of participation and cooperation that a

debtor would bestow on a creditor committee as the Court instructed at the November 13

Hearing.

38.    Courts previously have declined to extend exclusive periods where a

debtor has failed to make any meaningful progress towards promulgating a chapter 11 plan.  *See,*

*e.g., All Seasons Indus., Inc.*, 121 B.R. at 1005-06 (declining to extend debtor's exclusive periods

where debtor, after being in chapter 11 for nearly seven months, had failed to file a chapter 11

plan and negotiations with its primary creditor constituencies had broken down); *Curry Corp.*,

148 B.R. at 755-56 (declining to extend exclusivity periods where there had been no persuasive

testimony as to why a plan of reorganization plan could not have been promulgated during the

120-day exclusive period and debtor had not demonstrated that a plan of reorganization would be

forthcoming); *S.W. Oil Co.*, 84 B.R. at 451-53 (denying request for an extension of exclusive

periods where, after nearly eight months in chapter 11, the debtor had taken no steps to formulate

a plan of reorganization); *In re Century Inv. Fund VII Ltd.*, 96 B.R. 884, 892 (Bankr. E.D. Wisc.

1989) (declining to grant extension of debtor's exclusive periods where, at the time of the

hearing on the motion, the debtor had no outline of a plan proposal and, two months after the

hearing, had still yet to file a chapter 11 plan).

39.    Furthermore, throughout the course of their dealings with the Abax

Petitioners, the Debtor's management has routinely ignored its responsibilities to creditors and

other constituents in favor of its on-shore Chinese affiliates and there is no reason to believe that

this course of conduct will change.  Courts have previously held that a loss in confidence or faith

in the debtor's management should be considered in determining whether to extend a debtor's

US_ACTIVE:\44420042\7\99980.0219

exclusive period.  For example, in *In re All Seasons Indus., Inc.*, 121 B.R. 1002 (Bankr. N.D.

Ind. 1990), a bankruptcy court found that one of the reasons that the debtor and its major secured

creditors had been unable to find common ground upon which to build a consensual chapter 11

plan was that the creditors had lost faith in the capability and perhaps the integrity of the debtor's

management.  In declining to extend the debtor's exclusive periods, the court stated:

> While the court makes no finding as to whether or not this loss of
> faith is justified (indeed the nature of the hearing and the evidence
> presented do not permit the court to determine this question) for
> purposes of the present motion, it is only necessary to realize that a
> loss of confidence exists.  This is a factor the court should and
> must consider in its determination.

*Id.* at 1006; *see also R.G. Pharmacy. Inc.*, 374 B.R. at 488 (declining to grant additional

extension of exclusive periods where there had been a breakdown in negotiations between the

debtor and the objecting creditors and the debtor had not shown that additional extension sought

was likely to significantly improve the progress of the case); *In re Tripodi*, Ch. 11 Case No. 04-

30793, 2005 WL 2589185, *2 (Bankr. D. Conn. Oct. 9, 2005) (declining to grant additional

extension of exclusive periods where debtor had made progress negotiating with creditors and, in

light of, among other things, the positions and continuing acrimony between the debtors and their

principal creditors, a consensual plan was nowhere on the horizon).

40.    The Debtor has now been under the protection of chapter 11 for over a

year and has made little to no progress towards promulgating a viable chapter 11 plan.  In light,

however, of the recent steps taken by the Debtor, such as the engagement of Ernst & Young and

the beginning of discussions with third party suitors, the Abax Petitioners believe that a more

limited extension of the Exclusive Periods may be warranted.  Accordingly, the Debtor's request

for an additional ninety-day extension of the Exclusive Periods should be denied.

**B.    The Debtor's Case is Neither Large Nor Sufficiently Complex to
Warrant a Further Ninety-Day Extension of the Exclusive Periods**

41.    The Debtor asserts in its Motion that a further extension of the Exclusive

Periods is justified due to the "cross-border and complex nature" of this case.  *See* Sec. Excl.

Mot., at ¶ 24.  While the existence of operations in China makes this matter somewhat out-of-the

ordinary, at most it adds a modicum of complexity to an otherwise modest-sized and

uncomplicated chapter 11 case.  Indeed, at the November 13 Hearing the Court agreed with this

observation stating "This is not rocket science, as the saying goes.  This may be an exotic

company, Chinese based, and you may have a hostile creditor group, but welcome to bankruptcy.

It just so happens that happens in most cases."  Trans. Nov. 13 Hearing, at 30:4-7.

42.    Overall, this case is not complex in comparison to most bankruptcies of

large-, mid-, or even small-cap debtors.  It is the Debtor's own failure to seek solutions to its

need to refinance, recapitalize or sell its assets that is creating complexity and delay and this

factor, therefore, does not warrant and extension of the Exclusive Periods.

43.    Courts have previously stated that it is "clear from the legislative history

that Congress intended an extension to be granted only in unusual circumstances, involving very

large and complex cases."  *See In re S.W. Oil Co.*, 84 B.R. at 452.  This case, however, involves

a single debtor holding company with no employees or operations.  The Abax Petitioners and the

one other noteholder are the Debtor's only major creditor constituency and the Debtor's own

Schedules identify a grand total of twenty creditors and zero executory contract or lease

counterparties.  *See* Schedules, Ex. E-G.  Moreover, the central issue to this chapter 11 case – the

Debtor's failure to honor its obligations on its Senior Notes – is also not complex or in dispute.

44.    Courts have declined to extend the exclusive periods for debtors in similar

cases that were determined to be routine or of insufficient size or complexity where the debtor

17

had few creditors and few or no employees or operations.  *See, e.g., R.G. Pharmacy, Inc.*, 374 B.R. at 487-88 (debtor's bankruptcy case was not sufficiently large or complex to justify an extension of the debtor's exclusivity periods where debtor employed 44 people and had few major creditors – the objecting parties and the government – and only one equity holder); *Curry Co.*, 148 B.R. at 755 (holding that case was not complex for purposes of extending exclusivity where financial information on the debtor's operations was readily available and case had not produced numerous or complex proceedings); *Gen. Bearing Corp.*, 136 B.R. at 367 (case with only two secured creditors was not sufficiently complex to justify extension of exclusivity); *All Seasons Indus.*, 121 B.R. at 1006 (declining to grant extension of debtor's exclusive periods where court determined that the number of creditors and claims against the debtor were not extraordinary, case was neither large nor unique, and there was nothing unusual about the nature of the debtor's business or financial problems); *S.W. Oil Co.*, 84 B.R. at 452 (holding that case where objecting creditors were debtors' only primary creditors was neither unusually large nor unusually complex and, therefore, extension of debtors' exclusive periods was not warranted); *In re Gagel & Gagel*, 24 B.R. 674, 675 (Bankr. D. Conn. 1982) (declining to grant extension of debtor's exclusive periods where there were only two creditors and extension of exclusive period would be "fruitless.").

45.    This case stands in stark contrast to *In re Borders Group, Inc.*, 460 B.R. 818 (Bankr. S.D.N.Y. 2011), a chapter 11 case that this Court found to be sufficiently large and complex to warrant an extension of the debtors' exclusive periods.  In a decision holding that the debtors in that case had established good cause for an extension of the exclusivity periods, this Court took note of the significant evidence set forth by the debtors regarding the size and complexity of the cases.  In addition to the nearly 11,000 employees, the Court also noted that

18

there had been nearly 1,000 docket entries as of the time of the debtors' extension request and that numerous motions and stipulations had been heard or presented – all of which, collectively, illustrated the complexities of the debtors' cases and warranted the extension of exclusivity. *Id.* at 823-24.

46.    Unlike the *Borders* case, this Debtor's case is small and straightforward. As set forth above, this case involves but a single debtor with no employees or operations and only one major creditor constituency.  Furthermore, there has been little activity to date.  The Debtor has not had the need for any typical "first day" relief and, other than the approval of the SEC settlement, three professional retention applications, and a routine motion to establish a bar date, has not filed any requests for relief from the Court except for motions to extend various procedural deadlines.  In fact, as of the date of this Objection, there have been fewer than 120 total filings in the Debtor's case, many of which were filed by the Abax Petitioners – a far cry from the high level of activity and the 1,000+ docket entries noted by this Court in *Borders*.

47.    By any measure, the size of this case pales in comparison to chapter 11 cases routinely filed in the Southern District of New York where extensions of exclusivity have been granted due to size and complexity.  *See, e.g., In re Lehman Brothers Holdings Inc.*, Ch. 11 Case No. 08–13555 (Bankr. S.D.N.Y. 2008); *In re WorldCom, Inc.*, Ch. 11 Case No. 02–13533 (Bankr. S.D.N.Y. 2002); *In re Enron Corp.*, Ch. 11 Case No. 01–16034 (Bankr. S.D.N.Y. 2001); *In re Gen. Growth Props., Inc.*, Ch. 11 Case No. 09–11977 (Bankr. S.D.N.Y. 2009); *In re BGI Inc., f/k/a Borders Group Inc.*, Ch. 11 Case No. 11-10614 (MG) (Bankr. S.D.N.Y. 2011); *In re AMR Corp.*, Ch. 11 Case No. 11–15463 (Bankr. S.D.N.Y. 2012).

48.    Neither the size nor complexity of this chapter 11 case warrants a further ninety-day extension of the Exclusive Periods.

**C.    The Debtor Is Seeking A Further Ninety-Day Extension of**
**the Exclusive Periods as a Means of Extracting Value and**
**Pressuring the Abax Petitioners to Accept Less Than They**
**Are Entitled to on Account of the Senior Notes**

49.    Although the Debtor asserts in its motion that its requested extension is

necessary to attract and identify interested parties willing to invest in the Debtor, the Debtor

offers no evidence that it will use an additional three months of exclusivity to do anything other

than continue its policy of disengagement and delay in hopes that, by preserving the status quo,

the Abax Petitioners will eventually succumb and accept less value than they are entitled to for

their Senior Notes and Warrants.  This tactic of exerting undue pressure to force the Abax

Petitioners to accept an unreasonable settlement is improper and, therefore, a further ninety-day

extension of the Exclusive Periods should not be granted.

50.    Courts have previously held that an extension of exclusive periods should

not be employed as a "tactical device to put pressure on creditors to yield to a plan that they

might consider unsatisfactory."  *Curry Co.*, 148 B.R. at 754.  As one bankruptcy court stated:

> The Court should also determine or attempt to determine the
> debtor's motives in requesting an extension under § 1221(d) even
> where the debtor sustains its burden of proof.  A debtor may not
> employ an extension as a tactical device to put pressure on parties
> in interest to yield to a plan they consider unsatisfactory…Debtors
> may not use an extension to drag out the reorganization and
> pressure the creditor for concession in the status of its rights.

*S.W. Oil Co.,* 84 B.R. at 453; *see also In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr.

S.D.N.Y. 1990) ("[R]equests for extensions of the exclusivity periods should not be granted

routinely or as a matter of course without proof as to probable success in formulating a plan of

reorganization and evidence that the debtor did not seek the additional extension in order to

pressure the creditors to accede to the debtor's reorganization demands."); *Gen. Bearing Corp.*,

136 B.R. at 36 ("In considering a motion to extend exclusivity, the court must be mindful that the

20

debtor should not be permitted to use the extension as a way to pressure the secured claimants to accede to the debtor's proposals.").  Furthermore, extensions are "impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute."  *In re Lake in the Woods*, 10 B.R. 338, 345-46 (Bankr. E.D. Mich. 1981).

51.    The Abax Petitioners are concerned that the Debtor's management will continue to employ a tactic of delay and indifference as a means of forcing the Abax Petitioners to accept less than they are entitled to on account of their Senior Notes.  Furthermore, the longer the Debtor is permitted to maintain the status quo and prevent the chapter 11 case from progressing, the greater the risk to creditors that revenues being generated by the Debtor's operations in China (i.e. the VIE) will be improperly withdrawn from the company – revenues that the Debtor's management have wrongfully withheld from the WFOE that could have been used to pay down the Debtor's obligations.

52.    The Debtor should not be rewarded for its unreasonable delay and, accordingly, the Debtor should not be granted a further ninety-day extension of the Exclusive Periods.  In contrast, a brief extension of the Exclusive Periods will provide the Debtor with the opportunity to demonstrate to the Court and other parties in interest that meaningful progress is possible.

> **D.    The Legislative History and Congressional Policy Underlying Section 1121 Do Not Support a Further Ninety-Day Extension of the Exclusive Periods**

53.    The legislative history and Congressional policy underlying section 1121 do not support a further ninety-day extension of the Debtor's Exclusive Periods as the Debtor and this chapter 11 case would not be harmed by a termination of exclusivity.

US_ACTIVE:\44420042\7\99980.0219

54.    Courts have previously stated that "[i]n passing upon a request for a change in the debtor's exclusivity period, the court needs to consider more than just the articulated cause presented to it.  It must also consider the history and purpose of § 1121 and the competing interests which Congress sought to balance when it enacted these time tables." *All Seasons Indus.*, 121 B.R. at 1004; *S.W. Oil Co.*, 84 B.R. at 450 ("Courts considering the question of whether to extend the exclusivity period have not favored extension of the 120-day period, a position supported by the legislative history.").  Courts have often cited to the legislative history of section 1121, which indicates that the Bankruptcy Code imposed limitations on a debtor's exclusive right to file a chapter 11 plan in order to "balance the bargaining positions of debtors and creditors in negotiating the terms of a reorganization." *R.G. Pharmacy, Inc.*, 374 B.R. at 488; *Grossinger's Assoc.*, 116 B.R. at 36 (The goal reflected in section 1121 in allowing other interested parties to file a plan of reorganization after the expiration of the debtor's exclusivity is "predicated on the theory that there should be a relative balance of negotiating strength between the debtors and creditors during the reorganization process."); *Lake in the Woods*, 10 B.R. at 343 ("The desire to allow other interested parties to file a plan was grounded in the philosophy that there should be a relative balance of negotiating strength between debtors and creditors during reorganization of an enterprise.").

55.    Furthermore, "Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988); *In re Borders Group, Inc.*, 121 B.R. at 1004 ("The bankruptcy courts must avoid reinstituting the

22

imbalance between the debtor and its creditors that characterized proceedings under the old

Chapter XI.").

56.     Consistent with the legislative history and Congressional policy

underlying section 1121 of the Bankruptcy Code, declining to extend the Debtor's Exclusive

Periods by ninety days will not result in any harm to the Debtor; rather, it will simply restore

balance to the Debtor's chapter 11 case, placing creditors on equal footing with the Debtor.  The

Debtor will still be able to pursue a third party transaction and the Abax Petitioners have no

intention at this time of disrupting this process. Moreover, the Debtor will still be permitted to

file its own chapter 11 plan and have the opportunity to demonstrate its good faith in working

with its creditors and other parties in interest to maximize value.  Furthermore, a termination of

exclusivity after a brief extension will not result in a default in any DIP financing or otherwise

adversely affect the Debtor's financing or liquidity.

**E.     A More Limited Extension of the Exclusive
Periods is Appropriate to Insure that the Debtor
Aggressively Pursues Third Party Transactions**

57.     As set forth above, the Abax Petitioners do not believe that the Debtor has

demonstrated sufficient progress to warrant a further ninety-day extension of the Exclusive

Periods.  However, the Abax Petitioners are pleased that the Debtor has received some recent

indications of interest and the Abax Petitioners are willing to give Ernst & Young and the

Debtor's management a chance to demonstrate that they are serious about pursuing a transaction

that maximizes value for the estate and its creditors.  The concern, however, is that should the

Court grant the Debtor's requested extension, ninety days will pass without the Debtor pursuing

these transactions, and the parties will have wasted even more time putting creditor recoveries at

even further risk.

58.     Based on the Debtor's lack of progress thus far, it is imperative that the Debtor and its management be kept on a tight schedule to insure that they do not waste this opportunity.  Accordingly, the Abax Petitioners believe that a limited extension of exclusivity, such as 45- or 60-days, would be more appropriate to insure that the Debtor's management actively engages interested parties in hopes of achieving a transaction that maximizes value for the estate and all parties in interest.

## **Conclusion**

59.     For the reasons set forth above, the Abax Petitioners respectfully request that the Court deny the Second Exclusivity Motion and, in the alternative, grant a more limited extension of the Exclusive Periods as set forth herein.

Dated: February 18, 2014
          New York, New York

/s/ Jacqueline Marcus_____
Jacqueline Marcus
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Petitioners Abax Lotus Ltd.*
*and Abax Nai Xin Ltd.*

**EXHIBIT A**

**NOVEMBER 13 HEARING TRANSCRIPT**

**In Re:**

*CHINA NATURAL GAS, INC.*

*Case No. 13-10419-jmp*

---

*November 13, 2013*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 13-10419-jmp

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    CHINA NATURAL GAS, INC.,

9

10              Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 13, 2013

19              10:42 AM

20

21    B E F O R E:

22    HON. JAMES M. PECK

23    U.S. BANKRUPTCY JUDGE

24

25

1

2  Application Filed by Debtor for Entry of Order Establishing

3  Deadlines and Procedures for Filing Proofs of Claim and

4  Approving Form and Manner of Notice Thereof

5

6  Motion Filed by Debtor and Debtor-in-Possession for Entry of an

7  Order Extending its Exclusive Periods to File a Chapter 11 Plan

8  and Solicit Acceptances Thereof

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Esther Accardi

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2   A P P E A R A N C E S :

3   SCHIFF HARDIN LLP

4       Attorneys for Debtor

5       666 Fifth Avenue

6       17th Floor

7       New York, NY 10103

8

9   BY:   LOUIS T. DELUCIA, ESQ.

10      ALYSON FIEDLER, ESQ.

11

12

13   WEIL, GOTSHAL & MANGES LLP

14      Attorneys for Abax Lotus LTD and Abax Nai Xin Ltd.

15      1300 Eye Street NW

16      Suite 900

17      Washington, DC 20005

18

19   BY:   ADAM STROCHAK, ESQ.

20

21

22

23

24

25

1

2  WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Abax Lotus LTD and Abax Nai Xin

4          767 Fifth Avenue

5          New York, New York 10153

6

7  BY:   MATTHEW P. GOREN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2              THE COURT:  China Natural Gas.

3              MR. DELUCIA:  Good afternoon, Your Honor.  Louis

4    DeLucia of Schiff Hardin for debtor, China Natural Gas.  And

5    with me, Your Honor, is the CRO, Mr. Greg Pritchard (ph.).

6              Today, Your Honor, we have two matters pending, which

7    the Court has before it.

8              One is an uncontested bar date motion seeking entry of

9    an order setting a bar date of --

10             THE COURT:  Do you wish to enter your appearance; is

11   that why you're standing?

12             MR. DELUCIA:  Oh, I apologize.

13             MR. STROCHAK:  Yeah, I would like to -- an appearance,

14   Your Honor.

15             MR. DELUCIA:  I apologize, Your Honor.

16             MR. STROCHAK:  Thank you, Your Honor.  Adam Strochak

17   and Matthew Goren, Weil, Gotshal & Manges for the Abax

18   creditors.

19             THE COURT:  Okay.

20             MR. STROCHAK:  Thank you.

21             MR. DELUCIA:  Thank you, Your Honor, I apologize.

22             So January 6th is the requested extension -- or

23   requested date set for the bar, date for the filing of proof of

24   claims.  There's been no opposition.  We have submitted a form

25   of proof of claim.  We propose publication in both the USA

1  Today and Wall Street Journal publications, twenty-eight days

2  prior to the bar date, which is a proposed January 6th date.

3           There's been no opposition, Your Honor; therefore, on

4  that motion, if the Court has any questions, we would ask that

5  it be entered.

6           THE COURT:  No questions; it's approved.

7           MR. DELUCIA:  Thank you, Your Honor.

8           The second and perhaps more substantive motion is a

9  request for an extension of the debtor's exclusive period

10  within which to file a plan and solicit acceptances.

11          This is the debtor's first application in accordance

12  with Section 1121 of the Bankruptcy Code.  The only objector

13  and response that we received of any kind is from Abax, the

14  Abax entities, which are two entities controlled by Don Yang, a

15  former director of the debtors.

16          We -- the debtor is seeking a ninety-day extension

17  through and until February 4th, 2014 to file a plan and to

18  solicit acceptances until April 7th, 2014.  That application is

19  supported, as Your Honor is aware, by declaration of Greg

20  Pritchard.  And there are exhibits affixed thereto that Your

21  Honor yesterday graciously granted the submission under seal of

22  those documents.  In accordance with the confidentiality

23  agreement that we have with Abax and the Abax partners

24  entities, we have shared those exhibits with the Abax entities

25  and they now have them, some of those exhibits -- actually one

1   of which they were aware of even before they were filed, Your

2   Honor, pursuant to the agreement.

3           As the declaration demonstrates, and as the

4   application demonstrates, the debtor has not sat idly by doing

5   nothing, using time to exert leverage on the Abax entities.  In

6   fact, this debtor has been working with Mr. Pritchard, as well

7   as the representatives in China, to formulate a plan that would

8   be a basis that would be acceptable and perhaps one hundred

9   percent compliant with 1129 as soon as possible.

10          In order to do that, Your Honor, it has been candidly

11  an effort of educating principally executives and officers of a

12  PRC-controlled company that the laws of the United States, the

13  process of the United States, the laws governing bankruptcy

14  restructuring, and that process has taken some time.  But we

15  have made substantial progress.

16          To do so, Your Honor, we have made offers -- not one,

17  but two, at least, written offers to Abax, one of which was an

18  actual term sheet with terms by which we could, perhaps, obtain

19  their consent for a consensual restructuring by Abax.  But that

20  offer has not been accepted, and we have sought from them their

21  support for a plan; it has not been forthcoming.

22          However, we do believe that based upon the progress

23  we've made with this -- with the debtor, with Abax, that with

24  an additional period of time we should be able to cross that

25  hurdle and get to a confirmable plan within this ninety-day

CHINA NATURAL GAS, INC.                                        8

1  period.

2          Let me briefly state what perhaps is unique to this

3  case that has caused an extension request.  One is that it was

4  commenced as an involuntary, and it has taken some time for the

5  professionals who were not pre-petition on board consulting

6  with the debtor on restructuring to do so post-involuntary

7  filing.

8          Thereafter, Your Honor, the debtor has also had to

9  deal with -- during that gap period -- the SEC litigation which

10  it did settle in the gap period, and also has, in fact, teed up

11  immediately after the order for relief was entered and sought

12  the approval of that settlement.

13          There are two pending litigations by class action as

14  well as a derivative action in Delaware, both referenced in the

15  declaration.  Shearman & Sterling have been working on

16  resolving those litigations.  Those litigations include claims

17  against the officers and directors, and it is the intent to try

18  to bring those matters into resolution within a plan as well.

19  That has been discussed by myself, personally, with Shearman &

20  Sterling as well as with the insurers directly -- counsel to

21  the insurers directly.

22          That leaves us with really an effort to structure a

23  simple plan that would resolve, and we provided the Court

24  with -- under seal -- a proposed plan that would be in

25  generality a structure that we have obtained approval from the

1    company's principals in China that would be supported by them.

2    And that plan process, if we take it and refine it, try to

3    bring Abax into the fold, get us to a confirmation date, you're

4    looking at a very tight period for this ninety-day period.

5           I did some quick math; if you look at this ninety-day

6    period, it's November 13th, we have a very limited amount of

7    time of November left.  We have a January 6th bar date, now

8    that that has been entered.  It leaves us very little time from

9    January 6th to the extended period of February 4th we're asking

10   for to assess the true world of creditors that exist, based

11   upon those claims that were filed.  And we have two -- at least

12   two, and if not more, intervening holidays, the major holidays

13   as well as the New Years.  And these reflect some delays as

14   well.  So if you really look at it, we probably have less than

15   sixty days of working time to get this plan resolved despite

16   the ninety-day extension.  So with that, Your Honor, I do

17   believe progress has been made.

18          You have heard from -- I will just address quickly the

19   only objection.  We have no objection from the securities

20   plaintiffs, nothing from the U.S. Trustee, nothing from any

21   other creditor, and there are other creditors with more than a

22   million dollars each in claims against this estate.  So we have

23   no other objection.

24          That Abax objection, Your Honor, is -- I consider it

25   pretty much as expected.  You're taking too long to get to a

1    plan, you're being -- delaying the process in order to extract

2    something from us, all of which, as Your Honor can see, based

3    upon what we've proposed, based upon an offer that the company

4    has received and tomorrow morning at 9 a.m.  I have a call with

5    those parties in China to discuss, is not delaying the process.

6    The debtor is affirmatively looking at these options as a way

7    that may, in fact, give the maximum possible amount under the

8    Bankruptcy Code a creditor may seek.  And here, Your Honor,

9    there is very little this debtor could do more than to act in

10   good faith, pursue the course it's on and seek a confirmation

11   within the next ninety days.

12           THE COURT:  Okay.  Let me ask you a question.  I don't

13   mean to mischaracterize the Abax objection, and if I do,

14   counsel will correct me, but it's basically it's taking too

15   long, we're impatient and the extension of exclusivity is going

16   to be used to our detriment.

17           MR. DELUCIA:  Right.

18           THE COURT:  One question that I have, without going to

19   the substance of negotiations that have occurred to date

20   relates to what I understood to have been a proposed meeting in

21   Hong Kong --

22           MR. DELUCIA:  Yeah.

23           THE COURT:  -- sometime between the last time we were

24   together and today, in which parties were supposed to be

25   talking about settlement and compromise of these issues.  Did

1   that meeting take place?

2          MR. DELUCIA:  No.  What happened was we did exchange

3   offers, offers that included actual concrete numbers, offers of

4   participation in equity upon emergence with Abax, but because

5   there wasn't any counteroffer that suggested a willingness to

6   compromise in any way, there was no sense that there would be

7   progress of the expense and time to meet in Hong Kong to make

8   that happen.

9          In addition, Your Honor, we have been hoping -- and

10  Your Honor will see within the plan -- that there was an effort

11  to obtain additional financial advisors in the United States to

12  facilitate that process, including the process that's

13  envisioned by the plan.  I would elaborate but we're on the

14  open record.  That process and those professionals we've

15  discussed with Abax, we want them on board to facilitate that

16  process, and without them on board, I think it would be less

17  productive.  We want them on board at a meeting with Abax if

18  that can occur.  And we're more than anxious to have that

19  happen within the next ninety days.

20         What we get back from Abax -- and Abax is here; they

21  can defend themselves -- is that's just not good enough, we

22  don't understand why you don't just pay us in full, every

23  single time.  And all -- we understand that.

24         Now, if Your Honor has had the opportunity, I know

25  you've been busy, to look at what we filed yesterday, Your

1  Honor will see that if what they want is what they want, then

2  that is the way to get it.  And if there's no other way to get

3  them what they want, except perhaps to a plan that we're

4  proposing, it's the only way to bring the constituencies

5  together.  We've done what we can with that.

6       But we're not -- we're going to continue.  The call

7  that we have tomorrow morning with this interested party is one

8  that we've advised them last week, Abax, that we would include

9  them in the process.  We are having our first phone calls with

10 them tomorrow that are substantive phone calls.  Thereafter,

11 Abax will be folded into that process to participate in

12 understanding what others may be interested in doing with this

13 debtor.

14       THE COURT:  Okay.

15       MR. DELUCIA:  Thank you, Your Honor.

16       MR. STROCHAK:  Good morning, Your Honor.  Adam

17 Strochak, Weil, Gotshal & Manges, for Abax.

18       Let me start with a couple of things.  First of all,

19 Abax holds something like ninety-five percent of the debt in

20 this case.  So it shouldn't come as a huge surprise to anyone

21 that we're here arguing our position, because we have, by far,

22 the most at stake in this matter.

23       What you really have before Your Honor is a

24 retroactive motion to reinstate exclusivity.  By my

25 calculation, exclusivity ran in the beginning of November, and

CHINA NATURAL GAS, INC.                    13

1   I don't know that any bridge order was entered.  But even apart

2   from that technical issue, exclusivity should not be extended

3   on the merits here.  There is no cause in this case to extend

4   exclusivity.

5           THE COURT:  Let me ask you a very basic question

6   because I've read your papers, and if you think I've

7   mischaracterize what they're, saying you can tell me, but I

8   think I have the essence of your argument.

9           Assume for a moment that you have a spectacularly

10  successful argument and you convince me that exclusivity should

11  not be extended in this case -- which is, by the way, a very

12  difficult argument for you to win on the first request,

13  particularly in a situation in which your clients threw this

14  debtor into bankruptcy through an involuntary, so you end up

15  getting the consequences of the debtor in bankruptcy.  You

16  don't necessary get what you want, you get what happens in

17  bankruptcy, which is sometimes what you don't want.  So let's

18  assume for a moment that you get what you want, and I say, very

19  persuasive argument you win; then what do you do?

20          MR. STROCHAK:  Your Honor, the reason why --

21          THE COURT:  Do you have a plan on the table?

22          MR. STROCHAK:  No, we don't have a plan on the table,

23  Your Honor, because we couldn't go out and put together a plan

24  that would work while the debtor still had exclusivity.

25          So what we would like to be able to do is to go

1    forward and talk to prospective purchasers of these assets, to

2    talk to people who might be interested in recapitalizing this

3    debtor, and trying to put together a structure for a

4    recapitalization or a sale of the debtor that would work to get

5    creditors paid, maybe get a return to equity if there's enough

6    value for that, and resolve this matter.

7          THE COURT:  Okay.

8          MR. STROCHAK:  And then --

9          THE COURT:  I understand what you just said, but I

10    also understand that in other settings where debtors have

11    exclusivity and where there is a level of cooperation between

12    creditors and debtors or trustees, as the case may be, that

13    what you've just described is permissible; it happens all the

14    time.  Parties work collaboratively, opportunities are

15    presented to creditors' committees that are vetted within the

16    committee and then presented to the debtors for consideration.

17    This is standard practice.  In what way does the extension of

18    exclusivity preclude what you've just described?

19          MR. STROCHAK:  I think what it does, Your Honor, is it

20    continues to leave the case in the control of the debtor, and

21    it gives them the ability to simply continue to say no, and to

22    continue to simply hold us at arm's length.  Because the only

23    way to get the maximum value for this estate is to have the

24    full cooperation, either voluntarily or involuntarily, from the

25    management in China, because no one is going to come in and

1   offer the value that this estate is worth if the Chinese

2   management and the owners of the -- the equity owners of the

3   VIE entities, the operating companies in China, are just going

4   to stand back and say we're not going to cooperate, we're not

5   going to do anything.

6          So what we're looking for is the opportunity to go out

7   and put something together that will work and put that before

8   this Court, and frankly, put the debtor in a situation where

9   the debtor's management, as fiduciaries to the creditors of

10  this estate, are going to have to say no, we won't do that

11  deal, and we won't seek the cooperation that we need in China

12  to make that deal happen, because we don't think it's the best

13  deal for this estate.  And we don't think that they're ever

14  going to do that until we can go out and actually put something

15  together and put it before them and say here, this is a good

16  deal and you have a fiduciary duty to make this deal happen in

17  order to ensure a maximum return for the creditors of this

18  estate.

19         And the draft plan that they've put before Your Honor

20  late last night, which we got first thing this morning after

21  asking for a copy of it, is Exhibit A as to why you should give

22  us that opportunity and allow us to go out and try and put

23  something together; that we can go out to people in the market

24  and say look, we have the right to propose a plan, you can deal

25  with us because we're going to try and get this confirmed even

1   if we can't get full cooperation from the debtor on the first

2   round.

3           And the plan that they've put forward is a liquidating

4   plan -- it's, essentially, the plan of last resort.  It's what

5   you would do in this case if you've explored every avenue to

6   achieve maximum value and concluded you can't make anything

7   happen.  So you throw up your hands, you hand these keys to the

8   estate to a trustee and say you know what, you go and sell it,

9   you're not going to have any cooperation from the Chinese

10  management, you're going to get minimal value for it.  And then

11  if you read it carefully, Your Honor, they've done a really

12  cute thing.  They've separately --

13          MR. DELUCIA:  I have to object, Your Honor; that

14  document was filed under seal, and counsel is now putting on

15  the record -- and it was submitted under a confidentiality

16  agreement signed by Abax and Mr. Strochak, and he's now

17  discussing terms of --

18          THE COURT:  Well, I haven't heard any terms yet, but I

19  think that -- I view that interruption as an admonition to be

20  careful what you're about to say.

21          MR. STROCHAK:  Well, Your Honor, I don't -- I guess if

22  they're asserting that plan as evidence in support of an

23  extension of exclusivity, then I'm not quite sure how I can

24  oppose it without talking about it to some degree.  And I can

25  try and dance around the line, I don't know what Mr. -- what

1   counsel thinks is and isn't confidential in that plan, but I

2   think suffice it to say it is the plan of last resort, it is

3   the cramdown plan which they would have to get confirmed over

4   our objection as the creditors holding, you know, at least

5   ninety-five percent of the debt in this case.  So it's the plan

6   of last resort.

7          So what they're telling Your Honor is we'd like ninety

8   more days.  If the ninety days don't work, we have a plan; it's

9   the disaster scenario because it's going to have to be approved

10   in a cramdown situation, we're certainly not going to support

11   it, and that's what they're telling Your Honor.

12          So what we think is going to happen is they're going

13   to keep us at arm's length, they're going to run the clock out,

14   they're going to say we'd like to keep as much value as we can

15   for the Chinese equity owners of the VIE interests and the

16   Chinese management.  And we'll run the clock out and then in

17   February we'll propose a cramdown plan and we'll see what

18   happens then.

19          So we're not looking at a situation where we

20   realistically are going to get to a resolution of this matter

21   in February; we're looking at the beginning of an extended

22   litigation in February.  And that's what they're putting

23   forward.

24          I have to make a few comments about some of the things

25   that were communicated, Your Honor, because some of it is just

1   wrong.

2          I certainly understand, Your Honor -- we commenced

3   this as an involuntary because we thought that this forum would

4   be the best place to get this matter resolved.  It wasn't a

5   precipitous filing where we surprised anybody; we told them for

6   six months, let's get it resolved or we're going to have to

7   file an involuntary or take other enforcement actions.

8          Counsel has been involved since the involuntary was

9   filed in February.  This isn't a situation where they got

10  involved at the last minute.  Counsel's partner in Washington

11  has represented the debtor for a long time, was counsel before

12  the involuntary, so it's not like this was done by surprise in

13  the dark of night or anything like that; this has been coming

14  for a long time.  And it only came as a result of our

15  frustrations in inability to get this resolved.

16         It is correct that the debtor made a -- what they call

17  a proposal to us.  They came many, many months into this case.

18  It was categorically unworkable in a number of different ways.

19  And again, I won't get into the details due to the

20  confidentiality concerns, but it didn't work in terms of the

21  amount they're proposing to pay us, it didn't work in terms of

22  the structure, it wasn't supported by any justification, saying

23  here's why we think this amount of value is what you're

24  entitled to get in this case.  It was supported by nothing.

25         It's categorically untrue that we didn't respond.  We

1    responded within a week.  We responded within a week that said

2    look, you seem to be proposing an acquisition by the founder in

3    China, and if that's what you're proposing, we could work with

4    that.  Here's what we would need to make it happen.  And we

5    ticked off the things that we would need to make it happen.  We

6    explained to them why we thought that their proposal was

7    unworkable and unsupported.  And we said we would actually

8    consider taking a discount off of the amount we were owed if a

9    transaction like the one we outlined could be consummated by

10   the end of the year.  So categorically untrue that we have just

11   stood back and said we want a hundred percent of what we were

12   owed, we won't take anything less.  So that simply is untrue.

13           We have indicated that we are prepared to discuss that

14   framework with them, and then after our response went back to

15   them, just in the last week or so, they notified us that they

16   had, essentially, an over-the-transom offer from somebody that

17   would pay substantially all of the notes in terms of the value.

18   And that's just the opening proposal that was made.  So we

19   certainly think that that should be explored.

20           We want to be at the table, where I learned, for the

21   first time, in court this morning that there's a meeting or a

22   phone call tomorrow to discuss it.  We were not invited to that

23   process.

24           What's been going on here for many, many months, Your

25   Honor, is a rope-a-dope.  We were told initially that the

CHINA NATURAL GAS, INC.                                    20

1    debtor was simply going to refinance the debt and we'd be

2    refinanced out.  That never happened.  We never got any

3    information suggesting that there ever had been an opportunity

4    to shop for new financing.  Nothing has happened.  At every

5    step the response back we get is well, we're going to have a

6    call with the people in China and we'll see what happens.  So

7    we simply are being kept at arm's length and essentially

8    threatened with the idea that look, if you're not going to

9    accept what we, the Chinese ownership of the operating

10   entities, is willing to pay for it, then we'll just hand the

11   keys to the liquidating trustee, and we're not going to

12   cooperate, and they'll just sell it off for whatever they can

13   get, and that's where it all will end up.

14          So that's what's going on in this case, Your Honor.

15   We have not been provided with any information to support any

16   valuation of the debtor.  We've been provided with one

17   document, a liquidation analysis, for, essentially, a fire sale

18   value of the assets.  Nothing to support any contentions of

19   valuation.  No marketing plans.

20          We've been told that they wanted to get KPMG retained

21   as a financial advisor to assist with marketing and valuing

22   this estate.  We immediately responded and said yes, we think

23   that's a good idea.  In fact, we told you in the summer that

24   you needed people on the ground in China to do this.  That

25   suggestion was rejected at first, and now they've come around

 1   to that view, so they want to hire KPMG.  And we immediately

 2   responded yes, my partner in Hong Kong, she knows the KPMG

 3   team.  We'd love to talk to them.  That would be good.  And

 4   they responded no, they're not ready to talk yet.  You can't

 5   reach out to them.  Don't do that.

 6          So we haven't had any contact with the KPMG people in

 7   China that ostensibly are going to be responsible for this very

 8   short duration now marketing process that they're proposing,

 9   which is not really ninety days.  It's really sixty days.  We

10   haven't seen anything about it, and the only conclusion that we

11   can reach, Your Honor, is that this debtor is simply going to

12   run the clock, and they're either going to try and force us to

13   accept whatever the Chinese ownership might be willing to pay,

14   and if we don't like it, then they'll just try and cram down a

15   plan on us.

16          And that's not a justification for an extension,

17   particularly in a case here where there is no harm whatsoever

18   to the debtor from an extension of exclusivity.  This is not a

19   case where there's going to be dozens of competing --

20          THE COURT:  You mean harm from a denial of an

21   extension?

22          MR. STROCHAK:  A denial.  I'm sorry, Your Honor.

23   Thank you for the correction.

24          There's no harm whatsoever.  If we can go out and put

25   something together and if they can come before this Court as

CHINA NATURAL GAS, INC.                                    22

1  fiduciaries to this estate and say Your Honor, that doesn't

2  work for the following reasons.  We don't think it's the most

3  value.  They have that right.  They say they want to include us

4  in the process anyway, so there's no harm to them.

5          This is not a case where there's going to be multiple

6  competing plans and the debtor is going to be distracted, in

7  dealing with multiple competing plans, from accomplishing what

8  needs to be accomplished in Chapter 11.  This is a

9  recapitalization case.  It's not an operating debtor where

10 you've got lots of changes that need to be made and tools of

11 the Bankruptcy Code used to put the debtor in shape for a sale.

12         This is a well performing enterprise.  The financials

13 demonstrate that.  We attached that to our papers.  They're

14 socking away cash.  They're investing cash that they're

15 generating in expanding their business.  They've got cash on

16 the balance sheet.  Nobody is here before you saying, Your

17 Honor, that this is a sick company and we need to fix it; we

18 need more time to fix it.  This is a healthy company, and they

19 just need to recapitalize it, and we haven't seen anything, and

20 they haven't put anything before this Court, to demonstrate

21 that they've taken steps to do that.  Nothing.  I mean, there's

22 no marketing plan before the Court.  There's no list of

23 prospects.  There's no list of potential sources of capital.

24 There's no valuation information to assist the Court in

25 understanding why it might be difficult and they need more time

1    to do it.  There's nothing before the Court to justify an

2    extension in this case.

3             So I'll rest there, Your Honor.  Thank you for hearing

4    me out.

5             THE COURT:  Okay.

6             MR. DELUCIA:  Limited response, Your Honor.

7             One point I'd like to highlight, which is somewhat

8    subtle within what you've heard in terms of our argument and

9    Abax's argument, and that is this:  what they want is not to

10   file a plan but to provide opportunities to -- to provide

11   potential investors, provide financing, provide opportunities

12   for cash to come to the debtor to pay themselves off.

13            They commenced this case February 8th of this 2013.

14   We have not received one communication from them saying can you

15   speak to this company.  Why don't you speak to that investor?

16   Not one.  And they have been all over our back, as you can

17   tell.  So reality is, Judge, if they have somebody interested

18   in buying, investing in this company, as I indicated and as I

19   think the documents suggest we filed under seal, we're prepared

20   to go down that path and explore it.  But we haven't even

21   gotten one suggestion from the Abax parties that there is

22   someone they know we should speak to.  Not one since February

23   8th.  So, Your Honor, the answer is we are --

24            Now, let me talk about going forward.  He is right.

25   We do want to include them in the process.  We intend to

CHINA NATURAL GAS, INC.                                    24

1    include them in the process.  But this private equity fund,

2    with whom we have a call tomorrow morning, has the capacity to

3    do a deal, from what we've checked in the background, but if

4    their interests are not real, if they have no capacity to close

5    within a reasonable period of time, there's no point wasting

6    everybody's time.  But if it goes beyond this, Abax will be at

7    that table.

8             THE COURT:  Okay.

9             MR. DELUCIA:  And we are prepared to discuss -- and

10   you just heard, by the way, counsel state, not me, that the

11   offer that we're discussing tomorrow or the proposal that we're

12   discussing tomorrow includes a number that would pay out the

13   notes in full.  You heard him say that just now on the record.

14   So what's the harm of an extension of exclusivity as we explore

15   that path?  If we open the door, it's not just Abax who can

16   file a plan at that point.  It's the other unsecured creditors.

17   It's a securities claims plaintiff.  Any party in interest,

18   under 1121, can file a plan, at which point, Your Honor, the

19   door is open to a, perhaps, rogue plan that none of us want to

20   waste their time on.

21            So exclusivity has a purpose.  Congress did it for a

22   reason.  And we are here, Your Honor, to work with this

23   constituent, and we are not saying, despite the animosity the

24   Abax and the principals in China have -- there's nothing

25   between counsel.  We're always pleased to work with counsel.

1  But we have a real opportunity to go down a path if we work

2  together, and I think we can do that, Your Honor.

3        THE COURT:  Okay.  You said something that was on my

4  mind before you said it, which is the animosity that seems to

5  prevail behind the scenes here.  And it's not just because this

6  is a Chinese asset but because sometimes it's very difficult to

7  divine the difference between appearance and reality in dealing

8  with Chinese businesses.  And I've had other cases before me

9  that have involved Chinese assets.  I can't tell what's going

10 on, and the papers, candidly, on both sides, are more form than

11 substance in terms of talking about these issues.

12        To what extent is there a genuine and sincere

13 opportunity for parties to work collaboratively in the event

14 that exclusivity is extended?  Because the words are being

15 expressed, but embedded in the Abax opposition is the expressed

16 concern that exclusivity is being used here as a weapon --

17 that's the classic terminology -- to disadvantage creditor

18 interests.  I don't necessarily buy that, but it could be true

19 in this case because of the animosity you just described.  So I

20 don't know who's trying to disadvantage who.

21        MR. DELUCIA:  Yes.  That's a legitimate question, Your

22 Honor, and it's probably the undercurrent of whatever distrust

23 there may be.  I will say candidly that there is a sincere

24 interest, based upon -- as I mentioned, I gave Your Honor a

25 brief background to it when I stated there has been an

1   education process of hours spent by Mr. Pritchard and myself

2   educating everybody on the debtor's side on the U.S. bankruptcy

3   process, duties under that process, opportunities under that

4   process, and responsibilities under that process.  And that

5   includes the obligation to do what Your Honor is addressing,

6   which is the good faith negotiation which creditors toward a

7   plan of reorganization.

8           I believe we crossed that hurdle.  I believe they

9   understand it.  We are working with them and their

10  professionals, which include some law firms in China, the Doqui

11  (ph.) Law Firm, who have U.S. educated attorneys at that firm,

12  who have helped bridge that gap.

13          Is it a perfect world between Abax and the debtor?

14  Absolutely not.  Is it one that takes, probably, of every hour

15  that is spent on the case, a percentage of time that is needed

16  to make sure that those issues are put to the side and

17  substance is addressed?  Absolutely.

18          And I do believe that we are at a critical point where

19  the debtor will be turning towards plans and restructuring that

20  Abax will participate in.  They may not like the ultimate plan

21  that has to be proposed because it's the only workable plan.

22  And it may, in fact, obtain votes other than theirs, and it may

23  be confirmable under 1129 despite their negative vote, but

24  that's plan process.  That's the bankruptcy.  We do not have to

25  say that one hundred percent of creditors vote in favor.

1  That's the law.

2       So, Your Honor, we're comfortable with the fact that

3  we may have to file a plan that Abax doesn't like, but I will

4  never file a plan that doesn't comply, at least in my

5  understanding, of 1129.

6       THE COURT:  Okay.  But that doesn't entirely respond

7  to my question, although it came close.  It gave you an

8  opportunity to give a little speech at the end.

9       My concern here is that I don't really know what's

10  going on, because no one's really telling me, even in documents

11  that are filed under seal.  What you're basically saying is we

12  reserve the right to cram them down, and what they're saying is

13  we're concerned that exclusivity is being extended so that the

14  bankruptcy process will be used to our fundamental

15  disadvantage, and this company hasn't done enough up to this

16  point to warrant an extension of exclusivity in a case that,

17  while exotic, is not that complicated.  That's my understanding

18  of the positions.

19       MR. DELUCIA:  Sure.

20       THE COURT:  Here's what I'm going to do, because I

21  think I've heard enough and I understand enough about what's

22  going on at the surface, although not what's going on behind

23  the scenes.

24       I'm going to extend exclusivity for ninety days.  The

25  burden to get another extension will be almost insurmountable.

CHINA NATURAL GAS, INC.                                    28

1  So this is not a last and final as much as it is a first and

2  best.

3          Within the first thirty days of the ninety-day period,

4  I expect the parties to develop what I'm going to term a

5  protocol of cooperation.  There will be an agreed approach to

6  dealing with transactions to maximize value.  What happens in a

7  plan is one thing; whether there is a transactional

8  underpinning for a plan is something else altogether.  And as

9  to that transactional underpinning, including the sharing of

10  necessary financial information to assess plans, the

11  participation of Abax, through counsel or other advisors, in

12  transactional conversations, the ability of Abax to engage, all

13  of that will be, in one form or another, the subject of this

14  protocol together with such other and additional provisions the

15  parties consider appropriate to encourage that which is not

16  presently occurring.

17          If you fail in getting that done within the first

18  thirty days of this period, I will give Abax, for cause shown,

19  an ability to present a motion to shorten exclusivity.  They'll

20  have a pretty high burden, too.

21          And with that, I hope that you'll work together

22  constructively.  And I also hope that we don't end up with what

23  could turn out to be unproductive litigation.  A consensual

24  outcome is desirable.

25          And to the extent that your clients are looking for

 1   signals from this Court, I expect them to engage and reach an

 2   agreement, and if they don't, the consequences are not likely

 3   to be desirable.

 4         MR. DELUCIA:  Right.  Absolutely, Your Honor.  But one

 5   process I would just raise and then I'll -- you have a crowded

 6   docket; I don't want to take any more of your time -- is giving

 7   that protocol period, that thirty-day period -- obviously, we

 8   can do everything we can in good faith.

 9         THE COURT:  You can get that done today if you're

10   doing this in good faith.  There's no reason why you can't

11   reach that agreement today.

12         MR. DELUCIA:  Well, I have to -- I can have one

13   agreement.  They may not agree to that agreement, and we can

14   negotiate.  My point is they control, and can control, that

15   process.  They may say, no matter what we throw out to them in

16   order to cooperate that that's not good enough, because you're

17   giving them the opportunity to say see, Judge.  We never made

18   an agreement.

19         THE COURT:  No, that's not what's going to happen, and

20   if that's what you think is going to happen, you're missing my

21   message.  My message is to counsel to get this done and not to

22   make the reason that you don't have a protocol an excuse for

23   terminating the exclusivity, because I'll see through that and

24   it won't work.

25         I expect you guys to work together.  I expect you guys

1  to treat each other as you would if Abax were running a

2  creditors' committee and you're running a debtor that needs the

3  cooperation of the creditors' committee to get a plan done on a

4  consensual basis.  This is not rocket science, as the saying

5  goes.  This may be an exotic company, Chinese based, and you

6  may have a hostile creditor group, but welcome to bankruptcy.

7  It just so happens that happens in most cases.

8          MR. DELUCIA:  I agree.  I agree.

9          THE COURT:  So get it done.

10         MR. DELUCIA:  I have no problem with that, Your Honor.

11         THE COURT:  In fact, get it done this week.

12         MR. DELUCIA:  We'll do everything we can.

13         THE COURT:  I'd like a status report on it on a

14  telephone conference one week from today.  I expect it to be

15  done within a week.  You have thirty days to get it done; I

16  expect it to be fully documented within a week.  Treat it as a

17  high priority.  Not just the documentation, but the performance

18  that underlies the documentation, an attitude of true

19  cooperation and collaboration, and if I don't see that, you're

20  in trouble.

21         MR. DELUCIA:  There's no problem, Your Honor.  We're

22  happy to do it.  It's not us.  I mean, I'm --

23         THE COURT:  No.

24         MR. DELUCIA:  I'm only concerned --

25         THE COURT:  I think it may be.  Not you, but parties

1  that you report to --

2              MR. DELUCIA:  Sure.

3              THE COURT:  -- who not only may not misunderstand what

4  goes on in bankruptcy court, but may not understand that there

5  are adverse consequences that can flow from a lack of

6  cooperation.

7              So I am emphasizing that I expect parties not just to

8  go through the motions and nod their head but to actually

9  perform.

10              MR. DELUCIA:  Absolutely, Your Honor.

11              THE COURT:  And your clients need to understand that

12  they're going to be held on a tight leash here and that ninety

13  days is not an introduction into another ninety days.

14              This is their last opportunity to get this done or I

15  will open up exclusivity.

16              MR. DELUCIA:  That sounds fine, Your Honor.  Thank you

17  very much.

18              THE COURT:  Okay.

19              MR. DELUCIA:  Thank you.

20              MR. STROCHAK:  Your Honor, if I could ask one

21  indulgence?  Hopefully we won't need a call with the Court next

22  week, but if we do, could we make it Friday instead?  I'm going

23  to be out of the country, and it's just going to be very

24  difficult for me to get on the phone Thursday.

25              THE COURT:  I hope you don't need a call, but if you

CHINA NATURAL GAS, INC.                                    32

1    need a call on Friday, I'll be here.

2              MR. STROCHAK:  Thank you so much.

3              MR. DELUCIA:  Thank you, Judge.

4          (Whereupon these proceedings were concluded at 11:21 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

RULINGS

|  | Page | Line |
|---|---|---|
| Application Filed by Debtor for Entry of an Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof Granted | 6 | 6 |
| Period of Exclusivity is Extended for Ninety Days | 27 | 24 |

1

2                          C E R T I F I C A T I O N

3

4    I, Esther Accardi, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ESTHER ACCARDI

12   AAERT Certified Electronic Transcriber CET**D-485

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  November 15, 2013

19

20

21

22

23

24

25

CHINA NATURAL GAS, INC.
Case No. 13-10419-jmp

November 13, 2013

## A

**Abax (37)**
4:3,3;5:17;6:13,
14,23,23,24;7:5,17,
19,23;9:3,24;10:13;
11:4,15,17,20,20;
12:8,11,17,19;16:16;
23:21;24:6,15,24;
25:15;26:13,20;
27:3;28:11,12,18;
30:1
**Abax's (1)**
23:9
**ability (3)**
14:21;28:12,19
**able (2)**
7:24;13:25
**Absolutely (4)**
26:14,17;29:4;
31:10
**accept (2)**
20:9;21:13
**acceptable (1)**
7:8
**acceptances (2)**
6:10,18
**accepted (1)**
7:20
**accomplished (1)**
22:8
**accomplishing (1)**
22:7
**accordance (2)**
6:11,22
**achieve (1)**
16:6
**acquisition (1)**
19:2
**act (1)**
10:9
**action (2)**
8:13,14
**actions (1)**
18:7
**actual (2)**
7:18;11:3
**actually (4)**
6:25;15:14;19:7;
31:8
**Adam (2)**
5:16;12:16
**addition (1)**
11:9
**additional (3)**
7:24;11:11;28:14
**address (1)**
9:18
**addressed (1)**
26:17
**addressing (1)**
26:5

**admonition (1)**
16:19
**adverse (1)**
31:5
**advised (1)**
12:8
**advisor (1)**
20:21
**advisors (2)**
11:11;28:11
**affirmatively (1)**
10:6
**affixed (1)**
6:20
**afternoon (1)**
5:3
**again (1)**
18:19
**against (1)**
8:17;9:22
**agree (3)**
29:13;30:8,8
**agreed (1)**
28:5
**agreement (8)**
6:23;7:2;16:16;
29:2,11,13,13,18
**allow (1)**
15:22
**almost (1)**
27:25
**although (2)**
27:7,22
**altogether (1)**
28:8
**always (1)**
24:25
**amount (5)**
9:6;10:7;18:21,23;
19:8
**analysis (1)**
20:17
**animosity (3)**
24:23;25:4,19
**anxious (1)**
11:18
**apart (1)**
13:1
**apologize (3)**
5:12,15,21
**appearance (3)**
5:10,13;25:7
**application (3)**
6:11,18;7:4
**approach (1)**
28:5
**appropriate (1)**
28:15
**approval (2)**
8:12,25
**approved (2)**
6:6;17:9
**April (1)**

## 6:18

**arguing (1)**
12:21
**argument (6)**
13:8,10,12,19;
23:8,9
**arm's (3)**
14:22;17:13;20:7
**around (2)**
16:25;20:25
**asserting (1)**
16:22
**assess (2)**
9:10;28:10
**asset (1)**
25:6
**assets (3)**
14:1;20:18;25:9
**assist (2)**
20:21;22:24
**Assume (1)**
13:9,18
**attached (1)**
22:13
**attitude (1)**
30:18
**Attorneys (2)**
4:3;26:11
**Avenue (2)**
4:4;16:5
**aware (2)**
6:19;7:1
**away (1)**
22:14

## B

**back (6)**
11:20;15:4;19:11,
14;20:5;23:16
**background (2)**
24:3;25:25
**balance (1)**
22:16
**Bankruptcy (12)**
6:12;7:13;10:8;
13:14,15,17;22:11;
26:2,24;27:14;30:6;
31:4
**bar (5)**
5:8,9,23;6:2;9:7
**based (6)**
7:22;9:10;10:2,3;
25:24;30:5
**basic (1)**
13:5
**basically (2)**
10:14;27:11
**basis (2)**
7:8;30:4
**beginning (2)**
12:25;17:21
**behind (2)**

## 25:5;27:22

**best (3)**
15:12;18:4;28:2
**beyond (1)**
24:6
**board (4)**
8:5;11:15,16,17
**both (3)**
5:25;8:14;25:10
**bridge (2)**
13:1;26:12
**brief (1)**
25:25
**briefly (1)**
8:2
**bring (3)**
8:18;9:3;12:4
**burden (2)**
27:25;28:20
**business (1)**
22:15
**businesses (1)**
25:8
**busy (1)**
11:25
**buy (1)**
25:18
**buying (1)**
23:18

## C

**calculation (1)**
12:25
**call (9)**
10:4;12:6;18:16;
19:22;20:6;24:2;
31:21,25;32:1
**calls (2)**
12:9,10
**came (3)**
18:14,17;27:7
**can (28)**
10:2;11:18,21;
12:5;13:7;15:14,23,
24;16:23,24;17:14;
20:12;21:11,24,25;
23:14,16;24:15,18;
25:2;29:8,8,9,12,13,
14;30:12;31:5
**candidly (3)**
7:10;25:10,23
**capacity (2)**
24:2,4
**capital (1)**
22:23
**careful (1)**
16:20
**carefully (1)**
16:11
**case (20)**
8:3;12:20;13:3,11;
14:12,20;16:5;17:5;

## 18:17,24;20:14; 21:17,19;22:5,9; 23:2,13;25:19; 26:15;27:16

**cases (2)**
25:8;30:7
**cash (4)**
22:14,14,15;23:12
**categorically (3)**
18:18,25;19:10
**cause (2)**
13:3;28:18
**caused (1)**
8:3
**certainly (3)**
17:10;18:2;19:19
**changes (1)**
22:10
**Chapter (1)**
22:8
**checked (1)**
24:3
**China (14)**
5:2,4;7:7;9:1;10:5;
14:25;15:3,11;19:3;
20:6,24;21:7;24:24;
26:10
**Chinese (10)**
15:1;16:9;17:15,
16;20:9;21:13;25:6,
8,9;30:5
**claim (1)**
5:25
**claims (5)**
5:24;8:16;9:11,22;
24:17
**class (1)**
8:13
**classic (1)**
25:17
**clients (3)**
13:13;28:25;31:11
**clock (3)**
17:13,16;21:12
**close (2)**
24:4;27:7
**Code (3)**
6:12;10:8;22:11
**collaboration (1)**
30:19
**collaboratively (2)**
14:14;25:13
**comfortable (1)**
27:2
**coming (1)**
18:13
**commenced (3)**
8:4;18:2;23:13
**comments (1)**
17:24
**committee (3)**
14:16;30:2,3
**committees (1)**

**CHINA NATURAL GAS, INC.**
Case No. 13-10419-jmp

November 13, 2013

14:15
**communicated (1)**
17:25
**communication (1)**
23:14
**companies (1)**
15:3
**company (8)**
7:12;10:3;22:17,
18;23:15,18;27:15;
30:5
**company's (1)**
9:1
**competing (3)**
21:19;22:6,7
**compliant (1)**
7:9
**complicated (1)**
27:17
**comply (1)**
27:4
**compromise (2)**
10:25;11:6
**concern (2)**
25:16;27:9
**concerned (2)**
27:13;30:24
**concerns (1)**
18:20
**concluded (2)**
16:6;32:4
**conclusion (1)**
21:10
**concrete (1)**
11:3
**conference (1)**
30:14
**confidential (1)**
17:1
**confidentiality (3)**
6:22;16:15;18:20
**confirmable (2)**
7:25;26:23
**confirmation (2)**
9:3;10:10
**confirmed (2)**
15:25;17:3
**Congress (1)**
24:21
**consensual (3)**
7:19;28:23;30:4
**consent (1)**
7:19
**consequences (3)**
13:15;29:2;31:5
**consider (3)**
9:24;19:8;28:15
**consideration (1)**
14:16
**constituencies (1)**
12:4
**constituent (1)**
24:23

**constructively (1)**
28:22
**consulting (1)**
8:5
**consummated (1)**
19:9
**contact (1)**
21:6
**contentions (1)**
20:18
**continue (3)**
12:6;14:21,22
**continues (1)**
14:20
**control (3)**
14:20;29:14,14
**controlled (1)**
6:14
**conversations (1)**
28:12
**convince (1)**
13:10
**cooperate (3)**
15:4;20:12;29:16
**cooperation (9)**
14:11,24;15:11;
16:1,9;28:5;30:3,19;
31:6
**copy (1)**
15:21
**correction (1)**
21:23
**counsel (11)**
8:20;10:14;16:14;
17:1;18:8,11;24:10,
25,25;28:11;29:21
**Counsel's (1)**
18:10
**counteroffer (1)**
11:5
**country (1)**
31:23
**couple (1)**
12:18
**course (1)**
10:10
**COURT (43)**
5:2,7,10,19;6:4,6;
8:23;10:12,18,23;
12:14;13:5,21;14:7,
9;15:8;16:18;19:21;
21:20,25;22:20,22,
24;23:1,5;24:8;25:3;
27:6,20;29:1,9,19;
30:9,11,13,23,25;
31:3,4,11,18,21,25
**cram (2)**
21:14;27:12
**cramdown (3)**
17:3,10,17
**creditor (3)**
9:21;10:8;25:17;
30:6

**creditors (11)**
5:18;9:10,21;14:5,
12;15:9,17;17:4;
24:16;26:6,25
**creditors' (3)**
14:15;30:2,3
**critical (1)**
26:18
**CRO (1)**
5:5
**cross (1)**
7:24
**crossed (1)**
26:8
**crowded (1)**
29:5
**cute (1)**
16:12

**D**

**dance (1)**
16:25
**dark (1)**
18:13
**date (3)**
5:8,9,23,23;6:2,2;
9:3,7;10:19
**days (14)**
6:1;9:15;10:11;
11:19;17:8,8;21:9,9;
27:24;28:3,18;
30:15;31:13,13
**deal (8)**
8:9;15:11,12,13,
16,16,24;24:3
**dealing (3)**
22:7;25:7;28:6
**debt (3)**
12:19;17:5;20:1
**debtor (31)**
5:4;6:16;7:4,6,23;
8:6,8;10:6,9;12:13;
13:14,15,24;14:3,4,
20;15:8;16:1;18:11,
16;20:1,16;21:11,18;
22:6,9,11;23:12;
26:13,19;30:2
**debtors (4)**
6:15;14:10,12,16
**debtor's (4)**
6:9,11;15:9;26:2
**declaration (3)**
6:19;7:3;8:15
**defend (1)**
11:21
**degree (1)**
16:24
**Delaware (1)**
8:14
**delaying (2)**
10:1,5
**delays (1)**

9:13
**DELUCIA (27)**
5:3,4,12,15,21;6:7;
10:17,22;11:2;
12:15;16:13;23:6;
24:9;25:21;27:19;
29:4,12;30:8,10,12,
21,24;31:2,10,16,19;
32:3
**demonstrate (2)**
22:13,20
**demonstrates (2)**
7:3,4
**denial (2)**
21:20,22
**derivative (1)**
8:14
**described (3)**
14:13,18;25:19
**desirable (2)**
28:24;29:3
**despite (3)**
9:15;24:23;26:23
**details (1)**
18:19
**detriment (1)**
10:16
**develop (1)**
28:4
**difference (1)**
25:7
**different (1)**
18:18
**difficult (4)**
13:12;22:25;25:6;
31:24
**directly (2)**
8:20,21
**director (1)**
6:15
**directors (1)**
8:17
**disadvantage (3)**
25:17,20;27:15
**disaster (1)**
17:9
**discount (1)**
19:8
**discuss (4)**
10:5;19:13,22;
24:9
**discussed (2)**
8:19;11:15
**discussing (3)**
16:17;24:11,12
**distracted (1)**
22:6
**distrust (1)**
25:22
**divine (1)**
25:7
**docket (1)**
29:6

**document (2)**
16:14;20:17
**documentation (2)**
30:17,18
**documented (1)**
30:16
**documents (3)**
6:22;23:19;27:10
**dollars (1)**
9:22
**Don (1)**
6:14
**done (13)**
12:5;16:11;18:12;
27:15;28:17;29:9,
21;30:3,9,11,15,15;
31:14
**door (2)**
24:15,19
**Doqui (1)**
26:10
**down (4)**
21:14;23:20;25:1;
27:12
**dozens (1)**
21:19
**draft (1)**
15:19
**due (1)**
18:19
**duration (1)**
21:8
**during (1)**
8:9
**duties (1)**
26:3
**duty (1)**
15:16

**E**

**educated (1)**
26:11
**educating (2)**
7:11;26:2
**education (1)**
26:1
**effort (3)**
7:11;8:22;11:10
**either (2)**
14:24;21:12
**elaborate (1)**
11:13
**else (1)**
28:8
**embedded (1)**
25:15
**emergence (1)**
11:4
**emphasizing (1)**
31:7
**encourage (1)**
28:15

**CHINA NATURAL GAS, INC.**
Case No. 13-10419-jmp

November 13, 2013

**end (5)**
13:14;19:10;
20:13;27:8;28:22
**enforcement (1)**
18:7
**engage (2)**
28:12;29:1
**enough (6)**
11:21;14:5;27:15,
21,21;29:16
**ensure (1)**
15:17
**enter (1)**
5:10
**entered (4)**
6:5;8:11;9:8;13:1
**enterprise (1)**
22:12
**entirely (1)**
27:6
**entities (7)**
6:14,14,24,24;7:5;
15:3;20:10
**entitled (1)**
18:24
**entry (1)**
5:8
**envisioned (1)**
11:13
**equity (5)**
11:4;14:5;15:2;
17:15;24:1
**ESQ (1)**
4:7
**essence (1)**
13:8
**essentially (4)**
16:4;19:16;20:7,
17
**estate (9)**
9:22;14:23;15:1,
10,13,18;16:8;20:22;
22:1
**even (5)**
7:1;13:1;15:25;
23:20;27:10
**event (1)**
25:13
**everybody (1)**
26:2
**everybody's (1)**
24:6
**evidence (1)**
16:22
**except (1)**
12:3
**exchange (1)**
11:2
**exclusive (1)**
6:9
**exclusivity (21)**
10:15;12:24,25;
13:2,4,10,24;14:11,

18;16:23;21:18;
24:14,21;25:14,16;
27:13,16,24;28:19;
29:23;31:15
**excuse (1)**
29:22
**executives (1)**
7:11
**exert (1)**
7:5
**Exhibit (1)**
15:21
**exhibits (3)**
6:20,24,25
**exist (1)**
9:10
**exotic (2)**
27:17;30:5
**expanding (1)**
22:15
**expect (5)**
28:4;29:1,25,25;
30:14,16;31:7
**expected (1)**
9:25
**expense (1)**
11:7
**explained (1)**
19:6
**explore (2)**
23:20;24:14
**explored (2)**
16:5;19:19
**expressed (2)**
25:15,15
**extend (2)**
13:3;27:24
**extended (6)**
9:9;13:2,11;17:21;
25:14;27:13
**extension (15)**
5:22;6:9,16;8:3;
9:16;10:15;14:17;
16:23;21:16,18,21;
23:2;24:14;27:16,25
**extent (2)**
25:12;28:25
**extract (1)**
10:1

**F**

**facilitate (2)**
11:12,15
**fact (7)**
7:6;8:10;10:7;
20:23;26:22;27:2;
30:11
**fail (1)**
28:17
**faith (4)**
10:10;26:6;29:8,
10

**far (1)**
12:21
**favor (1)**
26:25
**February (8)**
6:17;9:9;17:17,21,
22;18:9;23:13,22
**few (1)**
17:24
**fiduciaries (2)**
15:9;22:1
**fiduciary (1)**
15:16
**Fifth (1)**
4:4
**file (8)**
6:10,17;18:7;
23:10;24:16,18;27:3,
4
**filed (7)**
7:1;9:11;11:25;
16:14;18:9;23:19;
27:11
**filing (3)**
5:23;8:7;18:5
**final (1)**
28:1
**financial (3)**
11:11;20:21;28:10
**financials (1)**
22:12
**financing (2)**
20:4;23:11
**fine (1)**
31:16
**fire (1)**
20:17
**firm (2)**
26:11,11
**firms (1)**
26:10
**first (11)**
6:11;12:9,18;
13:12;15:20;16:1;
19:21;20:25;28:1,3,
17
**fix (2)**
22:17,18
**flow (1)**
31:5
**fold (1)**
9:3
**folded (1)**
12:11
**following (1)**
22:2
**force (1)**
21:12
**form (3)**
5:24;25:10;28:13
**former (1)**
6:15
**formulate (1)**

7:7
**forthcoming (1)**
7:21
**forum (1)**
18:3
**forward (4)**
14:1;16:3;17:23;
23:24
**founder (1)**
19:2
**framework (1)**
19:14
**frankly (1)**
15:8
**Friday (2)**
31:22;32:1
**frustrations (1)**
18:15
**full (4)**
11:22;14:24;16:1;
24:13
**fully (1)**
30:16
**fund (1)**
24:1
**fundamental (1)**
27:14

**G**

**gap (3)**
8:9,10;26:12
**Gas (2)**
5:2,4
**gave (2)**
25:24;27:7
**generality (1)**
8:25
**generating (1)**
22:15
**genuine (1)**
25:12
**gives (1)**
14:21
**giving (2)**
29:6,17
**goes (3)**
24:6;30:5;31:4
**Good (11)**
5:3;10:10;11:21;
12:16;15:15;20:23;
21:3;26:6;29:8,10,16
**GOREN (2)**
4:7;5:17
**GOTSHAL (3)**
4:2;5:17;12:17
**governing (1)**
7:13
**graciously (1)**
6:21
**granted (1)**
6:21
**Greg (2)**

5:5;6:19
**ground (1)**
20:24
**group (1)**
30:6
**guess (1)**
16:21
**guys (2)**
29:25,25

**H**

**hand (1)**
16:7;20:10
**hands (1)**
16:7
**happen (10)**
11:8,19;15:12,16;
16:7;17:12;19:4,5;
29:19,20
**happened (3)**
11:2;20:2,4
**happens (7)**
13:16;14:13;
17:18;20:6;28:6;
30:7,7
**happy (1)**
30:22
**Hardin (1)**
5:4
**harm (5)**
21:17,20,24;22:4;
24:14
**head (1)**
31:8
**healthy (1)**
22:18
**heard (6)**
9:18;16:18;23:8;
24:10,13;27:21
**hearing (1)**
23:3
**held (1)**
31:12
**helped (1)**
26:12
**here's (3)**
18:23;19:4;27:20
**high (2)**
28:20;30:17
**highlight (1)**
23:7
**hire (1)**
21:1
**hold (1)**
14:22
**holding (1)**
17:4
**holds (1)**
12:19
**holidays (2)**
9:12,12
**Hong (3)**

10:21;11:7;21:2
**Honor (59)**
  5:3,5,6,14,15,16,
  21;6:3,7,19,21;7:2,
  10,16;8:8;9:16,24;
  10:2,8;11:9,10,24;
  12:1,15,16,23;13:20,
  23;14:19;15:19;
  16:11,13,21;17:7,11,
  25;18:2;19:25;
  20:14;21:11,22;22:1,
  17;23:3,6,23;24:18,
  22;25:2,22,24;26:5;
  27:2;29:4;30:10,21;
  31:10,16,20
**hope (3)**
  28:21,22;31:25
**Hopefully (1)**
  31:21
**hoping (1)**
  11:9
**hostile (1)**
  30:6
**hour (1)**
  26:14
**hours (1)**
  26:1
**huge (1)**
  12:20
**hundred (3)**
  7:8;19:11;26:25
**hurdle (2)**
  7:25;26:8

### I

**idea (2)**
  20:8,23
**idly (1)**
  7:4
**immediately (3)**
  8:11;20:22;21:1
**impatient (1)**
  10:15
**inability (1)**
  18:15
**include (6)**
  8:16;12:8;22:3;
  23:25;24:1;26:10
**included (1)**
  11:3
**includes (2)**
  24:12;26:5
**including (2)**
  11:12;28:9
**indicated (2)**
  19:13;23:18
**indulgence (1)**
  31:21
**information (4)**
  20:3,15;22:24;
  28:10
**initially (1)**

19:25
**instead (1)**
  31:22
**insurers (2)**
  8:20,21
**insurmountable (1)**
  27:25
**intend (1)**
  23:25
**intent (1)**
  8:17
**interest (2)**
  24:17;25:24
**interested (4)**
  12:7,12;14:2;
  23:17
**interests (3)**
  17:15;24:4;25:18
**interruption (1)**
  16:19
**intervening (1)**
  9:12
**into (7)**
  8:18;9:3;12:11;
  13:14;18:17,19;
  31:13
**introduction (1)**
  31:13
**investing (2)**
  22:14;23:18
**investor (1)**
  23:15
**investors (1)**
  23:11
**invited (1)**
  19:22
**involuntarily (1)**
  14:24
**involuntary (6)**
  8:4;13:14;18:3,7,
  8,12
**involved (3)**
  18:8,10;25:9
**issue (1)**
  13:2
**issues (3)**
  10:25;25:11;26:16

### J

**January (4)**
  5:22;6:2;9:7,9
**Journal (1)**
  6:1
**Judge (3)**
  23:17;29:17;32:3
**justification (2)**
  18:22;21:16
**justify (1)**
  23:1

### K

**keep (2)**
  17:13,14
**kept (1)**
  20:7
**keys (2)**
  16:7;20:11
**kind (1)**
  6:13
**knows (1)**
  21:2
**Kong (3)**
  10:21;11:7;21:2
**KPMG (4)**
  20:20;21:1,2,6

### L

**lack (1)**
  31:5
**last (10)**
  10:23;12:8;15:20;
  16:4;17:2,6;18:10;
  19:15;28:1;31:14
**late (1)**
  15:20
**law (3)**
  26:10,11;27:1
**laws (2)**
  7:12,13
**learned (1)**
  19:20
**leash (1)**
  31:12
**least (4)**
  7:17;9:11;17:4;
  27:4
**leave (1)**
  14:20
**leaves (2)**
  8:22;9:8
**left (1)**
  9:7
**legitimate (1)**
  25:21
**length (3)**
  14:22;17:13;20:7
**less (3)**
  9:14;11:16;19:12
**level (1)**
  14:11
**leverage (1)**
  7:5
**likely (1)**
  29:2
**limited (2)**
  9:6;23:6
**line (1)**
  16:25
**liquidating (2)**
  16:3;20:11
**liquidation (1)**
  20:17
**list (2)**

22:22,23
**litigation (3)**
  8:9;17:22;28:23
**litigations (3)**
  8:13,16,16
**little (1)**
  9:8;10:9;27:8
**LLP (1)**
  4:2
**long (4)**
  9:25;10:15;18:11,
  14
**look (6)**
  9:5,14;11:25;
  15:24;19:2;20:8
**looking (6)**
  9:4;10:6;15:6;
  17:19,21;28:25
**lots (1)**
  22:10
**Lotus (1)**
  4:3
**Louis (1)**
  5:3
**love (1)**
  21:3
**LTD (1)**
  4:3

### M

**major (1)**
  9:12
**management (5)**
  14:25;15:2,9;
  16:10;17:16
**MANGES (3)**
  4:2;5:17;12:17
**many (4)**
  18:17,17;19:24,24
**market (1)**
  15:23
**marketing (4)**
  20:19,21;21:8;
  22:22
**math (1)**
  9:5
**matter (5)**
  12:22;14:6;17:20;
  18:4;29:15
**matters (2)**
  5:6;8:18
**MATTHEW (2)**
  4:7;5:17
**maximize (1)**
  28:6
**maximum (4)**
  10:7;14:23;15:17;
  16:6
**may (16)**
  10:7,8;12:12;
  14:12;25:23;26:20,
  22,22;27:3;29:13,15;

30:5,6,25;31:3,4
**maybe (1)**
  14:5
**mean (4)**
  10:13;21:20;
  22:21;30:22
**meet (1)**
  11:7
**meeting (4)**
  10:20;11:1,17;
  19:21
**mentioned (1)**
  25:24
**merits (1)**
  13:3
**message (2)**
  29:21,21
**might (3)**
  14:2;21:13;22:25
**million (1)**
  9:22
**mind (1)**
  25:4
**minimal (1)**
  16:10
**minute (1)**
  18:10
**mischaracterize (2)**
  10:13;13:7
**missing (1)**
  29:20
**misunderstand (1)**
  31:3
**moment (2)**
  13:9,18
**months (3)**
  18:6,17;19:24
**more (10)**
  6:8;9:12,21;10:9;
  11:18;17:8;22:18,
  25;25:10;29:6
**morning (6)**
  10:4;12:7,16;
  15:20;19:21;24:2
**most (3)**
  12:22;22:2;30:7
**motion (5)**
  5:8;6:4,8;12:24;
  28:19
**motions (1)**
  31:8
**much (5)**
  9:25;17:14;28:1;
  31:17;32:2
**multiple (2)**
  22:5,7
**myself (2)**
  8:19;26:1

### N

**Nai (1)**
  4:3

CHINA NATURAL GAS, INC.
Case No. 13-10419-jmp

November 13, 2013

**Natural (2)**
5:2,4
**necessarily (1)**
25:18
**necessary (2)**
13:16;28:10
**need (12)**
15:11;19:4,5;
22:10,17,18,19,25;
31:11,21,25;32:1
**needed (2)**
20:24;26:15
**needs (2)**
22:8;30:2
**negative (1)**
26:23
**negotiate (1)**
29:14
**negotiation (1)**
26:6
**negotiations (1)**
10:19
**New (4)**
4:5,5;9:13;20:4
**next (3)**
10:11;11:19;31:21
**night (2)**
15:20;18:13
**ninety (8)**
10:11;11:19;17:7,
8;21:9;27:24;31:12,
13
**ninety-day (6)**
6:16;7:25;9:4,5,
16;28:3
**ninety-five (2)**
12:19;17:5
**Nobody (1)**
22:16
**nod (1)**
31:8
**none (1)**
24:19
**notes (2)**
19:17;24:13
**notified (1)**
19:15
**November (3)**
9:6,7;12:25
**number (2)**
18:18;24:12
**numbers (1)**
11:3

**O**

**object (1)**
16:13
**objection (6)**
9:19,19,23,24;
10:13;17:4
**objector (1)**
6:12

**obligation (1)**
26:5
**obtain (3)**
7:18;11:11;26:22
**obtained (1)**
8:25
**obviously (1)**
29:7
**occur (1)**
11:18
**occurred (1)**
10:19
**occurring (1)**
28:16
**off (4)**
19:5,8;20:12;
23:12
**offer (5)**
7:20;10:3;15:1;
19:16;24:11
**offers (5)**
7:16,17;11:3,3,3
**officers (2)**
7:11;8:17
**One (24)**
5:8;6:25;7:8,16,
17;8:3;10:18;12:7;
14:25;19:9;20:16;
23:7,14,16,21,22;
26:14,25;28:7,13;
29:4,12;30:14;31:20
**one's (1)**
27:10
**only (9)**
6:12;9:19;12:4;
14:22;18:14;21:10;
26:21;30:24;31:3
**open (4)**
11:14;24:15,19;
31:15
**opening (1)**
19:18
**operating (3)**
15:3;20:9;22:9
**opportunities (4)**
14:14;23:10,11;
26:3
**opportunity (9)**
11:24;15:6,22;
20:3;25:1,13;27:8;
29:17;31:14
**oppose (1)**
16:24
**opposition (3)**
5:24;6:3;25:15
**options (1)**
10:6
**order (7)**
5:9;7:10;8:11;
10:1;13:1;15:17;
29:16
**ostensibly (1)**
21:7

**others (1)**
12:12
**out (15)**
13:23;15:6,14,22,
23;17:13,16;20:2;
21:5,24;23:4;24:12;
28:23;29:15;31:23
**outcome (1)**
28:24
**outlined (1)**
19:9
**over (2)**
17:3;23:16
**over-the-transom (1)**
19:16
**owed (2)**
19:8,12
**owners (3)**
15:2,2;17:15
**ownership (2)**
20:9;21:13

**P**

**paid (1)**
14:5
**papers (3)**
13:6;22:13;25:10
**participate (2)**
12:11;26:20
**participation (1)**
11:4;28:11
**particularly (2)**
13:13;21:17
**parties (9)**
10:5,24;14:14;
23:21;25:13;28:4,
15;30:25;31:7
**partner (2)**
18:10;21:2
**partners (1)**
6:23
**party (2)**
12:7;24:17
**path (3)**
23:20;24:15;25:1
**pay (7)**
11:22;18:21;
19:17;20:10;21:13;
23:12;24:12
**pending (2)**
5:6;8:13
**people (5)**
14:2;15:23;20:6,
24;21:6
**percent (5)**
7:9;12:19;17:5;
19:11;26:25
**percentage (1)**
26:15
**perfect (1)**
26:13
**perform (1)**

31:9
**performance (1)**
30:17
**performing (1)**
22:12
**perhaps (6)**
6:8;7:8,18;8:2;
12:3;24:19
**period (14)**
6:9;7:24;8:1,9,10;
9:4,4,6,9;24:5;28:3,
18;29:7,7
**permissible (1)**
14:13
**personally (1)**
8:19
**persuasive (1)**
13:19
**ph (2)**
5:5;26:11
**phone (4)**
12:9,10;19:22;
31:24
**place (2)**
11:1;18:4
**plaintiff (1)**
24:17
**plaintiffs (1)**
9:20
**plan (44)**
6:10,17;7:7,21,25;
8:18,23,24;9:2,15;
10:1;11:10,13;12:3;
13:21,22,23;15:19,
24;16:3,4,4,22;17:1,
2,3,5,8,17;21:15;
22:22;23:10;24:16,
18,19;26:7,20,21,24;
27:3,4;28:7,8;30:3
**plans (5)**
20:19;22:6,7;
26:19;28:10
**pleased (1)**
24:25
**point (7)**
23:7;24:5,16,18;
26:18;27:16;29:14
**position (1)**
12:21
**positions (1)**
27:18
**possible (2)**
7:9;10:7
**post-involuntary (1)**
8:6
**potential (2)**
22:23;23:11
**practice (1)**
14:17
**PRC-controlled (1)**
7:12
**precipitous (1)**
18:5

**preclude (1)**
14:18
**prepared (5)**
19:13;23:19;24:9
**pre-petition (1)**
8:5
**present (1)**
28:19
**presented (2)**
14:15,16
**presently (1)**
28:16
**pretty (2)**
9:25;28:20
**prevail (1)**
25:5
**principally (1)**
7:11
**principals (2)**
9:1;24:24
**prior (1)**
6:2
**priority (1)**
30:17
**Pritchard (4)**
5:5;6:20;7:6;26:1
**private (1)**
24:1
**probably (3)**
9:14;25:22;26:14
**problem (2)**
30:10,21
**proceedings (1)**
32:4
**process (25)**
7:13,14;9:2;10:1,
5;11:12,12,14,16;
12:9,11;19:23;21:8;
22:4;23:25;24:1;
26:1,3,3,4,4,24;
27:14;29:5,15
**productive (1)**
11:17
**professionals (3)**
8:5;11:14;26:10
**progress (4)**
7:15,22;9:17;11:7
**proof (2)**
5:23,25
**proposal (4)**
18:17;19:6,18;
24:11
**propose (3)**
5:25;15:24;17:17
**proposed (5)**
6:2;8:24;10:3,20;
26:21
**proposing (5)**
12:4;18:21;19:2,3;
21:8
**prospective (1)**
14:1
**prospects (1)**

**CHINA NATURAL GAS, INC.**
Case No. 13-10419-jmp

November 13, 2013

22:23
**protocol (4)**
28:5,14;29:7,22
**provide (4)**
23:10,10,11,11
**provided (3)**
8:23;20:15,16
**provisions (1)**
28:14
**publication (1)**
5:25
**publications (1)**
6:1
**purchasers (1)**
14:1
**purpose (1)**
24:21
**pursuant (1)**
7:2
**pursue (1)**
10:10
**put (14)**
13:23;14:3;15:7,7,
8,14,15,19,22;16:3;
21:24;22:11,20;
26:16
**putting (2)**
16:14;17:22

**Q**

**quick (1)**
9:5
**quickly (1)**
9:18
**quite (1)**
16:23

**R**

**raise (1)**
29:5
**ran (1)**
12:25
**reach (4)**
21:5,11;29:1,11
**read (2)**
13:6;16:11
**ready (1)**
21:4
**real (2)**
24:4;25:1
**realistically (1)**
17:20
**reality (2)**
23:17;25:7
**really (8)**
8:22;9:14;12:23;
16:11;21:9,9;27:9,10
**reason (4)**
13:20;24:22;
29:10,22
**reasonable (1)**

24:5
**reasons (1)**
22:2
**recapitalization (2)**
14:4;22:9
**recapitalize (1)**
22:19
**recapitalizing (1)**
14:2
**received (3)**
6:13;10:4;23:14
**record (3)**
11:14;16:15;24:13
**referenced (1)**
8:14
**refinance (1)**
20:1
**refinanced (1)**
20:2
**refine (1)**
9:2
**reflect (1)**
9:13
**reinstate (1)**
12:24
**rejected (1)**
20:25
**relates (1)**
10:20
**relief (1)**
8:11
**reorganization (1)**
26:7
**report (2)**
30:13;31:1
**representatives (1)**
7:7
**represented (1)**
18:11
**request (3)**
6:9;8:3;13:12
**requested (2)**
5:22,23
**reserve (1)**
27:12
**resolution (2)**
8:18;17:20
**resolve (2)**
8:23;14:6
**resolved (4)**
9:15;18:4,6,15
**resolving (1)**
8:16
**resort (3)**
16:4;17:2,6
**respond (2)**
18:25;27:6
**responded (5)**
19:1,1;20:22;21:2,
4
**response (4)**
6:13;19:14;20:5;
23:6

**responsibilities (1)**
26:4
**responsible (1)**
21:7
**rest (1)**
23:3
**restructuring (4)**
7:14,19;8:6;26:19
**result (1)**
18:14
**retained (1)**
20:20
**retroactive (1)**
12:24
**return (2)**
14:5;15:17
**Right (6)**
10:17;15:24;22:3;
23:24;27:12;29:4
**rocket (1)**
30:4
**rogue (1)**
24:19
**rope-a-dope (1)**
19:25
**round (1)**
16:2
**run (3)**
17:13,16;21:12
**running (2)**
30:1,2

**S**

**sale (3)**
14:4;20:17;22:11
**sat (1)**
7:4
**saying (8)**
13:7;18:22;22:16;
23:14;24:23;27:11,
12;30:4
**scenario (1)**
17:9
**scenes (2)**
25:5;27:23
**Schiff (1)**
5:4
**science (1)**
30:4
**seal (5)**
6:21;8:24;16:14;
23:19;27:11
**SEC (1)**
8:9
**second (1)**
6:8
**Section (1)**
6:12
**securities (2)**
9:19;24:17
**seek (3)**
10:8,10;15:11

**seeking (2)**
5:8;6:16
**seem (1)**
19:2
**seems (1)**
25:4
**sell (2)**
16:8;20:12
**sense (1)**
11:6
**separately (1)**
16:12
**set (1)**
5:23
**setting (1)**
5:9
**settings (1)**
14:10
**settle (1)**
8:10
**settlement (2)**
8:12;10:25
**shape (1)**
22:11
**shared (1)**
6:24
**sharing (1)**
28:9
**Shearman (2)**
8:15,19
**sheet (2)**
7:18;22:16
**shop (1)**
20:4
**short (1)**
21:8
**shorten (1)**
28:19
**shown (1)**
28:18
**sick (1)**
22:17
**side (2)**
26:2,16
**sides (1)**
25:10
**signals (1)**
29:1
**signed (1)**
16:16
**simple (1)**
8:23
**simply (6)**
14:21,22;19:12;
20:1,7;21:11
**sincere (2)**
25:12,23
**single (1)**
11:23
**situation (5)**
13:13;15:8;17:10,
19;18:9
**six (1)**

18:6
**sixty (2)**
9:15;21:9
**socking (1)**
22:14
**solicit (2)**
6:10,18
**somebody (2)**
19:16;23:17
**someone (1)**
23:22
**sometime (1)**
10:23
**sometimes (2)**
13:17;25:6
**somewhat (1)**
23:7
**soon (1)**
7:9
**sorry (1)**
21:22
**sought (2)**
7:20;8:11
**sounds (1)**
31:16
**sources (1)**
22:23
**speak (3)**
23:15,15,22
**spectacularly (1)**
13:9
**speech (1)**
27:8
**spent (2)**
26:1,15
**stake (1)**
12:22
**stand (1)**
15:4
**standard (1)**
14:17
**standing (1)**
5:11
**start (1)**
12:18
**state (2)**
8:2;24:10
**stated (1)**
25:25
**States (3)**
7:12,13;11:11
**status (1)**
30:13
**step (1)**
20:5
**steps (1)**
22:21
**Sterling (2)**
8:15,20
**still (1)**
13:24
**stood (1)**
19:11

**CHINA NATURAL GAS, INC.**
Case No. 13-10419-jmp

November 13, 2013

**Street (1)**
6:1
**STROCHAK (15)**
5:13,16,16,20;
12:16,17;13:20,22;
14:8,19;16:16,21;
21:22;31:20;32:2
**structure (4)**
8:22,25;14:3;
18:22
**subject (1)**
28:13
**submission (1)**
6:21
**submitted (2)**
5:24;16:15
**substance (3)**
10:19;25:11;26:17
**substantial (1)**
7:15
**substantially (1)**
19:17
**substantive (2)**
6:8;12:10
**subtle (1)**
23:8
**successful (1)**
13:10
**suffice (1)**
17:2
**suggest (1)**
23:19
**suggested (1)**
11:5
**suggesting (1)**
20:3
**suggestion (2)**
20:25;23:21
**summer (1)**
20:23
**support (5)**
7:21;16:22;17:10;
20:15,18
**supported (4)**
6:19;9:1;18:22,24
**supposed (1)**
10:24
**sure (4)**
16:23;26:16;
27:19;31:2
**surface (1)**
27:22
**surprise (2)**
12:20;18:12
**surprised (1)**
18:5

**T**

**table (4)**
13:21,22;19:20;
24:7
**talk (5)**

**14:**1,2;21:3,4;
23:24
**talking (3)**
10:25;16:24;25:11
**team (1)**
21:3
**technical (1)**
13:2
**teed (1)**
8:10
**telephone (1)**
30:14
**telling (3)**
17:7,11;27:10
**term (2)**
7:18;28:4
**terminating (1)**
29:23
**terminology (1)**
25:17
**terms (8)**
7:18;16:17,18;
18:20,21;19:17;
23:8;25:11
**theirs (1)**
26:22
**Thereafter (2)**
8:8;12:10
**therefore (1)**
6:3
**thereto (1)**
6:20
**thirty (3)**
28:3,18;30:15
**thirty-day (1)**
29:7
**thought (2)**
18:3;19:6
**threatened (1)**
20:8
**threw (1)**
13:13
**throw (2)**
16:7;29:15
**Thursday (1)**
31:24
**ticked (1)**
19:5
**tight (2)**
9:4;31:12
**Today (6)**
5:6;6:1;10:24;
29:9,11;30:14
**together (2)**
10:24;12:5;13:23;
14:3;15:7,15,23;
21:25;25:2;28:14,
21;29:25
**told (4)**
18:5;19:25;20:20,
23
**tomorrow (7)**
10:4;12:7,10;

**19:**22;24:2,11,12
**tools (1)**
22:10
**toward (1)**
26:6
**towards (1)**
26:19
**transaction (1)**
19:9
**transactional (3)**
28:7,9,12
**transactions (1)**
28:6
**treat (2)**
30:1,16
**trouble (1)**
30:20
**true (3)**
9:10;25:18;30:18
**Trustee (3)**
9:20;16:8;20:11
**trustees (1)**
14:12
**try (7)**
8:17;9:2;15:22,25;
16:25;21:12,14
**trying (2)**
14:3;25:20
**turn (1)**
28:23
**turning (1)**
26:19
**twenty-eight (1)**
6:1
**two (6)**
5:6;6:14;7:17;
8:13;9:11,12

**U**

**ultimate (1)**
26:20
**uncontested (1)**
5:8
**under (12)**
6:21;8:24;10:7;
16:14,15;23:19;
24:18;26:3,3,4,23;
27:11
**undercurrent (1)**
25:22
**underlies (1)**
30:18
**underpinning (2)**
28:8,9
**understood (1)**
10:20
**unique (1)**
8:2
**United (3)**
7:12,13;11:11
**unproductive (1)**
28:23

**unsecured (1)**
24:16
**unsupported (1)**
19:7
**untrue (3)**
18:25;19:10,12
**unworkable (2)**
18:18;19:7
**up (7)**
8:10;13:14;16:7;
20:13;27:15;28:22;
31:15
**upon (6)**
7:22;9:11;10:3,3;
11:4;25:24
**USA (1)**
5:25
**used (4)**
10:16;22:11;
25:16;27:14
**using (1)**
7:5

**V**

**valuation (3)**
20:16,19;22:24
**value (11)**
14:6,23;15:1;16:6,
10;17:14;18:23;
19:17;20:18;22:3;
28:6
**valuing (1)**
20:21
**vetted (1)**
14:15
**VIE (2)**
15:3;17:15
**view (2)**
16:19;21:1
**voluntarily (1)**
14:24
**vote (2)**
26:23,25
**votes (1)**
26:22

**W**

**Wall (1)**
6:1
**warrant (1)**
27:16
**Washington (1)**
18:10
**waste (1)**
24:20
**wasting (1)**
24:5
**way (9)**
10:6;11:6;12:2,2,
4;13:11;14:17,23;
24:10

**ways (1)**
18:18
**weapon (1)**
25:16
**week (9)**
12:8;19:1,1,15;
30:11,14,15,16;
31:22
**WEIL (3)**
4:2;5:17;12:17
**welcome (1)**
30:6
**What's (3)**
19:24;20:14;
24:14;25:9;27:9,21,
22;29:19
**whatsoever (2)**
21:17,24
**Whereupon (1)**
32:4
**who's (1)**
25:20
**willing (2)**
20:10;21:13
**willingness (1)**
11:5
**win (2)**
13:12,19
**wish (1)**
5:10
**within (15)**
6:10;7:25;8:18;
10:11;11:10,19;
14:15;19:1,1;23:8;
24:5;28:3,17;30:15,
16
**without (3)**
10:18;11:16;16:24
**words (1)**
25:14
**work (16)**
13:24;14:4,14;
15:7;17:8;18:20,21;
19:3;22:22;24:22,25;
25:1,13;28:21;29:24,
25
**workable (1)**
26:21
**working (4)**
7:6;8:15;9:15;26:9
**world (2)**
9:10;26:13
**worth (1)**
15:1
**written (1)**
7:17
**wrong (1)**
18:1

**X**

**Xin (1)**
4:3

CHINA NATURAL GAS, INC.
Case No. 13-10419-jmp                                                    November 13, 2013

**Y**

**Yang (1)**
  6:14
**year (1)**
  19:10
**Years (1)**
  9:13
**yesterday (2)**
  6:21;11:25
**York (2)**
  4:5,5

**1**

**10153 (1)**
  4:5
**11 (1)**
  22:8
**11:21 (1)**
  32:4
**1121 (2)**
  6:12;24:18
**1129 (3)**
  7:9;26:23;27:5
**13th (1)**
  9:6

**2**

**2013 (1)**
  23:13
**2014 (2)**
  6:17,18

**4**

**4th (2)**
  6:17;9:9

**6**

**6th (4)**
  5:22;6:2;9:7,9

**7**

**767 (1)**
  4:4
**7th (1)**
  6:18

**8**

**8th (2)**
  23:13,23

**9**

**9 (1)**
  10:4