**Hearing Date and Time: April 10, 2014 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: April 3, 2014 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Petitioners Abax Lotus Ltd.*
*and Abax Nai Xin Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                           :

**In re**                     :         **Chapter 11 Case No.**
                           :

**CHINA NATURAL GAS, INC.,**    :         **13-10419 (SHL)**
                           :

              **Debtor.**     :

                           :
---------------------------------------------------------------x

**OBJECTION OF ABAX PETITIONERS TO THIRD MOTION OF**
**DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF AN**
**ORDER EXTENDING ITS EXCLUSIVE PERIODS TO FILE A**
**CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

        Abax Lotus Ltd. ("***Abax Lotus***") and Abax Nai Xin A Ltd. ("***Abax Nai Xin A***,"

and together with Abax Lotus, the "***Abax Petitioners***") hereby submit this objection (this

"***Objection***") to the third motion of China Natural Gas, Inc., as debtor and debtor in possession in

the above-captioned chapter 11 case (the "***Debtor***"), seeking an extension of its exclusive periods

to file a chapter 11 plan (the "***Exclusive Plan Period***") and to solicit acceptances thereof (the

"***Exclusive Solicitation Period***," and together with the Exclusive Plan Period, the "***Exclusive***

*Periods*") (ECF No. 128) (the "***Third Exclusivity Motion***[1]"), and respectfully represent as follows:

### Objection

1.      At the hearing (the "***Second Exclusivity Hearing***") held before the Court on February 25, 2014, on the Debtor's second motion for an extension of its Exclusive Periods (ECF No. 116) (the "***Second Exclusivity Motion***"), counsel for the Debtor identified a number of modest milestones that the Debtor expected to compete during its sixty-day extension period with respect to its ongoing efforts to market and sell its on-shore natural gas operations.  In addition to completing and opening a data room, counsel for the Debtor informed the Court that, at the conclusion of its sixty-day extension period, the Debtor expected to have fully marketed the assets for sale, identified a lead bidder, and commenced documenting the proposed transaction.  *See* Tr. Second Exclusivity Hr'g, at 22:5-23:7.[2]  Specifically, counsel for the Debtor stated:

> [T]he objective would be that E&Y would be formally retained, and E&Y will take the next steps to follow up with each of the interested parties and then assemble and complete its data room . . . Within thirty days have, perhaps, indentified [sic], for example, the leading runner on the bids for interest, either investment or sale or otherwise. And that, of course, would mean that in this thirty-day period we would have had working group calls. Abax would have been kept abreast and would be informed about who they are, in fact, and maybe even met with them. In addition to that, once that party was identified, assuming that we're at the stage, now, where an agreement would begin to take form and documents would have to be drafted. . . . .

*Id.* at 22:5-23:2.

---

[1] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Third Exclusivity Motion.

[2] The relevant portions of the transcript from the Second Exclusivity Hearing are annexed hereto as **Exhibit A**.

2

2.      Unfortunately, the Debtor has (again) wasted its extension and failed to accomplish any of its stated goals.  Despite numerous appeals and requests made by the Abax Petitioners, as well as certain of the Debtor's own retained professionals, the Debtor's management has failed to provide Ernst & Young with the financial and other information necessary to populate and open a data room to allow potential investors to commence their due diligence.  Even more egregious is management's failure to finalize even a simple form of advertisement to publicize the sale and attract interested parties.  This is a far cry from identifying a lead bidder and papering a transaction as Debtor's counsel stated at the Second Exclusivity Hearing.  With at least three of the potential investors having executed non-disclosure agreements well over a month ago, management's inability to accomplish even the simplest of administrative tasks is discouraging would-be participants and chilling the sale process before it even commences.  Clearly, the Debtor has fallen well short of meeting even the modest expectations of its own retained professionals.

3.      As the Court is aware, the Debtor's natural gas assets and operations are held in China by a variable interest entity, or VIE, which has a contractual relationship with a wholly-owned subsidiary of the Debtor, or WFOE.  Pursuant to certain operating and consulting agreements, the revenues of the PRC operating assets were to be paid by the VIE to the WFOE and ultimately distributed to the Debtor and used to, among other things, pay down the Senior Notes.  The failure of the Debtor's management to enforce the terms of the VIE operating agreements is what precipitated the commencement of this chapter 11 case.  The majority of the outstanding equity of the VIE is held by the Debtor's former chairman, Qin'an Ji, and certain other individuals.  As these individuals exercise direct control over the Debtor's natural gas

3

assets and operations, the success of any sale or marketing efforts is contingent upon their

cooperation.

        4.      This is why, at the status conference held before the Court on March 13,

2014 (the "***March 13 Status Conference***"), the Abax Petitioners stated that what was truly

critical to see during the extension period was genuine progress and cooperation from the

Debtor's management, because without it any sale process would be fruitless.  Specifically,

counsel for the Abax Petitioners stated:

> What we think really needs to be conveyed to potential purchasers
> is that the shareholders of the VIE entity, which is where the
> operating assets are located, are committed to this process and
> engaged in the process and will act in good faith to market this
> business.  And while there has been this information now
> conveyed to E&Y and for putting it in the data room ultimately,
> the concern is that the potential purchasers haven't seen that
> commitment by the ultimate shareholders of the VIE to cooperate,
> and without their cooperation this process is futile.

Tr. Mar. 13 Status Conf., at 15:22-16:6.[3]  *See also* Tr. Second Exclusivity Hr'g at

25:7-26:23.

        5.      The Abax Petitioners believe that the Debtor's chief restructuring officer

and the professionals at Schiff Hardin have genuinely attempted to engage their client and move

this case forward.  Their efforts, however, have failed thus far to result in any meaningful

cooperation from the Debtor's management.  The cooperation and assistance of the Debtor's

management and on-shore shareholders of the VIE is imperative to demonstrate to potential

investors that the sale process is legitimate and not simply a rouse orchestrated by management

to appease this Court.

---

[3] The relevant portions of the transcript from the March 13 Status Conference are annexed hereto as **Exhibit B**.

6.      Recognizing the necessity of demonstrating VIE shareholder commitment to the success of the sale process, the Court, at the March 13 Status Conference, ordered the parties in interest to brainstorm possible measures to be put in place to accomplish this goal.  *See Id.* at 16:16-21:1.  This was ordered by the Court after the Debtor's management failed to provide its professionals with the funds necessary to publish notice of the Bar Date in accordance with a previous order of the Court.  In response to that dereliction, the Court warned the Debtor's management that they "can't play fast and loose" with their duties and responsibilities under the Bankruptcy Code.  *See Id.* at 5:16-7:10.

7.      Thereafter, counsel for the Debtor raised the possibility of the shareholders of the VIE entering into an agreement with the Debtor binding the VIE shareholders to commit to the sale process and cooperate with the Debtor's professionals and any potential investors.  It was contemplated that this agreement would be executed by each of the VIE shareholders and would be enforceable in the PRC, which would simultaneously provide the Debtor, specifically the CRO, with a venue to pursue actionable and enforceable remedies directly against the VIE shareholders in the PRC, as well as to demonstrate the commitment of the shareholders to the sale process for the benefit of potential investors.  It was also suggested that an in-person meeting between principals of the VIE and the Abax Petitioners may work to help jump-start settlement or sale process discussions.  Unfortunately, as of the date of this Objection, neither an in-person meeting nor a cooperation agreement has come to fruition.

8.      It is clear based on their lack of action in this case, as well as the Abax Petitioners' entire course of dealing with the Debtor, that the Debtor's management has no intention of proceeding in good faith and is content to continue stonewalling the Abax Petitioners

US_ACTIVE:\44455336\2\99980.0219

and the other stakeholders in hopes that the Abax Petitioners will eventually succumb and accept less value than they are entitled to for their Senior Notes and Warrants.

9.    Accordingly, for all the reasons set forth in the Abax Petitioners' objection to the Second Exclusivity Motion, a copy of which is annexed hereto as **Exhibit C**, the Third Exclusivity Motion should be denied.

<u>**Conclusion**</u>

10.    For the reasons set forth above, the Abax Petitioners respectfully request that the Court deny the Third Exclusivity Motion.

Dated:  April 3, 2014
        New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Petitioners Abax Lotus Ltd.*
*and Abax Nai Xin Ltd.*

US_ACTIVE:\44455336\2\99980.0219

# EXHIBIT A

## RELEVANT PAGES FROM SECOND EXCLUSIVITY HEARING TRANSCRIPT

**In Re:**

*CHINA NATURAL GAS, INC.*

*Case No. 13-10419-shl*

*February 25, 2014*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 13-10419-shl

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  CHINA NATURAL GAS, INC.,

9

10            Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            February 25, 2014

19            11:15 AM

20

21  B E F O R E:

22  HON. SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Status Conference

3

4   Doc #116 Motion to extend exclusivity period for filing a

5   Chapter 11 plan and disclosure statement and solicit

6   acceptances thereof.

7

8   Doc. #117 Application to employ Ernst & Young (China) Advisory

9   Limited as restructuring advisor filed.

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   SCHIFF HARDIN LLP
 4         Attorneys for Debtor
 5         666 Fifth Avenue
 6         17th Floor
 7         New York, NY 10103
 8
 9   BY:   LOUIS T. DELUCIA, ESQ.
10         ALYSON M. FIEDLER, ESQ.
11
12
13   UNITED STATES DEPARTMENT OF JUSTICE
14         Office of the United States Trustee
15         201 Varick Street
16         Suite 1006
17         New York, NY 10014
18
19   BY:   GREG M. ZIPES, ESQ.
20
21
22
23
24
25
```

```
 1

 2   WEIL, GOTSHAL & MANGES LLP

 3         Attorneys for Abax Petitioners

 4         767 Fifth Avenue

 5         New York, NY 10153

 6

 7   BY:   MATHEW P. GOREN, ESQ.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   full answers.  And again, there might not be any significant

2   assets at the end of the day, here.  But there are significant

3   questions at the moment.

4           THE COURT:  All right.  Thank you.

5           Let me ask what the plan is going forward.  Obviously

6   this is something discussed in agreeing upon the sixty days.

7   Do you have any -- I won't use the term milestones -- but maybe

8   it's the best way to characterize it -- that you are looking to

9   hit in terms of where you expect the case to be in sixty days?

10          MR. DELUCIA:  That's a good question Your Honor.  I

11  think in the ideal world, the objective would be that E&Y would

12  be formally retained, and E&Y will take the next steps to

13  follow up with each of the interested parties and then assemble

14  and complete its data room, which we understood from our call

15  Sunday night, may be a physical data room in Hong Kong,

16  Shanghai, and Beijing and at E&Y's other offices, where parties

17  could examine the books and records.

18          Within thirty days have, perhaps, indentified, for

19  example, the leading runner on the bids for interest, either

20  investment or sale or otherwise.  And that, of course, would

21  mean that in this thirty-day period we would have had working

22  group calls.  Abax would have been kept abreast and would be

23  informed about who they are, in fact, and maybe even met with

24  them.

25          In addition to that, once that party was identified,

1  assuming that we're at the stage, now, where an agreement would

2  begin to take form and documents would have to be drafted, I

3  personally don't have enormous hope that we'll have a plan

4  filed in sixty days.  I do believe that probably within sixty

5  days, because I hope everyone wants this to be well marketed,

6  that we have an identified purchaser, that we're in the stage

7  of drafting an agreement or some other form of transaction.

8          THE COURT:  You have a proposed transaction.

9          MR. DELUCIA:  Correct.  And that we're either in

10  agreement for an additional period for the plan to be filed or

11  we see that there's no other interested party, at which point

12  we're in a different picture, and we'll have to assess where we

13  are.

14          But we certainly -- probably should know within the

15  next thirty to forty-five days if we are, in fact, going to

16  have a transaction that is successful with E&Y.  That's my gut.

17          THE COURT:  All right.  Is there any debate,

18  discussion, disagreement about what a transaction would look

19  like?  I understood Abax's counsel to say -- make reference to

20  releasing offshore funds.  But short of that, what they're

21  interested in is some sort of transaction to move the case

22  forward.

23          There are times when people use that as a shorthand,

24  because everybody knows what a transaction would look like.

25  Here, given the unusual aspects of the case, I don't know if

1  that -- even the nature of the transaction is -- what kind of

2  potential variation there might be.  Do you have any insight

3  into that at this time?

4          MR. DELUCIA:  Your Honor, I think there's a --

5  unfortunately, a lot can be read into that comment.  But here's

6  the practical reality.  The practical reality is that the

7  company doesn't have the cash.  If it had a fund -- as we

8  understand it, and based upon the financial records we've

9  seen -- Mr. Pritchard was just recently there -- I can't see a

10  source of funds that exists in a particular U.S. offshore PRC

11  account that has sufficient cash to even make a dent into the

12  debt.

13          THE COURT:  No, I was using that as a prelude --

14          MR. DELUCIA:  Okay.

15          THE COURT:  -- to my question, which is really

16  focusing on the transaction -- potential transaction aspect.

17  When people are talking about it, are they talking about the

18  same kind of transaction?

19          MR. DELUCIA:  Right.  I think so, Your Honor.  I think

20  so.  I mean, we're -- right now, the transaction that we're

21  looking at is either a sale or investment.  And I think Abax

22  had proposed a deal prior to the bankruptcy.  I'm not sure that

23  the proposals that we're going to see are going to be very

24  different than that, or it may actually be a straight-out sale.

25          I don't know that we have full mature terms of a

1  transaction, Your Honor.  But I do believe that we're looking

2  at a transaction that either infuses sufficient cash to take

3  out debt or a sale of the assets as operating in China.

4          THE COURT:  All right.

5          MR. GOREN:  Your Honor, if I may just briefly?

6          THE COURT:  Sure.

7          MR. GOREN:  I don't think we really know yet what the

8  type of structure would be for a potential sale, and that's for

9  a variety of reasons.  I mean, first and foremost, it would

10  depend on the purchaser.  I mean, we have this VIE WOFE

11  structure and a lot of that has to do with foreign investment.

12  If it's a PRC firm that ends up being the winning bidder, that

13  eliminates a lot of our headaches.

14          Second, with respect to the milestones, I think those

15  are very -- those are good milestones and very hypothetical.

16  What Abax is really looking for, though, to see in the next

17  sixty days, is good-faith real cooperation and progress in this

18  case.  Regardless of identifying a bidder or setting up a data

19  room, those are great milestones, but that's not what we're

20  looking for.  We're looking to see real progress, real openness

21  from the debtor's management to be open to the sale process,

22  which hasn't been the case this far --

23          THE COURT:  Is there any particular information that

24  you're looking for?  I know that there was a reference made

25  early in your remarks as to certain kinds of information you

CHINA NATURAL GAS, INC.                                    26

1   were seeking, financial information.  I don't know if that's

2   going to be subsumed by what E&Y is going to put together or if

3   there's some things that are standalone and are requested to

4   give it a sort of a window into possibilities going forward.

5        MR. GOREN:  Well, that's a good question, Your Honor.

6   We have prepared and acted like a committee, in that we

7   prepared diligence -- our client has prepared diligence

8   questions.  We passed those on to the debtor.  And it's my

9   understanding that Ernst & Young had similar requests, once

10  they began getting involved in this case.  And it's just slow

11  coming from the debtor.  It's typical financial information

12  that we would need, that any purchaser would need, that E&Y

13  would need to do this job.

14       THE COURT:  But you expect that -- if you're squawking

15  about information that E&Y will probably be in a similar

16  position?

17       MR. GOREN:  Exactly.  It's -- this case comes down to

18  cooperation from --

19       THE COURT:  Management.

20       MR. GOREN:  -- the debtor's management.  Because no --

21  there's going to be no sale if they're not cooperating.  No

22  interested party is going to be going to make a real bid

23  without their cooperation.

24       THE COURT:  All right.  That's helpful.

25       MR. GOREN:  Thank you.

1          MR. DELUCIA:  Your Honor, just my final comment.  And

2    I agree with what Mr. Goren just said about the cooperation, I

3    agree with that.

4          I have here their request for information from Abax.

5    That was provided on January 14th.  It was provided immediately

6    to the company.  The company soon thereafter -- unfortunately,

7    there is a very -- and candidly, I did not know the depth of

8    how intense it is -- but there is a New Year in China that is

9    celebrated for a period of time that spans almost two weeks.

10   And very little is done in China in that two-week period.

11         So from the -- and that started at the end of January.

12   So from the end of January through middle of February, there

13   was a slowdown in China completely across the board.

14   Everybody.  So I think there was a slight delay there in

15   delivery of that information.

16         He is right that E&Y asked for the same information.

17   And he's also correct that -- and as Mr. Pritchard advised me,

18   E&Y has already discussed the provision of the financial

19   information.  We also discussed it Sunday night about that

20   information coming forward.  I think it's critical.  I think

21   Abax will be receiving information.  I suggested that we don't

22   have to wait till one package is delivered.  It can come in --

23         THE COURT:  No, people always appreciate --

24         MR. DELUCIA:  Right.

25         THE COURT:  -- getting information when they can get

1  it.

2          Yeah, I think one thing to certainly tell management

3  is that everyone agrees that E&Y is a valuable step in moving

4  forward, and that part -- a central part of what needs to be

5  done for E&Y to function effectively is the information that

6  they need, which coincidentally turns out to be information

7  that's being requested by Abax, and that I'm assuming the

8  protocol will sort of kick in and track that.

9          But certainly management should be aware that

10  exclusivity can be extended; it can be reduced; it can be

11  lifted.  So a lot is going to depend on how things happen and

12  move forward in the next sixty days.  So I think that it sounds

13  like the folks -- nobody in this room needs any convincing, but

14  it sounds like there are people outside of this room that need

15  convincing.

16          So if there's anything that I can do to help on that

17  front, and this Court has this tradition of sort of being

18  creative about solutions and getting people what they need, let

19  me know, if it's a status conference or something else, because

20  it sounds like everybody in this room is looking at sort of

21  rowing in the same direction.

22          MR. DELUCIA:  Absolutely, Your Honor.  Thank you very

23  much.

24          THE COURT:  All right.  And speaking of that, what

25  makes sense for the next date?  And that may be the first of

**EXHIBIT B**

**RELEVANT PAGES FROM MARCH 13 STATUS CONFERENCE TRANSCRIPT**

**In Re:**

*CHINA NATURAL GAS, INC.*

*Case No. 13-10419-shl*

---

*March 13, 2014*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 13-10419-shl

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHINA NATURAL GAS, INC.,


          Debtor.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          March 13, 2014

          10:10 AM


B E F O R E:

HON. SEAN H. LANE

U.S. BANKRUPTCY JUDGE

1

2 Doc. #121 Motion to Extend Time for Filing Proofs of Claim

3 Modifying Deadline Procedures and Approving Form and Manner of

4 Notice Thereof

5

6 Status Conference

7

8

9

10

11

12

13

14

15

16

17

18

19

20 Transcribed by:  Hana Copperman

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY10040

24 (973)406-2250

25 operations@escribers.net

1
2   A P P E A R A N C E S :
3   SCHIFF HARDIN LLP
4           Attorneys for Debtor
5           666 Fifth Avenue
6           17th Floor
7           New York, NY 10103
8
9   BY:   LOUIS T. DELUCIA, ESQ.
10
11
12  WEIL, GOTSHAL & MANGES LLP
13          Attorneys for Abax Petitioners
14          767 Fifth Avenue
15          New York, NY 10153
16
17  BY:   JACQUELINE MARCUS, ESQ.
18
19
20  ALSO PRESENT
21          J. GREGG PRITCHARD, CEO, Warren Street Global, Inc.
22
23
24
25

CHINA NATURAL GAS, INC.                                        5

1          THE COURT:  And normally these things are filed before

2     the bar date passed, before the applicable deadline expires.

3     So I just -- I need some authority that that isn't a problem.

4          And I did notice that the reason that this date got

5     missed was because money hadn't been extended to pay for

6     publication.

7          MR. DELUCIA:  Right.  Correct.

8          THE COURT:  What makes me think we're not going to

9     have the same problem now?

10         MR. DELUCIA:  It was paid.  We have the money in hand.

11         THE COURT:  All right.  Well, what happened the first

12    time?

13         MR. DELUCIA:  The client simply did not fund from

14    China.  We had no -- and it was substantial.  It was over

15    40,000 dollars for the advertisement and --

16         THE COURT:  Right.  Well, they do realize they're in

17    bankruptcy, right?

18         MR. DELUCIA:  They do, Your Honor.

19         THE COURT:  And that if they need any convincing we

20    can do that.  That's, I mean, I'd never heard of that kind of a

21    situation before.  And that doesn't -- I don't know exactly

22    what it's a sign of in a circumstance -- in a factually unusual

23    circumstance of a case like this, but whatever it's a sign of,

24    it's not a good sign of anything.

25         So that's something that needs to be conveyed to the

 1  people who hold the purse strings.

 2          MR. DELUCIA:  Sure.

 3          THE COURT:  You can't play fast and loose with what

 4  your obligations are.  I mean, this is a, frankly, really bad

 5  excuse for extending the bar date.  And that needs to be

 6  conveyed to somebody.

 7          MR. DELUCIA:  It was, Your Honor.  And I one hundred

 8  percent agree, and it was conveyed, and it was conveyed with

 9  great vigor that it was unacceptable, and that we'd be in the

10  position of having to move to extend.

11          On the issue of the authority -- because there is no

12  other excuse for that.  I mean, we do have the money now.  We

13  refused to proceed --

14          THE COURT:  No, I appreciate your candor.  I don't

15  want to discourage candor.

16          MR. DELUCIA:  No, no.  That's reality.

17          THE COURT:  So I appreciate the fact that you called

18  it what it is, and that will serve you well in the course of

19  the case.  But I just -- and I know it's not your call.  And I

20  am sure that any lawyer, including yourself, really does not

21  want to have that as a problem.

22          MR. DELUCIA:  No, Your Honor.

23          THE COURT:  So I know I'm preaching to the choir, but

24  I figured I would join my voice to that chorus and perhaps make

25  your life easier in such things in the future.

CHINA NATURAL GAS, INC.                                    7

1          So I don't know the exact way to convey that other

2     than to direct you to convey that, and I don't know who the

3     person who had the authority and failed to exercise it, but

4     whoever that is, please deliver that message personally to that

5     individual.

6          MR. DELUCIA:  I will do so, Your Honor.  And we've

7     also, just so Your Honor is aware, we have, in the past, shared

8     transcripts, which has been helpful.

9          THE COURT:  All right.  I think that's an excellent

10    idea here, so I'll direct that as well.

11         MR. DELUCIA:  Thank you very much, Your Honor.

12         THE COURT:  And the other question I had -- we'll get

13    back to authority in a second -- is did the original bar date

14    order require the filing of proof of equity interests?

15         MR. DELUCIA:  It did not.

16         THE COURT:  It did not.  And that's not normally done,

17    so why is -- I see it's an add-on here, so why is it necessary

18    at this time?

19         MR. DELUCIA:  Well, we are --

20         THE COURT:  Like, what's changed?

21         MR. DELUCIA:  Nothing materially has changed here,

22    except we are moving as aggressively as we can towards a

23    consensual resolution but --

24         THE COURT:  I'm not --I'm inclined not to add that.

25         MR. DELUCIA:  Okay.

 1 | the process of what we're trying to explore.

 2 |         THE COURT:  All right.  All right.  Thank you.

 3 |         MR. DELUCIA:  Thank you, Your Honor.

 4 |         MS. MARCUS:  Good morning, again, Your Honor.

 5 | Jacqueline Marcus of Weil, Gotshal & Manges.  I'd like to

 6 | preface my comments by saying whatever I'm about to say is

 7 | absolutely no reflection on Mr. DeLucia or Mr. Pritchard.  We

 8 | believe that they're really doing their best under the

 9 | circumstances.

10 |         And we think it's interesting, Your Honor's concern

11 | about the expenses for publication of the bar date motion

12 | really hit the nail on the head in terms of Abax's concerns

13 | here, because the way the organization of the companies is set

14 | up the debtor here really depends on Chinese entities for its

15 | cash flow and for its decision making, unfortunately.

16 |         So I can confirm what Mr. DeLucia reported to the

17 | Court about the progress that has been made.  From my client's

18 | perspective it's been not fast enough.  There's a lot of

19 | information missing, and we'd like the process to be much

20 | further along than it is right now.  Again, no criticism to

21 | these gentlemen.

22 |         What we think really needs to be conveyed to potential

23 | purchasers is that the shareholders of the VIE entity, which is

24 | where the operating assets are located, are committed to this

25 | process and engaged in the process and will act in good faith

CHINA NATURAL GAS, INC.                            16

1   to market this business.  And while there has been this

2   information now conveyed to E&Y and for putting it in the data

3   room ultimately, the concern is that the potential purchasers

4   haven't seen that commitment by the ultimate shareholders of

5   the VIE to cooperate, and without their cooperation this

6   process is futile.

7            THE COURT:  Right.  There was a mention of marketing

8   material.  Is that the vehicle or a vehicle by which that might

9   be accomplished?

10           MS. MARCUS:  I think the answer to that is yes and no.

11  Yes and no, because yes, of course, the purchasers need to know

12  the information, and presumably if the access to the

13  information is provided, that means there is a commitment to

14  move forward.  But it's hard to tell whether that's a sincere

15  commitment to move forward or just going through the motions.

16           THE COURT:  Well, I guess what I mean, and I'm on the

17  outside looking in, so my comments may be helpful or they may

18  be completely off base, so I'll trust that you'll both

19  straighten me out, as the case may be.  But if we're talking

20  about marketing materials, I guess my question is whether the

21  VIE's embrace of it, in other words, acting as a spokesperson

22  through the marketing materials and making it very clear that

23  it's behind the process and advocating the process; having its

24  name on the materials; being one of, if not the communicator,

25  one of the communicators of the information, would at least

1  help to hopefully persuade folks that the marketing process for

2  these assets is a serious one that has the full backing of the

3  relevant parties, who need to back it or it's not going to

4  work.

5       MS. MARCUS:  Right.  I think that's right.  I think

6  that would help.  And I haven't seen the marketing materials,

7  so I don't know whether or not that's the case.  That and

8  information about whether there are legal opinions that exist

9  in China regarding the VIE structure and its enforceability in

10  those kinds of issues, I think, would help give credence to the

11  process.

12      THE COURT:  All right.  All right.  So really what

13  you're looking for is any tangible signs to parties-of-interest

14  that the VIE is behind this process as well as acting promptly

15  and thoroughly to convey all the things that you would expect

16  an entity who wants to sell their assets would do:  financial

17  information, legal opinions, transparency, so folks who are

18  interested know as much as they can know.

19      MS. MARCUS:  That's exactly right.

20      THE COURT:  As opposed to getting, sort of, mixed

21  messages.  You want to sell it, but we don't have this

22  information or that information.

23      MS. MARCUS:  That's correct, Your Honor.

24      THE COURT:  All right.  All that seems fair.

25  Certainly the more concrete -- it sounds like you haven't seen

1   the marketing materials, although it sounds like you have a

2   pretty good idea of what information, from your perspective, is

3   missing.  Obviously the more concrete and specific your

4   suggestions are, the better for counsel and the debtor, and

5   certainly the easier it is for me to put my weight behind them,

6   to the extent that that's appropriate.

7            MS. MARCUS:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            MR. DELUCIA:  Thank you, Your Honor.  I just want to

10  add to the record, and perhaps provide counsel with further

11  assurances of an understanding, and that is the VIE is an

12  entity.  China Natural Gas is an entity.  But the VIE is

13  controlled by a select set of individuals.  What Your Honor,

14  new to the case, may not know is that Abax's principal, Mr.

15  Yang, was a member of our board of directors and was once very

16  familiar with the company.  And why I say that is because that

17  means he is keenly aware of who really controls the VIE in

18  China.  And his concern is that those people who control the

19  entity, the VIE, in China are behind the process.

20           I am very aware of his concern, very aware of

21  counsel's concern, and what I'm trying to say is I completely

22  understand that these individuals have to be behind it,

23  otherwise it won't happen.  And I am committed to making sure

24  that we do not waste this Court's or their time with false

25  promises, that if there is going to be a backing, which they

1   have represented to us they will support this process, have

2   paid E&Y their engagement fee, have committed to pay them a

3   commission on an upside of the sale of the assets in China,

4   which include the VIE, that they have committed to us that

5   they're behind the process.  But I am keenly aware of their

6   concern and will make sure that those individuals -- not just

7   some representative at a lower level of the VIE says we're

8   prepared to share information, but the individuals who make the

9   decisions at the VIE are behind it.

10          THE COURT:  All right.  What's the best way to do

11  that?  You may or may not have an answer to that now, and it

12  may be that we have another status conference once you get

13  further along in the marketing materials and can address

14  information that everyone agrees is not available or in the

15  data room.

16          But I'm not familiar with Chinese government protocol

17  and to have any sense of what's in the realm of the possible,

18  what's in the realm of the possible but highly unlikely, and

19  also what's in the realm of this is how it's usually done, and

20  therefore, this usual method of conveying assent, support is

21  what everyone in the relevant community will recognize as being

22  such.  And I have to rely on all of you to do that.  It sounds

23  like we may be a little -- maybe another status conference away

24  from that -- but we're certainly not far away from that.  So I

25  would ask parties to think and brainstorm about what -- I mean,

1   you all have the folks who are insiders, not in the bankruptcy

2   sense, but in the know as to what can be done here and should

3   be done here.  So I'd ask that you really start maybe putting

4   together -- Abax can put together a list of here's what we

5   think is possible and a good idea, and you can do the same, and

6   we can work off those suggestions.

7           MR. DELUCIA:  Yes.  I mean, I do have an idea, and

8   it's not one that without vetting it through counsel as being

9   acceptable would I waste the Court's time on it.  But as we're

10  speaking, and as Your Honor is sharing the Court's concerns, I

11  am coming up with some ideas.  And I think that maybe counsel

12  and I could speak right after this with one way of making that

13  commitment by management of the VIE palpable.

14          THE COURT:  All right.  No, I got the sense that now

15  is not the right time to --

16          MR. DELUCIA:  Sure.

17          THE COURT:  -- discuss it in open court in a, sort of,

18  brainstorming way, that it doesn't seem like it's that kind of

19  process.

20          MR. DELUCIA:  Right.

21          THE COURT:  But I would think that maybe at the next

22  status conference, putting something on the record would be, at

23  that point, helpful, so I encourage folks to have conversations

24  with that goal in mind so that we know the process can work and

25  can be as robust as possible, and everybody will also perceive

1    it that way.

2            MR. DELUCIA:  Very good.  Thank you, Your Honor.

3            THE COURT:  And you're certainly happy to hang around

4    the courtroom.  I have an 11 o'clock, but it's on the

5    telephone, so I don't need the courtroom.And so if I can be of

6    use to you, by all means.

7            MR. DELUCIA:  Thank you so much, Your Honor.

8            THE COURT:  All right.  Do we have another date?

9            MR. DELUCIA:  I don't think we do, Your Honor.  We do

10   not.

11           THE COURT:  All right.  So I would guess thirty days

12   out would make sense.

13           MR. DELUCIA:  It would, Your Honor.

14           THE COURT:  All right.

15           MS. MARCUS:  Your Honor, Mr. DeLucia mentioned with

16   exclusivity --

17           MR. DELUCIA:  Oh, that's true.

18           MS. MARCUS:  --expiring he may want a hearing before

19   that or around that time.

20           THE COURT:  Fair enough.

21           MS. MARCUS:  Or at least a bridge order.

22           MR. DELUCIA:  That's correct, Your Honor.

23           THE COURT:  A very good observation.  Obviously if you

24   file the motion before the deadline expires --

25           MR. DELUCIA:  Yes.

**EXHIBIT C**

**ABAX PETEITIONERS' OBJECTION TO SECOND EXCLUSIVITY MOTION**

HEARING DATE AND TIME: February 25, 2014 at 11:00 a.m. (Eastern Time)
OBJECTION DEADLINE: February 18, 2014 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Petitioners Abax Lotus Ltd.*
*and Abax Nai Xin Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :
In re                               :     Chapter 11 Case No.
                                    :
CHINA NATURAL GAS, INC.,            :     13-10419 (SHL)
                                    :
                Debtor.             :
                                    :
------------------------------------------------------------x
```

**OBJECTION OF ABAX PETITIONERS TO MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF AN ORDER FURTHER EXTENDING ITS EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

# Table of Contents

Preliminary Statement ..................................................................................................................1

Background ....................................................................................................................................4

A.  General Background and Events Leading to the Commencement of the Chapter 11 Case.....4

    a.  Corporate Structure ...........................................................................................................4

    b.  The Senior Notes ...............................................................................................................6

    c.  The Debtor's Continuing Failure to Service the Senior Notes ...........................................7

    d.  The Current Undisputed and Unresolved Defaults ............................................................8

B.  Procedural Background..............................................................................................................10

There Is No Basis for a Further Ninety-Day Extension of the Debtor's Exclusive Period...........11

A.  The Debtor Has Not Made Any Meaningful Progress in its Chapter 11 Case or Progress in
    Negotiating with Creditors to Justify a Further Ninety-Day Extension of the Exclusive
    Periods. ..................................................................................................................................13

B.  The Debtor's Case is Neither Large Nor Sufficiently Complex to Warrant a Further Ninety-
    Day Extension of the Exclusive Periods. ...............................................................................17

C.  The Debtor Is Seeking A Further Ninety-Day Extension of the Exclusive Periods
    as a Means of Extracting Value and Pressuring the Abax Petitioners to Accept Less Than
    They Are Entitled to on Account of the Senior Notes. ............................................................20

D.  The Legislative History and Congressional Policy Underlying Section 1121 Do Not Support
    a Further Ninety-Day Extension of the Exclusive Periods. ....................................................21

E.  A More Limited Extension of the Exclusive Periods is Appropriate to Insure that the Debtor
    Aggressively Pursues Third Party Transactions. ...................................................................21

Conclusion……………………………………………………………………………………24

i

## Table of Authorities

**Cases**

*In re Adelphia Commc'ns Corp.*, 352 B.R. 578 (Bankr. S.D.N.Y. 2006) .........................................12

*In re All Season Indus., Inc.*, 121 B.R. 1002 (Bankr. W.D. Ind. 1990) ...................11, 15, 16, 18, 22

*In re AMR Corp.*, Ch. 11 Case No. 11–15463 (Bankr. S.D.N.Y. 2012)..........................................19

*In re Borders Group, Inc.*, 460 B.R. 818 (Bankr. S.D.N.Y. 2011)................................11, 18, 19, 22

*In re Century Inv. Fund VII Ltd.*, 96 B.R. 884 (Bankr. E.D. Wisc. 1989).......................................15

*In re Craghead*, 57 B.R. 366 (W.D. Mo. 1985)..............................................................................13

*In re Curry Co.*, 148 B.R. 754 (Bankr. S.D.N.Y. 1992)................................................12, 15, 18, 20

*In re Enron Corp.*, Ch. 11 Case No. 01–16034 (Bankr. S.D.N.Y. 2001) .........................................19

*In re Gagel & Gagel*, 24 B.R. 674 (Bankr. D. Conn. 1982)............................................................18

*In re Gen. Bearing Corp.*, 136 B.R. 361 (Bankr. S.D.N.Y. 1992) .............................................18, 20

*In re Gen. Growth Props., Inc.*, Ch. 11 Case No. 09–11977 (Bankr. S.D.N.Y. 2009).....................19

*In re Grossinger's Assoc.*, 116 B.R. 34 (Bankr. S.D.N.Y. 1990)...............................................20, 22

*In re Lake in the Woods*, 10 B.R. 338 (Bankr. E.D. Mich. 1981).............................................21, 22

*In re Lehman Brothers Holdings Inc.*, Ch. 11 Case No. 08–13555 (Bankr. S.D.N.Y. 2008)...........19

*In re McLean Indus., Inc.*, 87 B.R. 830 (Bankr. S.D.N.Y. 1987) ....................................................11

*In re Pine Run Trust, Inc.*, 67 B.R. 432 (Bankr. E.D. Pa. 1986) ....................................................13

*In re R.G. Pharmacy, Inc.*, 374 B.R. 484 (Bankr. D. Conn. 2007)...............................12, 16, 18, 22

*In re S.W. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448
(Bankr. W.D. Tex. 1987) ........................................................................ 11-13, 15, 17, 18, 20, 22

*In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363 (5th Cir. 1987) ), *aff'd sub nom.*
*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
484 U.S. 365 (1988)....................................................................................................................22

*In re Tripodi*, Ch. 11 Case No. 04-30793, 2005 WL 2589185 (Bankr. D. Conn. Oct. 9, 2005) ......16

ii

*In re WorldCom, Inc.*, Ch. 11 Case No. 02–13533 (Bankr. S.D.N.Y. 2002) .................................... 19

**Statutes**

11 U.S.C. § 1107(a) ................................................................................................................ 10

11 U.S.C. § 1108 ..................................................................................................................... 10

**Other Authorities**

Transcript of November 13, 2013 Hearing ............................................................................ 2, 3, 17

iii

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

Abax Lotus Ltd. ("**Abax Lotus**") and Abax Nai Xin A Ltd. ("**Abax Nai Xin A**,"

and together with Abax Lotus, the "**Abax Petitioners**") hereby submit this objection (this

"**Objection**") to the motion of China Natural Gas, Inc., as debtor and debtor in possession in the

above-captioned chapter 11 case (the "**Debtor**"), seeking a further extension of its exclusive

periods to file a chapter 11 plan (the "**Exclusive Plan Period**") and to solicit acceptances thereof

(the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the

"**Exclusive Periods**") (ECF No. 116) (the "**Second Exclusivity Motion**[1]"), and respectfully

represent as follows:

<u>**Preliminary Statement**</u>

1.      The Abax Petitioners are pleased that the Debtor has recently received

some initial indications of interest from third parties that may be interested in pursuing a

strategic transaction to maximize value for creditors and other parties in interest.  However,

given the Debtor's lack of progress thus far in its chapter 11 case, the Abax Petitioners, as the

Debtor's largest creditors, are greatly concerned that the Debtor will fail to take swift and

meaningful action to pursue these interested parties should the Court grant the Debtor's request

for another ninety-day (90) extension of the Exclusive Periods.  Based on the length of time it

has taken to reach this juncture, the Abax Petitioners believe that any further extension of the

Exclusive Periods should be limited, in order to insure that the Debtor and its management do

not waste this opportunity.

---

[1] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Second
Exclusivity Motion.

2.      At the hearing held before the Court on November 13, 2013 (the

"***November 13 Hearing***") on the Debtor's first request for an extension of its Exclusive Periods

(ECF No. 90) (the "***First Exclusivity Motion***"), Judge Peck, recognizing a lack of cooperation

and progress to date on the part of the Debtor, warned Debtor's counsel that there would be

consequences should the Debtor fail to demonstrate substantial progress and an increased level

of cooperation going forward in its chapter 11 case.  Not only did Judge Peck caution the Debtor

that there would likely be no further extensions of exclusivity, but he went further and stated that

he would consider reducing the extension that was previously granted if the Debtor delayed in

filing a joint protocol to govern an agreed approach between the Debtor and the Abax Petitioners

in dealing with potential restructuring transactions (the "***Cooperation Protocol***").   Trans. Nov.

13 Hearing, at 28:17-19.

3.      Specifically, when Judge Peck announced his decision at the November 13

Hearing, he began by stating "I'm going to extend exclusivity for ninety days.  ***The burden to***

***get another extension will be almost insurmountable***." *Id.* at 27:25 (emphasis added).  Judge

Peck then reiterated his point, warning Debtor's counsel that "[Y]our clients need to understand

that they're going to be held on a tight leash here and that ninety days is not an introduction into

another ninety days.  ***This is their last opportunity to get this done or I will open up***

***exclusivity***." *Id.* at 31:11-15 (emphasis added).

4.      To further emphasize the importance of the Debtor actively engaging with

the Abax Petitioners, the Court cautioned Debtor's counsel that "I expect you guys to work

together.  I expect you guys to treat each other as you would if Abax were running a creditors'

committee and you're running a debtor that needs the cooperation of the creditors' committee to

2

get a plan done on a consensual basis." *Id.* at 29:25-30:4.  A copy of the transcript from the

November 13 Hearing is annexed hereto as **Exhibit A**.

5.       As the Debtor's largest creditors, the Abax Petitioners have no intention of

disrupting any sale or marketing process that the Debtor and its management pursue in good

faith.  However, to date, the Debtor has not made progress in pursuing these transactions or

advancing its chapter 11 case that would warrant a further ninety-day extension of the Exclusive

Periods.  To wit, to the best of the Abax Petitioners' knowledge, the Debtor has not even entered

into a confidentiality agreement with any of the interested parties.

6.       Nearly every issue or event cited by the Debtor in support of the Second

Exclusivity Motion was completed *months* before the Debtor even filed its First Exclusivity

Motion.  Court approval of the SEC settlement, identifying and retaining a chief restructuring

officer, the filing of its Schedules and SOFAs, the filing of a motion to establish a claims bare

date – these were the very same accomplishments touted by the Debtor in its First Exclusivity

Motion.  *See* First Excl. Mot., at ¶¶10, 17.  Moreover, despite statements by the Debtor in its

motion suggesting that it has exchanged debt repayment proposals with its principal creditors,

the Abax Petitioners are not aware of single restructuring proposal having been exchanged by the

Debtor since early November, prior to the November 13 Hearing.

7.       The Debtor has simply not moved with enough purpose or expediency to

warrant a further ninety-day extension.  Despite the Court's warning, it took the Debtor until

December 18 – approximately thirty-five (35) days after the November 13 Hearing – to actually

file the Cooperation Protocol.  And, although the Cooperation Protocol was designed to, among

other things, set up Working Group calls, those calls have been few and far between.  Even more

disappointing to the Abax Petitioners has been the unwillingness of the Debtor's management to

3

discuss anything of substance on those calls until after the retention of Ernst & Young has been

finalized – a process that has yet to be accomplished despite (a) the United States Trustee having

set a deadline of January 7 for the Debtor to retain a financial advisor and (b) the Debtor having

been in chapter 11 *for over a year*.  The Debtor blames its lack of progress, in part, on the recent

Chinese New Year but that cannot explain away the lack of progress that has been made during

the entirety of its ninety-day extension period.

8.     Given the lack of meaningful progress in what should otherwise be a

manageable and straightforward chapter 11 case, there is little justification for granting the

Debtor a further extension of its Exclusive Periods.  Should the Court determine that an

extension of exclusivity is warranted, a more limited extension of exclusivity, such as 45- or 60-

days, would be more appropriate to insure that the Debtor's management takes advantage of this

limited window of opportunity to pursue interested parties in hopes of achieving a transaction

that maximizes value for the estate and all parties in interest.

### Background

### A.     General Background and Events Leading to the Commencement of the Chapter 11 Case

#### a.     Corporate Structure

9.     As discussed below, although the Debtor is a Delaware corporation, its

natural gas operations are held by its foreign subsidiary, Xi'an Xilan Natural Gas Company Ltd.

("***Xi'an Xilan***"), which was formed as a variable interest entity, or VIE, in the People's Republic

of China ("***PRC***").  *See Declaration of Adam P. Strochak*, dated March 20, 2013 (ECF No. 20),

Ex. F. at 2.

10.     PRC law imposes restrictions on direct foreign ownership of certain

business enterprises, particularly in regulated industries, and a VIE structure is often utilized to

4

conform to these restrictions. In particular, when PRC entities seek capital abroad (for example,
by listing on a U.S.-based stock exchange), a foreign entity will be incorporated for purposes of
the listing and the listed foreign entity will form a wholly foreign owned enterprise, or WFOE, in
the PRC.  WFOEs, as distinguished from other PRC business entities, are permitted by PRC law
to be wholly owned by foreign entities without the participation of PRC investors. The WFOE
will then enter into contractual arrangements with a VIE that holds the operating assets in the
PRC to ensure that the revenues of the PRC operating assets are paid by the VIE to the WFOE
and may ultimately be distributed to the listed foreign entity.  The VIE that holds the operating
assets in the PRC is, in turn, often owned by the management of the listed foreign entity and their
affiliates.

   11. On February 21, 2006, the Debtor formed Shaanxi Xilan Natural Gas
Equipment Co., Ltd.  ("***Shaanxi***"), a Chinese limited liability company, as a WFOE.  As such,
Shaanxi does not directly invest in regulated businesses in the PRC.  Instead, it has two key
contracts with Xi'an Xilan, which directly or indirectly holds the Debtor's operating assets in the
PRC.[2] *Id.* at 5.  Pursuant to a consulting services agreement, Shaanxi provides consulting,
human resources, and other services to Xi'an Xilan in exchange for quarterly payments of all of
Xi'an Xilan's revenues.  Further, pursuant to an operating agreement, Shaanxi acts as a guarantor
of Xi'an Xilan's obligations to third parties, and as a counter-guarantee Xi'an Xilan has pledged
all its assets to Shaanxi and undertaken not to transfer those assets.  The operating agreement
also gives Shaanxi the right to substantially influence Xi'an Xilan's daily operations and
financial affairs, appoint senior executives, and approval all matters requiring shareholder
approval.  *Id.* at 6-7.  While the Debtor has not publicly disclosed the identity of all owners of

---

[2] Only a portion of the assets used in the Debtor's PRC operations are subject to regulations restricting foreign
ownership.  Nevertheless, most of these assets are held by Xi'an Xilan, the VIE.

Xi'an Xilan, the Debtor has filed agreements with the SEC indicating that, as of March 2006, the

Debtor's former Chairman, Qinan Ji, and certain other individuals held a majority of the equity

interests of Xi'an Xilan and agreed not to transfer such interests.  Consequently, it appears that

the Debtor's former Chairman is among the individuals that currently control Xi'an Xilan.

### b.    The Senior Notes

12.    On January 29, 2008, pursuant to that certain securities purchase

agreement between the Debtor and Abax Lotus dated December 30, 2007 (the "***Purchase***

***Agreement***") and the 5.0% Guaranteed Senior Notes due in 2014 (the "***Senior Notes***") issued

pursuant to that certain indenture dated January 29, 2008 (the "***Indenture***") between the Debtor

and DB Trustees (Hong Kong) Limited, as trustee (the "***Trustee***"), the Debtor sold Senior Notes

to the Abax Petitioners in the principal amount of $20,000,000, and warrants to purchase

2,900,000 shares of the Debtor's common stock (the "***Warrants***").  On March 3, 2008, the

Debtor issued to the Abax Petitioners an additional $20,000,000 in principal amount of Senior

Notes.  The Senior Notes are denominated in renminbi ("***RMB***"), the currency of the People's

Republic of China ("***PRC***"), but are payable in U.S. dollars.  As of February 8, 2013, the Debtor

owed approximately $40.4 million to the Abax Petitioners on account of the Senior Notes.  A

detailed description of the amounts owed by the Debtor to the Abax Petitioners on account of the

Senior Notes and Warrants is set forth in the proofs of claim (Claim Nos. 6-10) (the "***Abax***

***Proofs of Claims***") timely filed by the Abax Petitioners in accordance with the Court's order,

dated November 25, 2013, establishing deadlines for filing proofs of claim and related

procedures (ECF No. 165) (the "***Bar Date Order***").  Copies of the Purchase Agreement and the

Indenture are annexed as exhibits to the Abax Proofs of Claim.

US_ACTIVE:\44420042\7\99980.0219

13.     The Senior Notes are secured by a pledge of the Debtor's equity interest in the WFOE, Shaanxi, representing 65% of the outstanding equity interests of Shaanxi.[3]  This security interest was memorialized in that certain Onshore Share Pledge Agreement (the "***Pledge Agreement***"), dated January 29, 2008, executed between the Debtor and the Trustee.

### c.    The Debtor's Continuing Failure to Service the Senior Notes

14.     In August 2009, the Debtor required a waiver from the holders of the Senior Notes due to its failure to have its stock listed on an exchange by the deadline required in the Indenture, as extended by conditional waiver obtained by the Trustee.  The Debtor sought and obtained a waiver from each holder of the Senior Notes at that time:  Abax Jade, Abax Nai Xin A and Lake Street LP ("***Lake Street***"), an unrelated investment fund.

15.     In the fall of 2010, the holders of the Senior Notes and the Debtor negotiated and executed two restructuring agreements to amend the terms and conditions of the Senior Notes and Warrants.  On September 7, 2010, each of the then-holders of the Senior Notes executed a Restructuring Agreement with the Debtor (the "***September 2010 Restructuring Agreement***").  The September 2010 Restructuring Agreement (a) provided that the Debtor would pay certain amounts on the Senior Notes on or before October 6, 2010 and October 13, 2010; and (b) amended the Senior Notes and the Indenture to change the stated maturity date from January 30, 2014 to August 30, 2011, with the full and final payment of all interest, principal and premium due on August 30, 2011.

---

[3] Pursuant to Section 4(a) of the Pledge Agreement, the Debtor was required to submit, within ten (10) days of the execution of the Pledge Agreement, all required documents to the Ministry of Commerce of the PRC (the "***MOC***"), whose approval is required to render the Pledge Agreement enforceable.  Additionally, within five (5) days of approval by the MOC, the Debtor was required to register the Pledge Agreement and the collateral described therein with the State Administration of Industry and Commerce of the PRC (the "***SAIC***").  The Abax Petitioners do not know whether the Debtor made the required submission and received the approval of the MOC or whether the Debtor registered the Pledge Agreement and the collateral described therein with the SAIC.

16.    After the Debtor failed to abide by any of the terms of the September 2010

Restructuring Agreement, on November 12, 2010, each of the then-holders of the Senior Notes

once again executed a revised Restructuring Agreement with the Debtor (the "***November 2010***

***Restructuring Agreement***").  The November 2010 Restructuring Agreement (a) provided that

the Debtor would pay approximately $18 million on the Senior Notes on or before November 30,

2010; and (b) amended the Senior Notes and the Indenture to change the stated maturity date

from January 30, 2014 to August 30, 2011, with the full and final payment of all interest,

principal and premium due on August 30, 2011.  Like the September 2010 Restructuring

Agreement, the Debtor never abided by any of the terms of the November 2010 Restructuring

Agreement and did not make the November 30, 2010 payment.  Copies of the September 2010

Restructuring Agreement and the November 2010 Restructuring Agreement are also attached as

exhibits to the Abax Proofs of Claim.

17.    On January 30, 2012, the Debtor failed to timely pay certain obligations

under the terms of the Indenture (the "***January 2012 Obligations***") thereby triggering the accrual

of default interest and allowing the noteholders to declare an event of default under the

Indenture.  The Debtor sought and obtained a waiver, executed March 17, 2012, by all holders of

the Senior Notes, waiving the events of default caused by its failure to timely pay the January

Obligations and related default interest.

### d.    The Current Undisputed and Unresolved Defaults

18.    The Indenture required the Debtor to make six semi-annual repayments of

principal beginning in July 2012 (8.3333% of outstanding principal for the first two repayments,

16.6667% for the next two, and 25% each for the last two).  The Debtor failed to make the

repayment due July 30, 2012, and has not paid interest on the Senior Notes since then.

US_ACTIVE:\44420042\7\99980.0219

19.     On August 21, 2012, Abax Global Capital ("**Abax Global**"), as investment
manager to the Abax Petitioners, sent the Debtor a formal notice of default (the "**Default
Notice**") and demanded that the Debtor make the July 2012 principal and interest payments and
remedy the default.  The Debtor did not respond to the Default Notice.

20.     On September 5, 2013, Abax Global provided notice of acceleration of the
principal amount of the Senior Notes, together with all accrued and unpaid interest and premium,
which was immediately due and payable under the Indenture (the "**Acceleration Notice**").  The
Debtor also failed to respond to the Acceleration Notice.

21.     On September 10, 2012, Abax Global provided the Debtor with a final
demand for payment (the "**Demand Letter**").  The Demand Letter expressly notified the Debtor
that the commencement of an involuntary bankruptcy was one of the remedies the Abax
Petitioners might pursue if the company did not remedy the default.  The Debtor did not put
forward any plan to remedy the defaults or repay the Senior Notes in response to the Demand
Letter.[4]

22.     For several months, the Abax Petitioners sought a consensual resolution of
the defaults, but the Debtor rejected or failed to act on Abax Global's proposals for repayment of
the Senior Notes.  The Debtor's board of directors met in late-January 2013, before the last
Chinese New Year holiday, to discuss the settlement of the pending SEC regulatory action
against the company.  The Abax Petitioners made a final attempt at a negotiated resolution of the
outstanding default around the same time.  Thereafter, when the Debtor failed to make any

---

[4] Copies of the Default Notice, the Acceleration Notice and the Demand Letter are annexed as exhibits to the
Declaration of Xiang Dong Yang In Support of Opposition of the Abax Petitioners to the Debtor's Motion to
Dismiss dated June 6, 2013 (ECF No. 31).

payment on the Senior Notes, the Abax Petitioners, together with Lake Street, filed the involuntary petition.

### B.    Procedural Background

23.     On February 8, 2013 (the "***Petition Date***"), the Abax Petitioners, together with Lake Street, filed an involuntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") against the Debtor.

24.     On June 26, 2013, the Debtor consented to entry of an order for relief, which the Court entered on July 9, 2013 (ECF No. 38) (the "***Order for Relief***").  The Debtor is operating its business and managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Abax Petitioners have refrained thus far from requesting the appointment of a trustee or examiner.

25.     Nearly four months after the Debtor consented to the entry of the Order for Relief and nearly eight months after the Petition Date, the Debtors sought Court approval for the retention of Schiff Hardin LLP as its counsel and J. Gregg Pritchard as its chief restructuring officer. The Abax Petitioners filed a limited objection to those retentions (ECF No. 80) raising concerns that the Debtor's professionals would be unable to effectively act as fiduciaries in light of the fact that the Debtor's management was running a profitable business in China but ignoring its obligations to creditors and other constituents of the Debtor.  The Court approved the Debtor's proposed retentions on October 23, 2013.[5]

26.     On October 30, 2013, the Debtor filed its First Exclusivity Motion seeking a ninety-day extension of the Exclusive Periods.  In response, the Abax Petitioners filed an

---

[5] *See* Order Authorizing Employment and Retention of Schiff Hardin LLP as Counsel for the Debtor *Nunc Pro Tunc* as of July 9, 2013, dated October 23, 2013 (ECF No. 86) and Order Authorizing Employment of Warren Street Global, Inc. and Designation of J. Gregg Pritchard as Chief Restructuring Officer of the Debtor *Nunc Pro Tunc* as of August 28, 2013, dated October 23, 2013 (ECF No. 87).

objection to that motion arguing that, in light of the Debtor's lack of progress in the chapter 11

case, the circumstances did not warrant an extension of the Exclusive Periods (ECF No. 93).  As

set forth above, at the November 13 Hearing, the Court granted the First Exclusivity Motion but

cautioned the Debtor that, unless significant signs of progress and cooperation on the part of the

Debtor were forthcoming, this would be the Debtor's only extension.  On November 20, 2013,

the Court entered an order (the "***First Exclusivity Extension Order***") extending the Exclusive

Plan Period and Exclusive Solicitation Period for ninety days to February 4 and April 27, 2014,

respectively (ECF No. 102).

27.    On February 3, 2014, the Debtor filed the Second Exclusivity Motion

seeking a second ninety-day extension of the Exclusive Periods to May 5 and July 7, 2014,

respectively.

**There Is No Basis for a Further Ninety-Day<br>
<u>Extension of the Debtor's Exclusive Periods</u>**

28.    A chapter 11 debtor has the exclusive right to file a plan and solicit

acceptances thereof for 120 days and 180 days, respectively.  *See* 11 U.S.C. §§ 1121(b), (c).  A

court's decision to extend exclusivity is a "serious matter" and "extensions are not granted

routinely or cavalierly."  *In re Borders Group, Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011);

*see also In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re All Season*

*Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. W.D. Ind. 1990).

29.    The debtor may extend its exclusive periods only upon a showing of

"cause."  11 U.S.C. § 1121(d); *see also In re S.W. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450

(Bankr. W.D. Tex. 1987) ("A court considering a motion to extend the 120-day period, during

which the debtor has an exclusive right to file a plan of reorganization, should not routinely grant

an extension.  It should act only where cause is shown.").  Section 1121(d) of the Bankruptcy

11

Code does not define "cause."  Accordingly, courts have developed a multi-factor balancing test

to aid in determining whether "cause" exists to extend the debtor's exclusive periods.  *See In re*

*Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (enumerating the factors

of the test); *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (adopting the

same multi-factor test).  The factors courts consider are the following:

> (a)    The size and complexity of the debtor's case;
>
> (b)    the existence of good faith progress towards developing a plan of reorganization;
>
> (c)    a finding that the debtor is not seeking to extend exclusivity to pressure creditors to accede to the debtor's reorganization demands;
>
> (d)    the existence of an unresolved contingency;
>
> (e)    the fact that the debtor is paying its bills as they come due;
>
> (f)    the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
>
> (g)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;
>
> (h)    whether the debtor has made progress in negotiations with its creditors; and
>
> (i)    the amount of time which has elapsed in the case.

*Id.*

30.    Further, the burden of extending exclusive periods rests with the debtor,

which "must make a clear showing of 'cause' to support an extension."  *Curry Corp.*, 148 B.R.

754, 756 (Bankr. S.D.N.Y. 1992); *see also S.W. Oil Co.*, 84 B.R. at 450 ("A debtor seeking to

extend the 120-day exclusivity period bears the burden of proof and must show that cause exists

for granting an extension.").

12

31.     The Debtor here has made no showing to warrant a further ninety-day

extension of the Exclusive Periods.

**A.     The Debtor Has Not Made Any Meaningful Progress in its Chapter 11 Case or Progress in Negotiating with Creditors to <u>Justify a Further Ninety-Day Extension of the Exclusive Periods</u>**

32.     The Debtor and its professionals have not made meaningful progress in

this chapter 11 case since the First Exclusivity Extension Order.  *See* Sec. Excl. Mot., at ¶ 20.

The Debtor overstates the progress it has made in this case and the matters it cites as a basis for

requesting an extension (settling the SEC Action, filing its Schedules and SOFAs, and retaining a

chief restructuring officer) are minimal administrative tasks that were accomplished well before

the Debtor filed its First Exclusivity Motion.

33.     Courts have previously held that it is the Debtor's burden to demonstrate

some promise of probable success in formulating a plan of reorganization to warrant an

extension of the Exclusive Periods.  *See In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr.

E.D. Pa. 1986) ("Some promise of probable success in formulating a plan of reorganization, if

the debtor is provided additional time, has been recognized as an element of cause for an

extension of the exclusivity period.").  A reasonable probability "cannot be grounded solely on

speculation."  *In re Craghead*, 57 B.R. 366, 370 (W.D. Mo. 1985); *see also S.W. Oil Co.*, 84

B.R. at 451 (noting that in virtually every case where an extension has been granted, the debtor

has shown that "substantial progress has been made in formulating a plan during the first 120

days").

34.     The Debtor has been in chapter 11 for over a year now, with very little to

show for it.  The settlement of the SEC Action was agreed in principle before commencement of

the chapter 11 case in early 2013, finalized in early June prior to the entry of the Order for

Relief, and approved by this Court at a hearing in early August.  Thus, the entire matter was fully

13

resolved at least 90 days before the expiration of the initial Exclusive Period.  Since that time,

the Debtor has retained counsel, employed a chief restructuring officer, filed its limited

Schedules and SOFAs (after three extensions), established a claims bar date and filed a retention

application for Ernst & Young.  These are straightforward administrative tasks and do not

explain why the Debtor has been unable to make significant progress on a chapter 11 plan.  Even

more discouraging is that the Debtor's management appears to be using the fact that it has

delayed in retaining a financial advisor for over a year as a justification both for refusing to

engage in serious and substantive restructuring discussions and for extending its Exclusive

Periods.

35.     The Abax Petitioners are concerned that the Debtor is seeking to delay this

case even further and maintain the exclusive right to propose a plan for another three months so

it can use that time to bolster its litigation position and develop expert testimony in support of a

low valuation that will minimize recoveries for creditors of the Debtor and maximize the value

retained by management and owners of the VIE operating companies in China.

36.     The Debtor has not made any meaningful proposal to the Abax Petitioners

on a workable construct for a chapter 11 plan of reorganization and, given the history of delay

that has been employed by the Debtor's management, there is little reason to believe that a viable

proposal on a consensual plan of reorganization is forthcoming.

37.     Nor has the Debtor shared any meaningful financial information with the

Abax Petitioners.  Since the parties entered into the Cooperation Protocol, the only piece of

financial information that the Debtor has shared with the Abax Petitioners is a three page six-

month cash flow projection.  On January 14, 2014, the Abax Petitioners sent the Debtor a

number of due diligence items and follow-up questions with respect to those cash flow

projections.  However, despite numerous requests, the Debtor has still not replied to a single one

of those diligence items.  This hardly seems like the level of participation and cooperation that a

debtor would bestow on a creditor committee as the Court instructed at the November 13

Hearing.

        38.      Courts previously have declined to extend exclusive periods where a

debtor has failed to make any meaningful progress towards promulgating a chapter 11 plan.  *See,*

*e.g., All Seasons Indus., Inc.*, 121 B.R. at 1005-06 (declining to extend debtor's exclusive periods

where debtor, after being in chapter 11 for nearly seven months, had failed to file a chapter 11

plan and negotiations with its primary creditor constituencies had broken down); *Curry Corp.*,

148 B.R. at 755-56 (declining to extend exclusivity periods where there had been no persuasive

testimony as to why a plan of reorganization plan could not have been promulgated during the

120-day exclusive period and debtor had not demonstrated that a plan of reorganization would be

forthcoming); *S.W. Oil Co.*, 84 B.R. at 451-53 (denying request for an extension of exclusive

periods where, after nearly eight months in chapter 11, the debtor had taken no steps to formulate

a plan of reorganization); *In re Century Inv. Fund VII Ltd.*, 96 B.R. 884, 892 (Bankr. E.D. Wisc.

1989) (declining to grant extension of debtor's exclusive periods where, at the time of the

hearing on the motion, the debtor had no outline of a plan proposal and, two months after the

hearing, had still yet to file a chapter 11 plan).

        39.      Furthermore, throughout the course of their dealings with the Abax

Petitioners, the Debtor's management has routinely ignored its responsibilities to creditors and

other constituents in favor of its on-shore Chinese affiliates and there is no reason to believe that

this course of conduct will change.  Courts have previously held that a loss in confidence or faith

in the debtor's management should be considered in determining whether to extend a debtor's

US_ACTIVE:\44420042\7\99980.0219

exclusive period.  For example, in *In re All Seasons Indus., Inc.*, 121 B.R. 1002 (Bankr. N.D.

Ind. 1990), a bankruptcy court found that one of the reasons that the debtor and its major secured

creditors had been unable to find common ground upon which to build a consensual chapter 11

plan was that the creditors had lost faith in the capability and perhaps the integrity of the debtor's

management.  In declining to extend the debtor's exclusive periods, the court stated:

> While the court makes no finding as to whether or not this loss of
> faith is justified (indeed the nature of the hearing and the evidence
> presented do not permit the court to determine this question) for
> purposes of the present motion, it is only necessary to realize that a
> loss of confidence exists.  This is a factor the court should and
> must consider in its determination.

*Id.* at 1006; *see also R.G. Pharmacy. Inc.*, 374 B.R. at 488 (declining to grant additional

extension of exclusive periods where there had been a breakdown in negotiations between the

debtor and the objecting creditors and the debtor had not shown that additional extension sought

was likely to significantly improve the progress of the case); *In re Tripodi*, Ch. 11 Case No. 04-

30793, 2005 WL 2589185, *2 (Bankr. D. Conn. Oct. 9, 2005) (declining to grant additional

extension of exclusive periods where debtor had made progress negotiating with creditors and, in

light of, among other things, the positions and continuing acrimony between the debtors and their

principal creditors, a consensual plan was nowhere on the horizon).

        40.     The Debtor has now been under the protection of chapter 11 for over a

year and has made little to no progress towards promulgating a viable chapter 11 plan.  In light,

however, of the recent steps taken by the Debtor, such as the engagement of Ernst & Young and

the beginning of discussions with third party suitors, the Abax Petitioners believe that a more

limited extension of the Exclusive Periods may be warranted.  Accordingly, the Debtor's request

for an additional ninety-day extension of the Exclusive Periods should be denied.

US_ACTIVE:\44420042\7\99980.0219

**B.      The Debtor's Case is Neither Large Nor Sufficiently Complex to
Warrant a Further Ninety-Day Extension of the Exclusive Periods**

41.      The Debtor asserts in its Motion that a further extension of the Exclusive

Periods is justified due to the "cross-border and complex nature" of this case.  *See* Sec. Excl.

Mot., at ¶ 24.  While the existence of operations in China makes this matter somewhat out-of-the

ordinary, at most it adds a modicum of complexity to an otherwise modest-sized and

uncomplicated chapter 11 case.  Indeed, at the November 13 Hearing the Court agreed with this

observation stating "This is not rocket science, as the saying goes.  This may be an exotic

company, Chinese based, and you may have a hostile creditor group, but welcome to bankruptcy.

It just so happens that happens in most cases."  Trans. Nov. 13 Hearing, at 30:4-7.

42.      Overall, this case is not complex in comparison to most bankruptcies of

large-, mid-, or even small-cap debtors.  It is the Debtor's own failure to seek solutions to its

need to refinance, recapitalize or sell its assets that is creating complexity and delay and this

factor, therefore, does not warrant and extension of the Exclusive Periods.

43.      Courts have previously stated that it is "clear from the legislative history

that Congress intended an extension to be granted only in unusual circumstances, involving very

large and complex cases."  *See In re S.W. Oil Co.*, 84 B.R. at 452.  This case, however, involves

a single debtor holding company with no employees or operations.  The Abax Petitioners and the

one other noteholder are the Debtor's only major creditor constituency and the Debtor's own

Schedules identify a grand total of twenty creditors and zero executory contract or lease

counterparties.  *See* Schedules, Ex. E-G.  Moreover, the central issue to this chapter 11 case – the

Debtor's failure to honor its obligations on its Senior Notes – is also not complex or in dispute.

44.      Courts have declined to extend the exclusive periods for debtors in similar

cases that were determined to be routine or of insufficient size or complexity where the debtor

US_ACTIVE:\44420042\7\99980.0219

had few creditors and few or no employees or operations.  *See, e.g., R.G. Pharmacy, Inc.*, 374

B.R. at 487-88 (debtor's bankruptcy case was not sufficiently large or complex to justify an

extension of the debtor's exclusivity periods where debtor employed 44 people and had few

major creditors – the objecting parties and the government – and only one equity holder); *Curry

Co.*, 148 B.R. at 755 (holding that case was not complex for purposes of extending exclusivity

where financial information on the debtor's operations was readily available and case had not

produced numerous or complex proceedings); *Gen. Bearing Corp.*, 136 B.R. at 367 (case with

only two secured creditors was not sufficiently complex to justify extension of exclusivity); *All

Seasons Indus.*, 121 B.R. at 1006 (declining to grant extension of debtor's exclusive periods

where court determined that the number of creditors and claims against the debtor were not

extraordinary, case was neither large nor unique, and there was nothing unusual about the nature

of the debtor's business or financial problems); *S.W. Oil Co.*, 84 B.R. at 452 (holding that case

where objecting creditors were debtors' only primary creditors was neither unusually large nor

unusually complex and, therefore, extension of debtors' exclusive periods was not warranted); *In

re Gagel & Gagel*, 24 B.R. 674, 675 (Bankr. D. Conn. 1982) (declining to grant extension of

debtor's exclusive periods where there were only two creditors and extension of exclusive period

would be "fruitless.").

      45.    This case stands in stark contrast to *In re Borders Group, Inc*., 460 B.R.

818 (Bankr. S.D.N.Y. 2011), a chapter 11 case that this Court found to be sufficiently large and

complex to warrant an extension of the debtors' exclusive periods.  In a decision holding that the

debtors in that case had established good cause for an extension of the exclusivity periods, this

Court took note of the significant evidence set forth by the debtors regarding the size and

complexity of the cases.  In addition to the nearly 11,000 employees, the Court also noted that

18

there had been nearly 1,000 docket entries as of the time of the debtors' extension request and

that numerous motions and stipulations had been heard or presented – all of which, collectively,

illustrated the complexities of the debtors' cases and warranted the extension of exclusivity.  *Id.*

at 823-24.

>        46.        Unlike the *Borders* case, this Debtor's case is small and straightforward.

As set forth above, this case involves but a single debtor with no employees or operations and

only one major creditor constituency.  Furthermore, there has been little activity to date.  The

Debtor has not had the need for any typical "first day" relief and, other than the approval of the

SEC settlement, three professional retention applications, and a routine motion to establish a bar

date, has not filed any requests for relief from the Court except for motions to extend various

procedural deadlines.  In fact, as of the date of this Objection, there have been fewer than 120

total filings in the Debtor's case, many of which were filed by the Abax Petitioners – a far cry

from the high level of activity and the 1,000+ docket entries noted by this Court in *Borders*.

>        47.        By any measure, the size of this case pales in comparison to chapter 11

cases routinely filed in the Southern District of New York where extensions of exclusivity have

been granted due to size and complexity.  *See, e.g., In re Lehman Brothers Holdings Inc.*, Ch. 11

Case No. 08–13555 (Bankr. S.D.N.Y. 2008); *In re WorldCom, Inc.*, Ch. 11 Case No. 02–13533

(Bankr. S.D.N.Y. 2002); *In re Enron Corp.*, Ch. 11 Case No. 01–16034 (Bankr. S.D.N.Y. 2001);

*In re Gen. Growth Props., Inc.*, Ch. 11 Case No. 09–11977 (Bankr. S.D.N.Y. 2009); *In re BGI

Inc., f/k/a Borders Group Inc.*, Ch. 11 Case No. 11-10614 (MG) (Bankr. S.D.N.Y. 2011); *In re

AMR Corp.*, Ch. 11 Case No. 11–15463 (Bankr. S.D.N.Y. 2012).

>        48.        Neither the size nor complexity of this chapter 11 case warrants a further

ninety-day extension of the Exclusive Periods.

19

C.     **The Debtor Is Seeking A Further Ninety-Day Extension of
the Exclusive Periods as a Means of Extracting Value and
Pressuring the Abax Petitioners to Accept Less Than They
Are Entitled to on Account of the Senior Notes**

49.     Although the Debtor asserts in its motion that its requested extension is

necessary to attract and identify interested parties willing to invest in the Debtor, the Debtor

offers no evidence that it will use an additional three months of exclusivity to do anything other

than continue its policy of disengagement and delay in hopes that, by preserving the status quo,

the Abax Petitioners will eventually succumb and accept less value than they are entitled to for

their Senior Notes and Warrants.  This tactic of exerting undue pressure to force the Abax

Petitioners to accept an unreasonable settlement is improper and, therefore, a further ninety-day

extension of the Exclusive Periods should not be granted.

50.     Courts have previously held that an extension of exclusive periods should

not be employed as a "tactical device to put pressure on creditors to yield to a plan that they

might consider unsatisfactory." *Curry Co.*, 148 B.R. at 754.  As one bankruptcy court stated:

> The Court should also determine or attempt to determine the
> debtor's motives in requesting an extension under § 1221(d) even
> where the debtor sustains its burden of proof.  A debtor may not
> employ an extension as a tactical device to put pressure on parties
> in interest to yield to a plan they consider unsatisfactory…Debtors
> may not use an extension to drag out the reorganization and
> pressure the creditor for concession in the status of its rights.

*S.W. Oil Co.,* 84 B.R. at 453; *see also In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr.

S.D.N.Y. 1990) ("[R]equests for extensions of the exclusivity periods should not be granted

routinely or as a matter of course without proof as to probable success in formulating a plan of

reorganization and evidence that the debtor did not seek the additional extension in order to

pressure the creditors to accede to the debtor's reorganization demands."); *Gen. Bearing Corp.*,

136 B.R. at 36 ("In considering a motion to extend exclusivity, the court must be mindful that the

20

debtor should not be permitted to use the extension as a way to pressure the secured claimants to

accede to the debtor's proposals.").  Furthermore, extensions are "impermissible if they are for

the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to

accede to its point of view on an issue in dispute."  *In re Lake in the Woods*, 10 B.R. 338, 345-46

(Bankr. E.D. Mich. 1981).

      51.    The Abax Petitioners are concerned that the Debtor's management will

continue to employ a tactic of delay and indifference as a means of forcing the Abax Petitioners

to accept less than they are entitled to on account of their Senior Notes.  Furthermore, the longer

the Debtor is permitted to maintain the status quo and prevent the chapter 11 case from

progressing, the greater the risk to creditors that revenues being generated by the Debtor's

operations in China (i.e. the VIE) will be improperly withdrawn from the company – revenues

that the Debtor's management have wrongfully withheld from the WFOE that could have been

used to pay down the Debtor's obligations.

      52.    The Debtor should not be rewarded for its unreasonable delay and,

accordingly, the Debtor should not be granted a further ninety-day extension of the Exclusive

Periods.  In contrast, a brief extension of the Exclusive Periods will provide the Debtor with the

opportunity to demonstrate to the Court and other parties in interest that meaningful progress is

possible.

    **D.**    **The Legislative History and Congressional Policy
Underlying Section 1121 Do Not Support a Further
<u>Ninety-Day Extension of the Exclusive Periods</u>**

      53.    The legislative history and Congressional policy underlying section 1121

do not support a further ninety-day extension of the Debtor's Exclusive Periods as the Debtor

and this chapter 11 case would not be harmed by a termination of exclusivity.

21

54.     Courts have previously stated that "[i]n passing upon a request for a change in the debtor's exclusivity period, the court needs to consider more than just the articulated cause presented to it.  It must also consider the history and purpose of § 1121 and the competing interests which Congress sought to balance when it enacted these time tables." *All Seasons Indus.*, 121 B.R. at 1004; *S.W. Oil Co.*, 84 B.R. at 450 ("Courts considering the question of whether to extend the exclusivity period have not favored extension of the 120-day period, a position supported by the legislative history.").  Courts have often cited to the legislative history of section 1121, which indicates that the Bankruptcy Code imposed limitations on a debtor's exclusive right to file a chapter 11 plan in order to "balance the bargaining positions of debtors and creditors in negotiating the terms of a reorganization." *R.G. Pharmacy, Inc.*, 374 B.R. at 488; *Grossinger's Assoc.*, 116 B.R. at 36 (The goal reflected in section 1121 in allowing other interested parties to file a plan of reorganization after the expiration of the debtor's exclusivity is "predicated on the theory that there should be a relative balance of negotiating strength between the debtors and creditors during the reorganization process."); *Lake in the Woods*, 10 B.R. at 343 ("The desire to allow other interested parties to file a plan was grounded in the philosophy that there should be a relative balance of negotiating strength between debtors and creditors during reorganization of an enterprise.").

55.     Furthermore, "Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988); *In re Borders Group, Inc.*, 121 B.R. at 1004 ("The bankruptcy courts must avoid reinstituting the

22

imbalance between the debtor and its creditors that characterized proceedings under the old
Chapter XI.").

56.    Consistent with the legislative history and Congressional policy
underlying section 1121 of the Bankruptcy Code, declining to extend the Debtor's Exclusive
Periods by ninety days will not result in any harm to the Debtor; rather, it will simply restore
balance to the Debtor's chapter 11 case, placing creditors on equal footing with the Debtor.  The
Debtor will still be able to pursue a third party transaction and the Abax Petitioners have no
intention at this time of disrupting this process. Moreover, the Debtor will still be permitted to
file its own chapter 11 plan and have the opportunity to demonstrate its good faith in working
with its creditors and other parties in interest to maximize value.  Furthermore, a termination of
exclusivity after a brief extension will not result in a default in any DIP financing or otherwise
adversely affect the Debtor's financing or liquidity.

**E.    A More Limited Extension of the Exclusive
Periods is Appropriate to Insure that the Debtor
<u>Aggressively Pursues Third Party Transactions</u>**

57.    As set forth above, the Abax Petitioners do not believe that the Debtor has
demonstrated sufficient progress to warrant a further ninety-day extension of the Exclusive
Periods.  However, the Abax Petitioners are pleased that the Debtor has received some recent
indications of interest and the Abax Petitioners are willing to give Ernst & Young and the
Debtor's management a chance to demonstrate that they are serious about pursuing a transaction
that maximizes value for the estate and its creditors.  The concern, however, is that should the
Court grant the Debtor's requested extension, ninety days will pass without the Debtor pursuing
these transactions, and the parties will have wasted even more time putting creditor recoveries at
even further risk.

23

58.    Based on the Debtor's lack of progress thus far, it is imperative that the

Debtor and its management be kept on a tight schedule to insure that they do not waste this

opportunity.  Accordingly, the Abax Petitioners believe that a limited extension of exclusivity,

such as 45- or 60-days, would be more appropriate to insure that the Debtor's management

actively engages interested parties in hopes of achieving a transaction that maximizes value for

the estate and all parties in interest.

## Conclusion

59.    For the reasons set forth above, the Abax Petitioners respectfully request

that the Court deny the Second Exclusivity Motion and, in the alternative, grant a more limited

extension of the Exclusive Periods as set forth herein.


Dated: February 18, 2014
         New York, New York


                                        /s/ Jacqueline Marcus
                                        Jacqueline Marcus
                                        767 Fifth Avenue
                                        New York, NY 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        *Attorneys for Petitioners Abax Lotus Ltd.*
                                        *and Abax Nai Xin Ltd.*


24

**EXHIBIT A**

**NOVEMBER 13 HEARING TRANSCRIPT**

**In Re:**

*CHINA NATURAL GAS, INC.*

*Case No. 13-10419-jmp*

_____

*November 13, 2013*

_____

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 13-10419-jmp

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  CHINA NATURAL GAS, INC.,

9

10            Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            November 13, 2013

19            10:42 AM

20

21  B E F O R E:

22  HON. JAMES M. PECK

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    Application Filed by Debtor for Entry of Order Establishing

3    Deadlines and Procedures for Filing Proofs of Claim and

4    Approving Form and Manner of Notice Thereof

5

6    Motion Filed by Debtor and Debtor-in-Possession for Entry of an

7    Order Extending its Exclusive Periods to File a Chapter 11 Plan

8    and Solicit Acceptances Thereof

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Esther Accardi

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

1

2  A P P E A R A N C E S :

3  SCHIFF HARDIN LLP

4      Attorneys for Debtor

5      666 Fifth Avenue

6      17th Floor

7      New York, NY 10103

8

9  BY:   LOUIS T. DELUCIA, ESQ.

10     ALYSON FIEDLER, ESQ.

11

12

13 WEIL, GOTSHAL & MANGES LLP

14     Attorneys for Abax Lotus LTD and Abax Nai Xin Ltd.

15     1300 Eye Street NW

16     Suite 900

17     Washington, DC 20005

18

19 BY:   ADAM STROCHAK, ESQ.

20

21

22

23

24

25

1

2  WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Abax Lotus LTD and Abax Nai Xin

4          767 Fifth Avenue

5          New York, New York 10153

6

7  BY:    MATTHEW P. GOREN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2              THE COURT:  China Natural Gas.
 3              MR. DELUCIA:  Good afternoon, Your Honor.  Louis
 4    DeLucia of Schiff Hardin for debtor, China Natural Gas.  And
 5    with me, Your Honor, is the CRO, Mr. Greg Pritchard (ph.).
 6              Today, Your Honor, we have two matters pending, which
 7    the Court has before it.
 8              One is an uncontested bar date motion seeking entry of
 9    an order setting a bar date of --
10              THE COURT:  Do you wish to enter your appearance; is
11    that why you're standing?
12              MR. DELUCIA:  Oh, I apologize.
13              MR. STROCHAK:  Yeah, I would like to -- an appearance,
14    Your Honor.
15              MR. DELUCIA:  I apologize, Your Honor.
16              MR. STROCHAK:  Thank you, Your Honor.  Adam Strochak
17    and Matthew Goren, Weil, Gotshal & Manges for the Abax
18    creditors.
19              THE COURT:  Okay.
20              MR. STROCHAK:  Thank you.
21              MR. DELUCIA:  Thank you, Your Honor, I apologize.
22              So January 6th is the requested extension -- or
23    requested date set for the bar, date for the filing of proof of
24    claims.  There's been no opposition.  We have submitted a form
25    of proof of claim.  We propose publication in both the USA
```

1   Today and Wall Street Journal publications, twenty-eight days

2   prior to the bar date, which is a proposed January 6th date.

3          There's been no opposition, Your Honor; therefore, on

4   that motion, if the Court has any questions, we would ask that

5   it be entered.

6          THE COURT:  No questions; it's approved.

7          MR. DELUCIA:  Thank you, Your Honor.

8          The second and perhaps more substantive motion is a

9   request for an extension of the debtor's exclusive period

10  within which to file a plan and solicit acceptances.

11         This is the debtor's first application in accordance

12  with Section 1121 of the Bankruptcy Code.  The only objector

13  and response that we received of any kind is from Abax, the

14  Abax entities, which are two entities controlled by Don Yang, a

15  former director of the debtors.

16         We -- the debtor is seeking a ninety-day extension

17  through and until February 4th, 2014 to file a plan and to

18  solicit acceptances until April 7th, 2014.  That application is

19  supported, as Your Honor is aware, by declaration of Greg

20  Pritchard.  And there are exhibits affixed thereto that Your

21  Honor yesterday graciously granted the submission under seal of

22  those documents.  In accordance with the confidentiality

23  agreement that we have with Abax and the Abax partners

24  entities, we have shared those exhibits with the Abax entities

25  and they now have them, some of those exhibits -- actually one

1   of which they were aware of even before they were filed, Your

2   Honor, pursuant to the agreement.

3           As the declaration demonstrates, and as the

4   application demonstrates, the debtor has not sat idly by doing

5   nothing, using time to exert leverage on the Abax entities.  In

6   fact, this debtor has been working with Mr. Pritchard, as well

7   as the representatives in China, to formulate a plan that would

8   be a basis that would be acceptable and perhaps one hundred

9   percent compliant with 1129 as soon as possible.

10          In order to do that, Your Honor, it has been candidly

11  an effort of educating principally executives and officers of a

12  PRC-controlled company that the laws of the United States, the

13  process of the United States, the laws governing bankruptcy

14  restructuring, and that process has taken some time.  But we

15  have made substantial progress.

16          To do so, Your Honor, we have made offers -- not one,

17  but two, at least, written offers to Abax, one of which was an

18  actual term sheet with terms by which we could, perhaps, obtain

19  their consent for a consensual restructuring by Abax.  But that

20  offer has not been accepted, and we have sought from them their

21  support for a plan; it has not been forthcoming.

22          However, we do believe that based upon the progress

23  we've made with this -- with the debtor, with Abax, that with

24  an additional period of time we should be able to cross that

25  hurdle and get to a confirmable plan within this ninety-day

1 period.

2          Let me briefly state what perhaps is unique to this

3 case that has caused an extension request.  One is that it was

4 commenced as an involuntary, and it has taken some time for the

5 professionals who were not pre-petition on board consulting

6 with the debtor on restructuring to do so post-involuntary

7 filing.

8          Thereafter, Your Honor, the debtor has also had to

9 deal with -- during that gap period -- the SEC litigation which

10 it did settle in the gap period, and also has, in fact, teed up

11 immediately after the order for relief was entered and sought

12 the approval of that settlement.

13         There are two pending litigations by class action as

14 well as a derivative action in Delaware, both referenced in the

15 declaration.  Shearman & Sterling have been working on

16 resolving those litigations.  Those litigations include claims

17 against the officers and directors, and it is the intent to try

18 to bring those matters into resolution within a plan as well.

19 That has been discussed by myself, personally, with Shearman &

20 Sterling as well as with the insurers directly -- counsel to

21 the insurers directly.

22         That leaves us with really an effort to structure a

23 simple plan that would resolve, and we provided the Court

24 with -- under seal -- a proposed plan that would be in

25 generality a structure that we have obtained approval from the

1   company's principals in China that would be supported by them.

2   And that plan process, if we take it and refine it, try to

3   bring Abax into the fold, get us to a confirmation date, you're

4   looking at a very tight period for this ninety-day period.

5        I did some quick math; if you look at this ninety-day

6   period, it's November 13th, we have a very limited amount of

7   time of November left.  We have a January 6th bar date, now

8   that that has been entered.  It leaves us very little time from

9   January 6th to the extended period of February 4th we're asking

10  for to assess the true world of creditors that exist, based

11  upon those claims that were filed.  And we have two -- at least

12  two, and if not more, intervening holidays, the major holidays

13  as well as the New Years.  And these reflect some delays as

14  well.  So if you really look at it, we probably have less than

15  sixty days of working time to get this plan resolved despite

16  the ninety-day extension.  So with that, Your Honor, I do

17  believe progress has been made.

18       You have heard from -- I will just address quickly the

19  only objection.  We have no objection from the securities

20  plaintiffs, nothing from the U.S. Trustee, nothing from any

21  other creditor, and there are other creditors with more than a

22  million dollars each in claims against this estate.  So we have

23  no other objection.

24       That Abax objection, Your Honor, is -- I consider it

25  pretty much as expected.  You're taking too long to get to a

1   plan, you're being -- delaying the process in order to extract

2   something from us, all of which, as Your Honor can see, based

3   upon what we've proposed, based upon an offer that the company

4   has received and tomorrow morning at 9 a.m.  I have a call with

5   those parties in China to discuss, is not delaying the process.

6   The debtor is affirmatively looking at these options as a way

7   that may, in fact, give the maximum possible amount under the

8   Bankruptcy Code a creditor may seek.  And here, Your Honor,

9   there is very little this debtor could do more than to act in

10  good faith, pursue the course it's on and seek a confirmation

11  within the next ninety days.

12          THE COURT:  Okay.  Let me ask you a question.  I don't

13  mean to mischaracterize the Abax objection, and if I do,

14  counsel will correct me, but it's basically it's taking too

15  long, we're impatient and the extension of exclusivity is going

16  to be used to our detriment.

17          MR. DELUCIA:  Right.

18          THE COURT:  One question that I have, without going to

19  the substance of negotiations that have occurred to date

20  relates to what I understood to have been a proposed meeting in

21  Hong Kong --

22          MR. DELUCIA:  Yeah.

23          THE COURT:  -- sometime between the last time we were

24  together and today, in which parties were supposed to be

25  talking about settlement and compromise of these issues.  Did

1  that meeting take place?

2          MR. DELUCIA:  No.  What happened was we did exchange

3  offers, offers that included actual concrete numbers, offers of

4  participation in equity upon emergence with Abax, but because

5  there wasn't any counteroffer that suggested a willingness to

6  compromise in any way, there was no sense that there would be

7  progress of the expense and time to meet in Hong Kong to make

8  that happen.

9          In addition, Your Honor, we have been hoping -- and

10  Your Honor will see within the plan -- that there was an effort

11  to obtain additional financial advisors in the United States to

12  facilitate that process, including the process that's

13  envisioned by the plan.  I would elaborate but we're on the

14  open record.  That process and those professionals we've

15  discussed with Abax, we want them on board to facilitate that

16  process, and without them on board, I think it would be less

17  productive.  We want them on board at a meeting with Abax if

18  that can occur.  And we're more than anxious to have that

19  happen within the next ninety days.

20          What we get back from Abax -- and Abax is here; they

21  can defend themselves -- is that's just not good enough, we

22  don't understand why you don't just pay us in full, every

23  single time.  And all -- we understand that.

24          Now, if Your Honor has had the opportunity, I know

25  you've been busy, to look at what we filed yesterday, Your

1    Honor will see that if what they want is what they want, then

2    that is the way to get it.  And if there's no other way to get

3    them what they want, except perhaps to a plan that we're

4    proposing, it's the only way to bring the constituencies

5    together.  We've done what we can with that.

6           But we're not -- we're going to continue.  The call

7    that we have tomorrow morning with this interested party is one

8    that we've advised them last week, Abax, that we would include

9    them in the process.  We are having our first phone calls with

10   them tomorrow that are substantive phone calls.  Thereafter,

11   Abax will be folded into that process to participate in

12   understanding what others may be interested in doing with this

13   debtor.

14           THE COURT:  Okay.

15           MR. DELUCIA:  Thank you, Your Honor.

16           MR. STROCHAK:  Good morning, Your Honor.  Adam

17   Strochak, Weil, Gotshal & Manges, for Abax.

18           Let me start with a couple of things.  First of all,

19   Abax holds something like ninety-five percent of the debt in

20   this case.  So it shouldn't come as a huge surprise to anyone

21   that we're here arguing our position, because we have, by far,

22   the most at stake in this matter.

23           What you really have before Your Honor is a

24   retroactive motion to reinstate exclusivity.  By my

25   calculation, exclusivity ran in the beginning of November, and

1  I don't know that any bridge order was entered.  But even apart

2  from that technical issue, exclusivity should not be extended

3  on the merits here.  There is no cause in this case to extend

4  exclusivity.

5          THE COURT:  Let me ask you a very basic question

6  because I've read your papers, and if you think I've

7  mischaracterize what they're, saying you can tell me, but I

8  think I have the essence of your argument.

9          Assume for a moment that you have a spectacularly

10  successful argument and you convince me that exclusivity should

11  not be extended in this case -- which is, by the way, a very

12  difficult argument for you to win on the first request,

13  particularly in a situation in which your clients threw this

14  debtor into bankruptcy through an involuntary, so you end up

15  getting the consequences of the debtor in bankruptcy.  You

16  don't necessary get what you want, you get what happens in

17  bankruptcy, which is sometimes what you don't want.  So let's

18  assume for a moment that you get what you want, and I say, very

19  persuasive argument you win; then what do you do?

20          MR. STROCHAK:  Your Honor, the reason why --

21          THE COURT:  Do you have a plan on the table?

22          MR. STROCHAK:  No, we don't have a plan on the table,

23  Your Honor, because we couldn't go out and put together a plan

24  that would work while the debtor still had exclusivity.

25          So what we would like to be able to do is to go

1   forward and talk to prospective purchasers of these assets, to

2   talk to people who might be interested in recapitalizing this

3   debtor, and trying to put together a structure for a

4   recapitalization or a sale of the debtor that would work to get

5   creditors paid, maybe get a return to equity if there's enough

6   value for that, and resolve this matter.

7           THE COURT:  Okay.

8           MR. STROCHAK:  And then --

9           THE COURT:  I understand what you just said, but I

10  also understand that in other settings where debtors have

11  exclusivity and where there is a level of cooperation between

12  creditors and debtors or trustees, as the case may be, that

13  what you've just described is permissible; it happens all the

14  time.  Parties work collaboratively, opportunities are

15  presented to creditors' committees that are vetted within the

16  committee and then presented to the debtors for consideration.

17  This is standard practice.  In what way does the extension of

18  exclusivity preclude what you've just described?

19          MR. STROCHAK:  I think what it does, Your Honor, is it

20  continues to leave the case in the control of the debtor, and

21  it gives them the ability to simply continue to say no, and to

22  continue to simply hold us at arm's length.  Because the only

23  way to get the maximum value for this estate is to have the

24  full cooperation, either voluntarily or involuntarily, from the

25  management in China, because no one is going to come in and

 1  offer the value that this estate is worth if the Chinese

 2  management and the owners of the -- the equity owners of the

 3  VIE entities, the operating companies in China, are just going

 4  to stand back and say we're not going to cooperate, we're not

 5  going to do anything.

 6          So what we're looking for is the opportunity to go out

 7  and put something together that will work and put that before

 8  this Court, and frankly, put the debtor in a situation where

 9  the debtor's management, as fiduciaries to the creditors of

10  this estate, are going to have to say no, we won't do that

11  deal, and we won't seek the cooperation that we need in China

12  to make that deal happen, because we don't think it's the best

13  deal for this estate.  And we don't think that they're ever

14  going to do that until we can go out and actually put something

15  together and put it before them and say here, this is a good

16  deal and you have a fiduciary duty to make this deal happen in

17  order to ensure a maximum return for the creditors of this

18  estate.

19          And the draft plan that they've put before Your Honor

20  late last night, which we got first thing this morning after

21  asking for a copy of it, is Exhibit A as to why you should give

22  us that opportunity and allow us to go out and try and put

23  something together; that we can go out to people in the market

24  and say look, we have the right to propose a plan, you can deal

25  with us because we're going to try and get this confirmed even

 1   if we can't get full cooperation from the debtor on the first
 2   round.
 3          And the plan that they've put forward is a liquidating
 4   plan -- it's, essentially, the plan of last resort.  It's what
 5   you would do in this case if you've explored every avenue to
 6   achieve maximum value and concluded you can't make anything
 7   happen.  So you throw up your hands, you hand these keys to the
 8   estate to a trustee and say you know what, you go and sell it,
 9   you're not going to have any cooperation from the Chinese
10   management, you're going to get minimal value for it.  And then
11   if you read it carefully, Your Honor, they've done a really
12   cute thing.  They've separately --
13          MR. DELUCIA:  I have to object, Your Honor; that
14   document was filed under seal, and counsel is now putting on
15   the record -- and it was submitted under a confidentiality
16   agreement signed by Abax and Mr. Strochak, and he's now
17   discussing terms of --
18          THE COURT:  Well, I haven't heard any terms yet, but I
19   think that -- I view that interruption as an admonition to be
20   careful what you're about to say.
21          MR. STROCHAK:  Well, Your Honor, I don't -- I guess if
22   they're asserting that plan as evidence in support of an
23   extension of exclusivity, then I'm not quite sure how I can
24   oppose it without talking about it to some degree.  And I can
25   try and dance around the line, I don't know what Mr. -- what

1  counsel thinks is and isn't confidential in that plan, but I
2  think suffice it to say it is the plan of last resort, it is
3  the cramdown plan which they would have to get confirmed over
4  our objection as the creditors holding, you know, at least
5  ninety-five percent of the debt in this case.  So it's the plan
6  of last resort.

7          So what they're telling Your Honor is we'd like ninety
8  more days.  If the ninety days don't work, we have a plan; it's
9  the disaster scenario because it's going to have to be approved
10 in a cramdown situation, we're certainly not going to support
11 it, and that's what they're telling Your Honor.

12         So what we think is going to happen is they're going
13 to keep us at arm's length, they're going to run the clock out,
14 they're going to say we'd like to keep as much value as we can
15 for the Chinese equity owners of the VIE interests and the
16 Chinese management.  And we'll run the clock out and then in
17 February we'll propose a cramdown plan and we'll see what
18 happens then.

19         So we're not looking at a situation where we
20 realistically are going to get to a resolution of this matter
21 in February; we're looking at the beginning of an extended
22 litigation in February.  And that's what they're putting
23 forward.

24         I have to make a few comments about some of the things
25 that were communicated, Your Honor, because some of it is just

 1  wrong.

 2         I certainly understand, Your Honor -- we commenced

 3  this as an involuntary because we thought that this forum would

 4  be the best place to get this matter resolved.  It wasn't a

 5  precipitous filing where we surprised anybody; we told them for

 6  six months, let's get it resolved or we're going to have to

 7  file an involuntary or take other enforcement actions.

 8         Counsel has been involved since the involuntary was

 9  filed in February.  This isn't a situation where they got

10  involved at the last minute.  Counsel's partner in Washington

11  has represented the debtor for a long time, was counsel before

12  the involuntary, so it's not like this was done by surprise in

13  the dark of night or anything like that; this has been coming

14  for a long time.  And it only came as a result of our

15  frustrations in inability to get this resolved.

16         It is correct that the debtor made a -- what they call

17  a proposal to us.  They came many, many months into this case.

18  It was categorically unworkable in a number of different ways.

19  And again, I won't get into the details due to the

20  confidentiality concerns, but it didn't work in terms of the

21  amount they're proposing to pay us, it didn't work in terms of

22  the structure, it wasn't supported by any justification, saying

23  here's why we think this amount of value is what you're

24  entitled to get in this case.  It was supported by nothing.

25         It's categorically untrue that we didn't respond.  We

1   responded within a week.  We responded within a week that said
2   look, you seem to be proposing an acquisition by the founder in
3   China, and if that's what you're proposing, we could work with
4   that.  Here's what we would need to make it happen.  And we
5   ticked off the things that we would need to make it happen.  We
6   explained to them why we thought that their proposal was
7   unworkable and unsupported.  And we said we would actually
8   consider taking a discount off of the amount we were owed if a
9   transaction like the one we outlined could be consummated by
10  the end of the year.  So categorically untrue that we have just
11  stood back and said we want a hundred percent of what we were
12  owed, we won't take anything less.  So that simply is untrue.
13       We have indicated that we are prepared to discuss that
14  framework with them, and then after our response went back to
15  them, just in the last week or so, they notified us that they
16  had, essentially, an over-the-transom offer from somebody that
17  would pay substantially all of the notes in terms of the value.
18  And that's just the opening proposal that was made.  So we
19  certainly think that that should be explored.
20       We want to be at the table, where I learned, for the
21  first time, in court this morning that there's a meeting or a
22  phone call tomorrow to discuss it.  We were not invited to that
23  process.
24       What's been going on here for many, many months, Your
25  Honor, is a rope-a-dope.  We were told initially that the

1  debtor was simply going to refinance the debt and we'd be
2  refinanced out.  That never happened.  We never got any
3  information suggesting that there ever had been an opportunity
4  to shop for new financing.  Nothing has happened.  At every
5  step the response back we get is well, we're going to have a
6  call with the people in China and we'll see what happens.  So
7  we simply are being kept at arm's length and essentially
8  threatened with the idea that look, if you're not going to
9  accept what we, the Chinese ownership of the operating
10 entities, is willing to pay for it, then we'll just hand the
11 keys to the liquidating trustee, and we're not going to
12 cooperate, and they'll just sell it off for whatever they can
13 get, and that's where it all will end up.
14       So that's what's going on in this case, Your Honor.
15 We have not been provided with any information to support any
16 valuation of the debtor.  We've been provided with one
17 document, a liquidation analysis, for, essentially, a fire sale
18 value of the assets.  Nothing to support any contentions of
19 valuation.  No marketing plans.
20       We've been told that they wanted to get KPMG retained
21 as a financial advisor to assist with marketing and valuing
22 this estate.  We immediately responded and said yes, we think
23 that's a good idea.  In fact, we told you in the summer that
24 you needed people on the ground in China to do this.  That
25 suggestion was rejected at first, and now they've come around

1  to that view, so they want to hire KPMG.  And we immediately

2  responded yes, my partner in Hong Kong, she knows the KPMG

3  team.  We'd love to talk to them.  That would be good.  And

4  they responded no, they're not ready to talk yet.  You can't

5  reach out to them.  Don't do that.

6          So we haven't had any contact with the KPMG people in

7  China that ostensibly are going to be responsible for this very

8  short duration now marketing process that they're proposing,

9  which is not really ninety days.  It's really sixty days.  We

10 haven't seen anything about it, and the only conclusion that we

11 can reach, Your Honor, is that this debtor is simply going to

12 run the clock, and they're either going to try and force us to

13 accept whatever the Chinese ownership might be willing to pay,

14 and if we don't like it, then they'll just try and cram down a

15 plan on us.

16         And that's not a justification for an extension,

17 particularly in a case here where there is no harm whatsoever

18 to the debtor from an extension of exclusivity.  This is not a

19 case where there's going to be dozens of competing --

20         THE COURT:  You mean harm from a denial of an

21 extension?

22         MR. STROCHAK:  A denial.  I'm sorry, Your Honor.

23 Thank you for the correction.

24         There's no harm whatsoever.  If we can go out and put

25 something together and if they can come before this Court as

1   fiduciaries to this estate and say Your Honor, that doesn't

2   work for the following reasons.  We don't think it's the most

3   value.  They have that right.  They say they want to include us

4   in the process anyway, so there's no harm to them.

5            This is not a case where there's going to be multiple

6   competing plans and the debtor is going to be distracted, in

7   dealing with multiple competing plans, from accomplishing what

8   needs to be accomplished in Chapter 11.  This is a

9   recapitalization case.  It's not an operating debtor where

10  you've got lots of changes that need to be made and tools of

11  the Bankruptcy Code used to put the debtor in shape for a sale.

12           This is a well performing enterprise.  The financials

13  demonstrate that.  We attached that to our papers.  They're

14  socking away cash.  They're investing cash that they're

15  generating in expanding their business.  They've got cash on

16  the balance sheet.  Nobody is here before you saying, Your

17  Honor, that this is a sick company and we need to fix it; we

18  need more time to fix it.  This is a healthy company, and they

19  just need to recapitalize it, and we haven't seen anything, and

20  they haven't put anything before this Court, to demonstrate

21  that they've taken steps to do that.  Nothing.  I mean, there's

22  no marketing plan before the Court.  There's no list of

23  prospects.  There's no list of potential sources of capital.

24  There's no valuation information to assist the Court in

25  understanding why it might be difficult and they need more time

1   to do it.  There's nothing before the Court to justify an

2   extension in this case.

3            So I'll rest there, Your Honor.  Thank you for hearing

4   me out.

5            THE COURT:  Okay.

6            MR. DELUCIA:  Limited response, Your Honor.

7            One point I'd like to highlight, which is somewhat

8   subtle within what you've heard in terms of our argument and

9   Abax's argument, and that is this:  what they want is not to

10  file a plan but to provide opportunities to -- to provide

11  potential investors, provide financing, provide opportunities

12  for cash to come to the debtor to pay themselves off.

13           They commenced this case February 8th of this 2013.

14  We have not received one communication from them saying can you

15  speak to this company.  Why don't you speak to that investor?

16  Not one.  And they have been all over our back, as you can

17  tell.  So reality is, Judge, if they have somebody interested

18  in buying, investing in this company, as I indicated and as I

19  think the documents suggest we filed under seal, we're prepared

20  to go down that path and explore it.  But we haven't even

21  gotten one suggestion from the Abax parties that there is

22  someone they know we should speak to.  Not one since February

23  8th.  So, Your Honor, the answer is we are --

24           Now, let me talk about going forward.  He is right.

25  We do want to include them in the process.  We intend to

 1  include them in the process.  But this private equity fund,

 2  with whom we have a call tomorrow morning, has the capacity to

 3  do a deal, from what we've checked in the background, but if

 4  their interests are not real, if they have no capacity to close

 5  within a reasonable period of time, there's no point wasting

 6  everybody's time.  But if it goes beyond this, Abax will be at

 7  that table.

 8          THE COURT:  Okay.

 9          MR. DELUCIA:  And we are prepared to discuss -- and

10  you just heard, by the way, counsel state, not me, that the

11  offer that we're discussing tomorrow or the proposal that we're

12  discussing tomorrow includes a number that would pay out the

13  notes in full.  You heard him say that just now on the record.

14  So what's the harm of an extension of exclusivity as we explore

15  that path?  If we open the door, it's not just Abax who can

16  file a plan at that point.  It's the other unsecured creditors.

17  It's a securities claims plaintiff.  Any party in interest,

18  under 1121, can file a plan, at which point, Your Honor, the

19  door is open to a, perhaps, rogue plan that none of us want to

20  waste their time on.

21          So exclusivity has a purpose.  Congress did it for a

22  reason.  And we are here, Your Honor, to work with this

23  constituent, and we are not saying, despite the animosity the

24  Abax and the principals in China have -- there's nothing

25  between counsel.  We're always pleased to work with counsel.

1  But we have a real opportunity to go down a path if we work

2  together, and I think we can do that, Your Honor.

3          THE COURT:  Okay.  You said something that was on my

4  mind before you said it, which is the animosity that seems to

5  prevail behind the scenes here.  And it's not just because this

6  is a Chinese asset but because sometimes it's very difficult to

7  divine the difference between appearance and reality in dealing

8  with Chinese businesses.  And I've had other cases before me

9  that have involved Chinese assets.  I can't tell what's going

10  on, and the papers, candidly, on both sides, are more form than

11  substance in terms of talking about these issues.

12          To what extent is there a genuine and sincere

13  opportunity for parties to work collaboratively in the event

14  that exclusivity is extended?  Because the words are being

15  expressed, but embedded in the Abax opposition is the expressed

16  concern that exclusivity is being used here as a weapon --

17  that's the classic terminology -- to disadvantage creditor

18  interests.  I don't necessarily buy that, but it could be true

19  in this case because of the animosity you just described.  So I

20  don't know who's trying to disadvantage who.

21          MR. DELUCIA:  Yes.  That's a legitimate question, Your

22  Honor, and it's probably the undercurrent of whatever distrust

23  there may be.  I will say candidly that there is a sincere

24  interest, based upon -- as I mentioned, I gave Your Honor a

25  brief background to it when I stated there has been an

1    education process of hours spent by Mr. Pritchard and myself

2    educating everybody on the debtor's side on the U.S. bankruptcy

3    process, duties under that process, opportunities under that

4    process, and responsibilities under that process.  And that

5    includes the obligation to do what Your Honor is addressing,

6    which is the good faith negotiation which creditors toward a

7    plan of reorganization.

8            I believe we crossed that hurdle.  I believe they

9    understand it.  We are working with them and their

10   professionals, which include some law firms in China, the Doqui

11   (ph.) Law Firm, who have U.S. educated attorneys at that firm,

12   who have helped bridge that gap.

13           Is it a perfect world between Abax and the debtor?

14   Absolutely not.  Is it one that takes, probably, of every hour

15   that is spent on the case, a percentage of time that is needed

16   to make sure that those issues are put to the side and

17   substance is addressed?  Absolutely.

18           And I do believe that we are at a critical point where

19   the debtor will be turning towards plans and restructuring that

20   Abax will participate in.  They may not like the ultimate plan

21   that has to be proposed because it's the only workable plan.

22   And it may, in fact, obtain votes other than theirs, and it may

23   be confirmable under 1129 despite their negative vote, but

24   that's plan process.  That's the bankruptcy.  We do not have to

25   say that one hundred percent of creditors vote in favor.

1    That's the law.

2            So, Your Honor, we're comfortable with the fact that

3    we may have to file a plan that Abax doesn't like, but I will

4    never file a plan that doesn't comply, at least in my

5    understanding, of 1129.

6            THE COURT:  Okay.  But that doesn't entirely respond

7    to my question, although it came close.  It gave you an

8    opportunity to give a little speech at the end.

9            My concern here is that I don't really know what's

10   going on, because no one's really telling me, even in documents

11   that are filed under seal.  What you're basically saying is we

12   reserve the right to cram them down, and what they're saying is

13   we're concerned that exclusivity is being extended so that the

14   bankruptcy process will be used to our fundamental

15   disadvantage, and this company hasn't done enough up to this

16   point to warrant an extension of exclusivity in a case that,

17   while exotic, is not that complicated.  That's my understanding

18   of the positions.

19           MR. DELUCIA:  Sure.

20           THE COURT:  Here's what I'm going to do, because I

21   think I've heard enough and I understand enough about what's

22   going on at the surface, although not what's going on behind

23   the scenes.

24           I'm going to extend exclusivity for ninety days.  The

25   burden to get another extension will be almost insurmountable.

1    So this is not a last and final as much as it is a first and

2    best.

3            Within the first thirty days of the ninety-day period,

4    I expect the parties to develop what I'm going to term a

5    protocol of cooperation.  There will be an agreed approach to

6    dealing with transactions to maximize value.  What happens in a

7    plan is one thing; whether there is a transactional

8    underpinning for a plan is something else altogether.  And as

9    to that transactional underpinning, including the sharing of

10   necessary financial information to assess plans, the

11   participation of Abax, through counsel or other advisors, in

12   transactional conversations, the ability of Abax to engage, all

13   of that will be, in one form or another, the subject of this

14   protocol together with such other and additional provisions the

15   parties consider appropriate to encourage that which is not

16   presently occurring.

17           If you fail in getting that done within the first

18   thirty days of this period, I will give Abax, for cause shown,

19   an ability to present a motion to shorten exclusivity.  They'll

20   have a pretty high burden, too.

21           And with that, I hope that you'll work together

22   constructively.  And I also hope that we don't end up with what

23   could turn out to be unproductive litigation.  A consensual

24   outcome is desirable.

25           And to the extent that your clients are looking for

1  signals from this Court, I expect them to engage and reach an

2  agreement, and if they don't, the consequences are not likely

3  to be desirable.

4          MR. DELUCIA:  Right.  Absolutely, Your Honor.  But one

5  process I would just raise and then I'll -- you have a crowded

6  docket; I don't want to take any more of your time -- is giving

7  that protocol period, that thirty-day period -- obviously, we

8  can do everything we can in good faith.

9          THE COURT:  You can get that done today if you're

10  doing this in good faith.  There's no reason why you can't

11  reach that agreement today.

12          MR. DELUCIA:  Well, I have to -- I can have one

13  agreement.  They may not agree to that agreement, and we can

14  negotiate.  My point is they control, and can control, that

15  process.  They may say, no matter what we throw out to them in

16  order to cooperate that that's not good enough, because you're

17  giving them the opportunity to say see, Judge.  We never made

18  an agreement.

19          THE COURT:  No, that's not what's going to happen, and

20  if that's what you think is going to happen, you're missing my

21  message.  My message is to counsel to get this done and not to

22  make the reason that you don't have a protocol an excuse for

23  terminating the exclusivity, because I'll see through that and

24  it won't work.

25          I expect you guys to work together.  I expect you guys

1   to treat each other as you would if Abax were running a

2   creditors' committee and you're running a debtor that needs the

3   cooperation of the creditors' committee to get a plan done on a

4   consensual basis.  This is not rocket science, as the saying

5   goes.  This may be an exotic company, Chinese based, and you

6   may have a hostile creditor group, but welcome to bankruptcy.

7   It just so happens that happens in most cases.

8            MR. DELUCIA:  I agree.  I agree.

9            THE COURT:  So get it done.

10           MR. DELUCIA:  I have no problem with that, Your Honor.

11           THE COURT:  In fact, get it done this week.

12           MR. DELUCIA:  We'll do everything we can.

13           THE COURT:  I'd like a status report on it on a

14  telephone conference one week from today.  I expect it to be

15  done within a week.  You have thirty days to get it done; I

16  expect it to be fully documented within a week.  Treat it as a

17  high priority.  Not just the documentation, but the performance

18  that underlies the documentation, an attitude of true

19  cooperation and collaboration, and if I don't see that, you're

20  in trouble.

21           MR. DELUCIA:  There's no problem, Your Honor.  We're

22  happy to do it.  It's not us.  I mean, I'm --

23           THE COURT:  No.

24           MR. DELUCIA:  I'm only concerned --

25           THE COURT:  I think it may be.  Not you, but parties

 1  that you report to --

 2          MR. DELUCIA:  Sure.

 3          THE COURT:  -- who not only may not misunderstand what

 4  goes on in bankruptcy court, but may not understand that there

 5  are adverse consequences that can flow from a lack of

 6  cooperation.

 7          So I am emphasizing that I expect parties not just to

 8  go through the motions and nod their head but to actually

 9  perform.

10          MR. DELUCIA:  Absolutely, Your Honor.

11          THE COURT:  And your clients need to understand that

12  they're going to be held on a tight leash here and that ninety

13  days is not an introduction into another ninety days.

14          This is their last opportunity to get this done or I

15  will open up exclusivity.

16          MR. DELUCIA:  That sounds fine, Your Honor.  Thank you

17  very much.

18          THE COURT:  Okay.

19          MR. DELUCIA:  Thank you.

20          MR. STROCHAK:  Your Honor, if I could ask one

21  indulgence?  Hopefully we won't need a call with the Court next

22  week, but if we do, could we make it Friday instead?  I'm going

23  to be out of the country, and it's just going to be very

24  difficult for me to get on the phone Thursday.

25          THE COURT:  I hope you don't need a call, but if you

1  need a call on Friday, I'll be here.

2           MR. STROCHAK:  Thank you so much.

3           MR. DELUCIA:  Thank you, Judge.

4        (Whereupon these proceedings were concluded at 11:21 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                                    RULINGS

5                                                      Page      Line

6    Application Filed by Debtor for Entry          6          6

7    of an Order Establishing Deadlines and

8    Procedures for Filing Proofs of Claim and

9    Approving Form and Manner of Notice

10   Thereof Granted

11

12   Period of Exclusivity is Extended for         27         24

13   Ninety Days

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T I O N

3

4    I, Esther Accardi, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ESTHER ACCARDI

12   AAERT Certified Electronic Transcriber CET**D-485

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  November 15, 2013

19

20

21

22

23

24

25

## A

**Abax (37)**
4:3,3;5:17;6:13,
14,23,23,24;7:5,17,
19,23;9:3,24;10:13;
11:4,15,17,20,20;
12:8,11,17,19;16:16;
23:21;24:6,15,24;
25:15;26:13,20;
27:3;28:11,12,18;
30:1

**Abax's (1)**
23:9

**ability (3)**
14:21;28:12,19

**able (2)**
7:24;13:25

**Absolutely (4)**
26:14,17;29:4;
31:10

**accept (2)**
20:9;21:13

**acceptable (1)**
7:8

**acceptances (2)**
6:10,18

**accepted (1)**
7:20

**accomplished (1)**
22:8

**accomplishing (1)**
22:7

**accordance (2)**
6:11,22

**achieve (1)**
16:6

**acquisition (1)**
19:2

**act (1)**
10:9

**action (2)**
8:13,14

**actions (1)**
18:7

**actual (2)**
7:18;11:3

**actually (4)**
6:25;15:14;19:7;
31:8

**Adam (2)**
5:16;12:16

**addition (1)**
11:9

**additional (3)**
7:24;11:11;28:14

**address (1)**
9:18

**addressed (1)**
26:17

**addressing (1)**
26:5

**admonition (1)**
16:19

**adverse (1)**
31:5

**advised (1)**
12:8

**advisor (1)**
20:21

**advisors (2)**
11:11;28:11

**affirmatively (1)**
10:6

**affixed (1)**
6:20

**afternoon (1)**
5:3

**again (1)**
18:19

**against (2)**
8:17;9:22

**agree (3)**
29:13;30:8,8

**agreed (1)**
28:5

**agreement (8)**
6:23;7:2;16:16;
29:2,11,13,13,18

**allow (1)**
15:22

**almost (1)**
27:25

**although (2)**
27:7,22

**altogether (1)**
28:8

**always (1)**
24:25

**amount (5)**
9:6;10:7;18:21,23;
19:8

**analysis (1)**
20:17

**animosity (3)**
24:23;25:4,19

**anxious (1)**
11:18

**apart (1)**
13:1

**apologize (3)**
5:12,15,21

**appearance (3)**
5:10,13;25:7

**application (3)**
6:11,18;7:4

**approach (1)**
28:5

**appropriate (1)**
28:15

**approval (2)**
8:12,25

**approved (2)**
6:6;17:9

**April (1)**

**6:18**
**arguing (1)**
12:21

**argument (6)**
13:8,10,12,19;
23:8,9

**arm's (3)**
14:22;17:13;20:7

**around (2)**
16:25;20:25

**asserting (1)**
16:22

**assess (2)**
9:10;28:10

**asset (1)**
25:6

**assets (3)**
14:1;20:18;25:9

**assist (2)**
20:21;22:24

**Assume (2)**
13:9,18

**attached (1)**
22:13

**attitude (1)**
30:18

**Attorneys (2)**
4:3;26:11

**Avenue (2)**
4:4;16:5

**aware (2)**
6:19;7:1

**away (1)**
22:14

## B

**back (6)**
11:20;15:4;19:11,
14;20:5;23:16

**background (2)**
24:3;25:25

**balance (1)**
22:16

**Bankruptcy (12)**
6:12;7:13;10:8;
13:14,15,17;22:11;
26:2,24;27:14;30:6;
31:4

**bar (5)**
5:8,9,23;6:2;9:7

**based (6)**
7:22;9:10;10:2,3;
25:24;30:5

**basic (1)**
13:5

**basically (2)**
10:14;27:11

**basis (2)**
7:8;30:4

**beginning (2)**
12:25;17:21

**behind (2)**

**25:5;27:22**
**best (3)**
15:12;18:4;28:2

**beyond (1)**
24:6

**board (4)**
8:5;11:15,16,17

**both (3)**
5:25;8:14;25:10

**bridge (2)**
13:1;26:12

**brief (1)**
25:25

**briefly (1)**
8:2

**bring (3)**
8:18;9:3;12:4

**burden (2)**
27:25;28:20

**business (1)**
22:15

**businesses (1)**
25:8

**busy (1)**
11:25

**buy (1)**
25:18

**buying (1)**
23:18

## C

**calculation (1)**
12:25

**call (9)**
10:4;12:6;18:16;
19:22;20:6;24:2;
31:21,25;32:1

**calls (2)**
12:9,10

**came (3)**
18:14,17;27:7

**can (28)**
10:2;11:18,21;
12:5;13:7;15:14,23,
24;16:23,24;17:14;
20:12;21:11,24,25;
23:14,16;24:15,18;
25:2;29:8,8,9,12,13,
14;30:12;31:5

**candidly (3)**
7:10;25:10,23

**capacity (2)**
24:2,4

**capital (1)**
22:23

**careful (1)**
16:20

**carefully (1)**
16:11

**case (20)**
8:3;12:20;13:3,11;
14:12,20;16:5;17:5;

**18:17,24;20:14;**
**21:17,19;22:5,9;**
**23:2,13;25:19;**
**26:15;27:16**
**cases (2)**
25:8;30:7

**cash (4)**
22:14,14,15;23:12

**categorically (1)**
18:18;25;19:10

**cause (2)**
13:3;28:18

**caused (1)**
8:3

**certainly (3)**
17:10;18:2;19:19

**changes (1)**
22:10

**Chapter (1)**
22:8

**checked (1)**
24:3

**China (14)**
5:2,4;7:7;9:1;10:5;
14:25;15:3,11;19:3;
20:6,24;21:7;24:24;
26:10

**Chinese (10)**
15:1;16:9;17:15,
16;20:9;21:13;25:6,
8,9;30:5

**claim (1)**
5:25

**claims (5)**
5:24;8:16;9:11,22;
24:17

**class (1)**
8:13

**classic (1)**
25:17

**clients (3)**
13:13;28:25;31:11

**clock (3)**
17:13,16;21:12

**close (2)**
24:4;27:7

**Code (3)**
6:12;10:8;22:11

**collaboration (1)**
30:19

**collaboratively (2)**
14:14;25:13

**comfortable (1)**
27:2

**coming (1)**
18:13

**commenced (3)**
8:4;18:2;23:13

**comments (1)**
17:24

**committee (3)**
14:16;30:2,3

**committees (1)**

14:15
**communicated (1)**
17:25
**communication (1)**
23:14
**companies (1)**
15:3
**company (8)**
7:12;10:3;22:17,
18;23:15,18;27:15;
30:5
**company's (1)**
9:1
**competing (3)**
21:19;22:6,7
**compliant (1)**
7:9
**complicated (1)**
27:17
**comply (1)**
27:4
**compromise (2)**
10:25;11:6
**concern (2)**
25:16;27:9
**concerned (2)**
27:13;30:24
**concerns (1)**
18:20
**concluded (2)**
16:6;32:4
**conclusion (1)**
21:10
**concrete (1)**
11:3
**conference (1)**
30:14
**confidential (1)**
17:1
**confidentiality (3)**
6:22;16:15;18:20
**confirmable (2)**
7:25;26:23
**confirmation (2)**
9:3;10:10
**confirmed (2)**
15:25;17:3
**Congress (1)**
24:21
**consensual (3)**
7:19;28:23;30:4
**consent (1)**
7:19
**consequences (3)**
13:15;29:2;31:5
**consider (3)**
9:24;19:8;28:15
**consideration (1)**
14:16
**constituencies (1)**
12:4
**constituent (1)**
24:23

**constructively (1)**
28:22
**consulting (1)**
8:5
**consummated (1)**
19:9
**contact (1)**
21:6
**contentions (1)**
20:18
**continue (3)**
12:6;14:21,22
**continues (1)**
14:20
**control (3)**
14:20;29:14,14
**controlled (1)**
6:14
**conversations (1)**
28:12
**convince (1)**
13:10
**cooperate (1)**
15:4;20:12;29:16
**cooperation (9)**
14:11,24;15:11;
16:1,9;28:5;30:3,19;
31:6
**copy (1)**
15:21
**correction (1)**
21:23
**counsel (11)**
8:20;10:14;16:14;
17:1;18:8,11;24:10,
25,25;28:11;29:21
**Counsel's (1)**
18:10
**counteroffer (1)**
11:5
**country (1)**
31:23
**couple (1)**
12:18
**course (1)**
10:10
**COURT (43)**
5:2,7,10,19;6:4,6;
8:23;10:12,18,23;
12:14;13:5,21;14:7,
9;15:8;16:18;19:21;
21:20,25;22:20,22,
24;23:1,5;24:8;25:3;
27:6,20;29:1,9,19;
30:9,11,13,23,25;
31:3,4,11,18,21,25
**cram (2)**
21:14;27:12
**cramdown (3)**
17:3,10,17
**creditor (2)**
9:21;10:8;25:17;
30:6

**creditors (11)**
5:18;9:10,21;14:5,
12;15:9,17;17:4;
24:16;26:6,25
**creditors' (3)**
14:15;30:2,3
**critical (1)**
26:18
**CRO (1)**
5:5
**cross (1)**
7:24
**crossed (1)**
26:8
**crowded (1)**
29:5
**cute (1)**
16:12

**D**

**dance (1)**
16:25
**dark (1)**
18:13
**date (9)**
5:8,9,23,23;6:2,2;
9:3,7;10:19
**days (14)**
6:1;9:15;10:11;
11:19;17:8,8;21:9,9;
27:24;28:3,18;
30:15;31:13,13
**deal (8)**
8:9;15:11,12,13,
16,16,24;24:3
**dealing (3)**
22:7;25:7;28:6
**debt (3)**
12:19;17:5;20:1
**debtor (31)**
5:4;6:16;7:4,6,23;
8:6,8;10:6,9;12:13;
13:14,15,24;14:3,4,
20;15:8;16:1;18:11,
16;20:1,16;21:11,18;
22:6,9,11;23:12;
26:13,19;30:2
**debtors (4)**
6:15;14:10,12,16
**debtor's (4)**
6:9,11;15:9;26:2
**declaration (3)**
6:19;7:3;8:15
**defend (1)**
11:21
**degree (1)**
16:24
**Delaware (1)**
8:14
**delaying (2)**
10:1,5
**delays (1)**

9:13
**DELUCIA (27)**
5:3,4,12,15,21;6:7;
10:17,22;11:2;
12:15;16:13;23:6;
24:9;25:21;27:19;
29:4,12;30:8,10,12,
21,24;31:2,10,16,19;
32:3
**demonstrate (2)**
22:13,20
**demonstrates (2)**
7:3,4
**denial (2)**
21:20,22
**derivative (1)**
8:14
**described (3)**
14:13,18;25:19
**desirable (2)**
28:24;29:3
**despite (3)**
9:15;24:23;26:23
**details (1)**
18:19
**detriment (1)**
10:16
**develop (1)**
28:4
**difference (1)**
25:7
**different (1)**
18:18
**difficult (4)**
13:12;22:25;25:6;
31:24
**directly (2)**
8:20,21
**director (1)**
6:15
**directors (1)**
8:17
**disadvantage (3)**
25:17,20;27:15
**disaster (1)**
17:9
**discount (1)**
19:8
**discuss (4)**
10:5;19:13,22;
24:9
**discussed (2)**
8:19;11:15
**discussing (3)**
16:17;24:11,12
**distracted (1)**
22:6
**distrust (1)**
25:22
**divine (1)**
25:7
**docket (1)**
29:6

**document (2)**
16:14;20:17
**documentation (2)**
30:17,18
**documented (1)**
30:16
**documents (3)**
6:22;23:19;27:10
**dollars (1)**
9:22
**Don (1)**
6:14
**done (13)**
12:5;16:11;18:12;
27:15;28:17;29:9,
21;30:3,9,11,15,15;
31:14
**door (2)**
24:15,19
**Doqui (1)**
26:10
**down (4)**
21:14;23:20;25:1;
27:12
**dozens (1)**
21:19
**draft (1)**
15:19
**due (1)**
18:19
**duration (1)**
21:8
**during (1)**
8:9
**duties (1)**
26:3
**duty (1)**
15:16

**E**

**educated (1)**
26:11
**educating (2)**
7:11;26:2
**education (1)**
26:1
**effort (3)**
7:11;8:22;11:10
**either (2)**
14:24;21:12
**elaborate (1)**
11:13
**else (1)**
28:8
**embedded (1)**
25:15
**emergence (1)**
11:4
**emphasizing (1)**
31:7
**encourage (1)**
28:15

November 13, 2013

**end (5)**
13:14;19:10;
20:13;27:8;28:22
**enforcement (1)**
18:7
**engage (2)**
28:12;29:1
**enough (6)**
11:21;14:5;27:15,
21,21;29:16
**ensure (1)**
15:17
**enter (1)**
5:10
**entered (4)**
6:5;8:11;9:8;13:1
**enterprise (1)**
22:12
**entirely (1)**
27:6
**entities (7)**
6:14,14,24,24;7:5;
15:3;20:10
**entitled (1)**
18:24
**entry (1)**
5:8
**envisioned (1)**
11:13
**equity (5)**
11:4;14:5;15:2;
17:15;24:1
**ESQ (1)**
4:7
**essence (1)**
13:8
**essentially (4)**
16:4;19:16;20:7,
17
**estate (9)**
9:22;14:23;15:1,
10,13,18;16:8;20:22;
22:1
**even (5)**
7:1;13:1;15:25;
23:20;27:10
**event (1)**
25:13
**everybody (1)**
26:2
**everybody's (1)**
24:6
**evidence (1)**
16:22
**except (1)**
12:3
**exchange (1)**
11:2
**exclusive (1)**
6:9
**exclusivity (21)**
10:15;12:24,25;
13:2,4,10,24;14:11,

18;16:23;21:18;
24:14,21;25:14,16;
27:13,16,24;28:19;
29:23;31:15
**excuse (1)**
29:22
**executives (1)**
7:11
**exert (1)**
7:5
**Exhibit (1)**
15:21
**exhibits (3)**
6:20,24,25
**exist (1)**
9:10
**exotic (2)**
27:17;30:5
**expanding (1)**
22:15
**expect (7)**
28:4;29:1,25,25;
30:14,16;31:7
**expected (1)**
9:25
**expense (1)**
11:7
**explained (1)**
19:6
**explore (2)**
23:20;24:14
**explored (2)**
16:5;19:19
**expressed (2)**
25:15,15
**extend (2)**
13:3;27:24
**extended (6)**
9:9;13:2,11;17:21;
25:14;27:13
**extension (15)**
5:22;6:9,16;8:3;
9:16;10:15;14:17;
16:23;21:16,18,21;
23:2;24:14;27:16,25
**extent (2)**
25:12;28:25
**extract (1)**
10:1

**F**

**facilitate (2)**
11:12,15
**fact (7)**
7:6;8:10;10:7;
20:23;26:22;27:2;
30:11
**fail (1)**
28:17
**faith (4)**
10:10;26:6;29:8,
10

**far (1)**
12:21
**favor (1)**
26:25
**February (8)**
6:17;9:9;17:17,21,
22;18:9;23:13,22
**few (1)**
17:24
**fiduciaries (2)**
15:9;22:1
**fiduciary (1)**
15:16
**Fifth (1)**
4:4
**file (8)**
6:10,17;18:7;
23:10;24:16,18;27:3,
4
**filed (7)**
7:1;9:11;11:25;
16:14;18:9;23:19;
27:11
**filing (3)**
5:23;8:7;18:5
**final (1)**
28:1
**financial (3)**
11:11;20:21;28:10
**financials (1)**
22:12
**financing (2)**
20:4;23:11
**fine (1)**
31:16
**fire (1)**
20:17
**firm (2)**
26:11,11
**firms (1)**
26:10
**first (11)**
6:11;12:9,18;
13:12;15:20;16:1;
19:21;20:25;28:1,3,
17
**fix (2)**
22:17,18
**flow (1)**
31:5
**fold (1)**
9:3
**folded (1)**
12:11
**following (1)**
22:2
**force (1)**
21:12
**form (3)**
5:24;25:10;28:13
**former (1)**
6:15
**formulate (1)**

7:7
**forthcoming (1)**
7:21
**forum (1)**
18:3
**forward (4)**
14:1;16:3;17:23;
23:24
**founder (1)**
19:2
**framework (1)**
19:14
**frankly (1)**
15:8
**Friday (2)**
31:22;32:1
**frustrations (1)**
18:15
**full (4)**
11:22;14:24;16:1;
24:13
**fully (1)**
30:16
**fund (1)**
24:1
**fundamental (1)**
27:14

**G**

**gap (3)**
8:9,10;26:12
**Gas (2)**
5:2,4
**gave (2)**
25:24;27:7
**generality (1)**
8:25
**generating (1)**
22:15
**genuine (1)**
25:12
**gives (1)**
14:21
**giving (2)**
29:6,17
**goes (3)**
24:6;30:5;31:4
**Good (11)**
5:3;10:10;11:21;
12:16;15:15;20:23;
21:3;26:6;29:8,10,16
**GOREN (2)**
4:7;5:17
**GOTSHAL (3)**
4:2;5:17;12:17
**governing (1)**
7:13
**graciously (1)**
6:21
**granted (1)**
6:21
**Greg (2)**

5:5;6:19
**ground (1)**
20:24
**group (1)**
30:6
**guess (1)**
16:21
**guys (2)**
29:25,25

**H**

**hand (1)**
16:7;20:10
**hands (1)**
16:7
**happen (10)**
11:8,19;15:12,16;
16:7;17:12;19:4,5;
29:19,20
**happened (3)**
11:2;20:2,4
**happens (7)**
13:16;14:13;
17:18;20:6;28:6;
30:7,7
**happy (1)**
30:22
**Hardin (1)**
5:4
**harm (5)**
21:17,20,24;22:4;
24:14
**head (1)**
31:8
**healthy (1)**
22:18
**heard (6)**
9:18;16:18;23:8;
24:10,13;27:21
**hearing (1)**
23:3
**held (1)**
31:12
**helped (1)**
26:12
**here's (3)**
18:23;19:4;27:20
**high (2)**
28:20;30:17
**highlight (1)**
23:7
**hire (1)**
21:1
**hold (1)**
14:22
**holding (1)**
17:4
**holds (1)**
12:19
**holidays (2)**
9:12,12
**Hong (3)**

10:21;11:7;21:2
**Honor (59)**
5:3,5,6,14,15,16,
21;6:3,7,19,21;7:2,
10,16;8:8;9:16,24;
10:2,8;11:9,10,24;
12:1,15,16,23;13:20,
23;14:19;15:19;
16:11,13,21;17:7,11,
25;18:2;19:25;
20:14;21:11,22;22:1,
17;23:3,6,23;24:18,
22;25:2,22,24,26:5;
27:2;29:4;30:10,21;
31:10,16,20
**hope (3)**
28:21,22;31:25
**Hopefully (1)**
31:21
**hoping (1)**
11:9
**hostile (1)**
30:6
**hour (1)**
26:14
**hours (1)**
26:1
**huge (1)**
12:20
**hundred (3)**
7:8;19:11;26:25
**hurdle (2)**
7:25;26:8

**I**

**idea (2)**
20:8,23
**idly (1)**
7:4
**immediately (3)**
8:11;20:22;21:1
**impatient (1)**
10:15
**inability (1)**
18:15
**include (6)**
8:16;12:8;22:3;
23:25;24:1;26:10
**included (1)**
11:3
**includes (2)**
24:12;26:5
**including (2)**
11:12;28:9
**indicated (2)**
19:13;23:18
**indulgence (1)**
31:21
**information (4)**
20:3,15;22:24;
28:10
**initially (1)**

19:25
**instead (1)**
31:22
**insurers (2)**
8:20,21
**insurmountable (1)**
27:25
**intend (1)**
23:25
**intent (1)**
8:17
**interest (2)**
24:17;25:24
**interested (4)**
12:7,12;14:2;
23:17
**interests (3)**
17:15;24:4;25:18
**interruption (1)**
16:19
**intervening (1)**
9:12
**into (7)**
8:18;9:3;12:11;
13:14;18:17,19;
31:13
**introduction (1)**
31:13
**investing (2)**
22:14;23:18
**investor (1)**
23:15
**investors (1)**
23:11
**invited (1)**
19:22
**involuntarily (1)**
14:24
**involuntary (6)**
8:4;13:14;18:3,7,
8,12
**involved (3)**
18:8,10;25:9
**issue (1)**
13:2
**issues (3)**
10:25;25:11;26:16

**J**

**January (4)**
5:22;6:2;9:7,9
**Journal (1)**
6:1
**Judge (3)**
23:17;29:17;32:3
**justification (2)**
18:22;21:16
**justify (1)**
23:1

**K**

**keep (2)**
17:13,14
**kept (1)**
20:7
**keys (2)**
16:7;20:11
**kind (1)**
6:13
**knows (1)**
21:2
**Kong (2)**
10:21;11:7;21:2
**KPMG (4)**
20:20;21:1,2,6

**L**

**lack (1)**
31:5
**last (10)**
10:23;12:8;15:20;
16:4;17:2,6;18:10;
19:15;28:1;31:14
**late (1)**
15:20
**law (3)**
26:10,11;27:1
**laws (2)**
7:12,13
**learned (1)**
19:20
**leash (1)**
31:12
**least (4)**
7:17;9:11;17:4;
27:4
**leave (1)**
14:20
**leaves (2)**
8:22;9:8
**left (1)**
9:7
**legitimate (1)**
25:21
**length (3)**
14:22;17:13;20:7
**less (3)**
9:14;11:16;19:12
**level (1)**
14:11
**leverage (1)**
7:5
**likely (1)**
29:2
**limited (2)**
9:6;23:6
**line (1)**
16:25
**liquidating (2)**
16:3;20:11
**liquidation (1)**
20:17
**list (2)**

22:22,23
**litigation (3)**
8:9;17:22;28:23
**litigations (3)**
8:13,16,16
**little (3)**
9:8;10:9;27:8
**LLP (1)**
4:2
**long (4)**
9:25;10:15;18:11,
14
**look (6)**
9:5,14;11:25;
15:24;19:2;20:8
**looking (6)**
9:4;10:6;15:6;
17:19,21;28:25
**lots (1)**
22:10
**Lotus (1)**
4:3
**Louis (1)**
5:3
**love (1)**
21:3
**LTD (1)**
4:3

**M**

**major (1)**
9:12
**management (5)**
14:25;15:2,9;
16:10;17:16
**MANGES (3)**
4:2;5:17;12:17
**many (4)**
18:17,17;19:24,24
**market (1)**
15:23
**marketing (4)**
20:19,21;21:8;
22:22
**math (1)**
9:5
**matter (5)**
12:22;14:6;17:20;
18:4;29:15
**matters (2)**
5:6;8:18
**MATTHEW (2)**
4:7;5:17
**maximize (1)**
28:6
**maximum (4)**
10:7;14:23;15:17;
16:6
**may (16)**
10:7,8;12:12;
14:12;25:23;26:20,
22,22;27:3;29:13,15;

30:5,6,25;31:3,4
**maybe (1)**
14:5
**mean (4)**
10:13;21:20;
22:21;30:22
**meet (1)**
11:7
**meeting (4)**
10:20;11:1,17;
19:21
**mentioned (1)**
25:24
**merits (1)**
13:3
**message (2)**
29:21,21
**might (3)**
14:2;21:13;22:25
**million (1)**
9:22
**mind (1)**
25:4
**minimal (1)**
16:10
**minute (1)**
18:10
**mischaracterize (2)**
10:13;13:7
**missing (1)**
29:20
**misunderstand (1)**
31:3
**moment (2)**
13:9,18
**months (3)**
18:6,17;19:24
**more (10)**
6:8;9:12,21;10:9;
11:18;17:8;22:18,
25;25:10;29:6
**morning (3)**
10:4;12:7,16;
15:20;19:21;24:2
**most (3)**
12:22;22:2;30:7
**motion (5)**
5:8;6:4,8;12:24;
28:19
**motions (1)**
31:8
**much (5)**
9:25;17:14;28:1;
31:17;32:2
**multiple (2)**
22:5,7
**myself (2)**
8:19;26:1

**N**

**Nai (1)**
4:3

**Natural (2)**
5:2,4
**necessarily (1)**
25:18
**necessary (2)**
13:16;28:10
**need (12)**
15:11;19:4,5;
22:10,17,18,19,25;
31:11,21,25;32:1
**needed (2)**
20:24;26:15
**needs (2)**
22:8;30:2
**negative (1)**
26:23
**negotiate (1)**
29:14
**negotiation (1)**
26:6
**negotiations (1)**
10:19
**New (4)**
4:5,5;9:13;20:4
**next (3)**
10:11;11:19;31:21
**night (2)**
15:20;18:13
**ninety (8)**
10:11;11:19;17:7,
8;21:9;27:24;31:12,
13
**ninety-day (6)**
6:16;7:25;9:4,5,
16;28:3
**ninety-five (2)**
12:19;17:5
**Nobody (1)**
22:16
**nod (1)**
31:8
**none (1)**
24:19
**notes (2)**
19:17;24:13
**notified (1)**
19:15
**November (3)**
9:6,7;12:25
**number (2)**
18:18;24:12
**numbers (1)**
11:3

**O**

**object (1)**
16:13
**objection (6)**
9:19,19,23,24;
10:13;17:4
**objector (1)**
6:12

**obligation (1)**
26:5
**obtain (3)**
7:18;11:11;26:22
**obtained (1)**
8:25
**obviously (1)**
29:7
**occur (1)**
11:18
**occurred (1)**
10:19
**occurring (1)**
28:16
**off (4)**
19:5,8;20:12;
23:12
**offer (5)**
7:20;10:3;15:1;
19:16;24:11
**offers (5)**
7:16,17;11:3,3,3
**officers (2)**
7:11;8:17
**One (24)**
5:8;6:25;7:8,16,
17;8:3;10:18;12:7;
14:25;19:9;20:16;
23:7,14,16,21,22;
26:14,25;28:7,13;
29:4,12;30:14;31:20
**one's (1)**
27:10
**only (9)**
6:12;9:19;12:4;
14:22;18:14;21:10;
26:21;30:24;31:3
**open (4)**
11:14;24:15,19;
31:15
**opening (1)**
19:18
**operating (3)**
15:3;20:9;22:9
**opportunities (4)**
14:14;23:10,11;
26:3
**opportunity (9)**
11:24;15:6,22;
20:3;25:1,13;27:8;
29:17;31:14
**oppose (1)**
16:24
**opposition (3)**
5:24;6:3;25:15
**options (1)**
10:6
**order (7)**
5:9;7:10;8:11;
10:1;13:1;15:17;
29:16
**ostensibly (1)**
21:7

**others (1)**
12:12
**out (15)**
13:23;15:6,14,22,
23;17:13,16;20:2;
21:5,24;23:4;24:12;
28:23;29:15;31:23
**outcome (1)**
28:24
**outlined (1)**
19:9
**over (2)**
17:3;23:16
**over-the-transom (1)**
19:16
**owed (2)**
19:8,12
**owners (3)**
15:2,2;17:15
**ownership (2)**
20:9;21:13

**P**

**paid (1)**
14:5
**papers (3)**
13:6;22:13;25:10
**participate (2)**
12:11;26:20
**participation (1)**
11:4;28:11
**particularly (2)**
13:13;21:17
**parties (9)**
10:5,24;14:14;
23:21;25:13;28:4,
15;30:25;31:7
**partner (2)**
18:10;21:2
**partners (1)**
6:23
**party (2)**
12:7;24:17
**path (3)**
23:20;24:15;25:1
**pay (7)**
11:22;18:21;
19:17;20:10;21:13;
23:12;24:12
**pending (2)**
5:6;8:13
**people (5)**
14:2;15:23;20:6,
24;21:6
**percent (5)**
7:9;12:19;17:5;
19:11;26:25
**percentage (1)**
26:15
**perfect (1)**
26:13
**perform (1)**

31:9
**performance (1)**
30:17
**performing (1)**
22:12
**perhaps (6)**
6:8;7:8,18;8:2;
12:3;24:19
**period (14)**
6:9;7:24;8:1,9,10;
9:4,4,6,9;24:5;28:3,
18;29:7,7
**permissible (1)**
14:13
**personally (1)**
8:19
**persuasive (1)**
13:19
**ph (2)**
5:5;26:11
**phone (4)**
12:9,10;19:22;
31:24
**place (2)**
11:1;18:4
**plaintiff (1)**
24:17
**plaintiffs (1)**
9:20
**plan (44)**
6:10,17;7:7,21,25;
8:18,23,24;9:2,15;
10:1;11:10,13;12:3;
13:21,22,23;15:19,
24;16:3,4,4,22;17:1,
2,3,5,8,17;21:15;
22:22;23:10;24:16,
18,19;26:7,20,21,24;
27:3,4;28:7,8;30:3
**plans (5)**
20:19;22:6,7;
26:19;28:10
**pleased (1)**
24:25
**point (7)**
23:7;24:5,16,18;
26:18;27:16;29:14
**position (1)**
12:21
**positions (1)**
27:18
**possible (2)**
7:9;10:7
**post-involuntary (1)**
8:6
**potential (2)**
22:23;23:11
**practice (1)**
14:17
**PRC-controlled (1)**
7:12
**precipitous (1)**
18:5

**preclude (1)**
14:18
**prepared (3)**
19:13;23:19;24:9
**pre-petition (1)**
8:5
**present (1)**
28:19
**presented (2)**
14:15,16
**presently (1)**
28:16
**pretty (2)**
9:25;28:20
**prevail (1)**
25:5
**principally (1)**
7:11
**principals (2)**
9:1;24:24
**prior (1)**
6:2
**priority (1)**
30:17
**Pritchard (4)**
5:5;6:20;7:6;26:1
**private (1)**
24:1
**probably (3)**
9:14;25:22;26:14
**problem (2)**
30:10,21
**proceedings (1)**
32:4
**process (25)**
7:13,14;9:2;10:1,
5;11:12,12,14,16;
12:9,11;19:23;21:8;
22:4;23:25;24:1;
26:1,3,3,4,4,24;
27:14;29:5,15
**productive (1)**
11:17
**professionals (3)**
8:5;11:14;26:10
**progress (4)**
7:15,22;9:17;11:7
**proof (2)**
5:23,25
**proposal (4)**
18:17;19:6,18;
24:11
**propose (3)**
5:25;15:24;17:17
**proposed (5)**
6:2;8:24;10:3,20;
26:21
**proposing (5)**
12:4;18:21;19:2,3;
21:8
**prospective (1)**
14:1
**prospects (1)**

CHINA NATURAL GAS, INC.
Case No. 13-10419-jmp

November 13, 2013

22:23
**protocol (4)**
  28:5,14;29:7,22
**provide (4)**
  23:10,10,11,11
**provided (3)**
  8:23;20:15,16
**provisions (1)**
  28:14
**publication (1)**
  5:25
**publications (1)**
  6:1
**purchasers (1)**
  14:1
**purpose (1)**
  24:21
**pursuant (1)**
  7:2
**pursue (1)**
  10:10
**put (14)**
  13:23;14:3;15:7,7,
  8,14,15,19,22;16:3;
  21:24;22:11,20;
  26:16
**putting (2)**
  16:14;17:22

**Q**

**quick (1)**
  9:5
**quickly (1)**
  9:18
**quite (1)**
  16:23

**R**

**raise (1)**
  29:5
**ran (1)**
  12:25
**reach (4)**
  21:5,11;29:1,11
**read (2)**
  13:6;16:11
**ready (1)**
  21:4
**real (2)**
  24:4;25:1
**realistically (1)**
  17:20
**reality (2)**
  23:17;25:7
**really (8)**
  8:22;9:14;12:23;
  16:11;21:9,9;27:9,10
**reason (4)**
  13:20;24:22;
  29:10,22
**reasonable (1)**

24:5
**reasons (1)**
  22:2
**recapitalization (2)**
  14:4;22:9
**recapitalize (1)**
  22:19
**recapitalizing (1)**
  14:2
**received (3)**
  6:13;10:4;23:14
**record (3)**
  11:14;16:15;24:13
**referenced (1)**
  8:14
**refinance (1)**
  20:1
**refinanced (1)**
  20:2
**refine (1)**
  9:2
**reflect (1)**
  9:13
**reinstate (1)**
  12:24
**rejected (1)**
  20:25
**relates (1)**
  10:20
**relief (1)**
  8:11
**reorganization (1)**
  26:7
**report (2)**
  30:13;31:1
**representatives (1)**
  7:7
**represented (1)**
  18:11
**request (3)**
  6:9;8:3;13:12
**requested (2)**
  5:22,23
**reserve (1)**
  27:12
**resolution (2)**
  8:18;17:20
**resolve (2)**
  8:23;14:6
**resolved (4)**
  9:15;18:4,6,15
**resolving (1)**
  8:16
**resort (3)**
  16:4;17:2,6
**respond (2)**
  18:25;27:6
**responded (5)**
  19:1,1;20:22;21:2,
  4
**response (4)**
  6:13;19:14;20:5;
  23:6

**responsibilities (1)**
  26:4
**responsible (1)**
  21:7
**rest (1)**
  23:3
**restructuring (4)**
  7:14,19;8:6;26:19
**result (1)**
  18:14
**retained (1)**
  20:20
**retroactive (1)**
  12:24
**return (2)**
  14:5;15:17
**Right (6)**
  10:17;15:24;22:3;
  23:24;27:12;29:4
**rocket (1)**
  30:4
**rogue (1)**
  24:19
**rope-a-dope (1)**
  19:25
**round (1)**
  16:2
**run (3)**
  17:13,16;21:12
**running (2)**
  30:1,2

**S**

**sale (3)**
  14:4;20:17;22:11
**sat (1)**
  7:4
**saying (8)**
  13:7;18:22;22:16;
  23:14;24:23;27:11,
  12;30:4
**scenario (1)**
  17:9
**scenes (2)**
  25:5;27:23
**Schiff (1)**
  5:4
**science (1)**
  30:4
**seal (5)**
  6:21;8:24;16:14;
  23:19;27:11
**SEC (1)**
  8:9
**second (1)**
  6:8
**Section (1)**
  6:12
**securities (2)**
  9:19;24:17
**seek (3)**
  10:8,10;15:11

**seeking (2)**
  5:8;6:16
**seem (1)**
  19:2
**seems (1)**
  25:4
**sell (2)**
  16:8;20:12
**sense (1)**
  11:6
**separately (1)**
  16:12
**set (1)**
  5:23
**setting (1)**
  5:9
**settings (1)**
  14:10
**settle (1)**
  8:10
**settlement (2)**
  8:12;10:25
**shape (1)**
  22:11
**shared (1)**
  6:24
**sharing (1)**
  28:9
**Shearman (2)**
  8:15,19
**sheet (2)**
  7:18;22:16
**shop (1)**
  20:4
**short (1)**
  21:8
**shorten (1)**
  28:19
**shown (1)**
  28:18
**sick (1)**
  22:17
**side (2)**
  26:2,16
**sides (1)**
  25:10
**signals (1)**
  29:1
**signed (1)**
  16:16
**simple (1)**
  8:23
**simply (6)**
  14:21,22;19:12;
  20:1,7;21:11
**sincere (2)**
  25:12,23
**single (1)**
  11:23
**situation (5)**
  13:13;15:8;17:10,
  19;18:9
**six (1)**

18:6
**sixty (2)**
  9:15;21:9
**socking (1)**
  22:14
**solicit (2)**
  6:10,18
**somebody (2)**
  19:16;23:17
**someone (1)**
  23:22
**sometime (1)**
  10:23
**sometimes (2)**
  13:17;25:6
**somewhat (1)**
  23:7
**soon (1)**
  7:9
**sorry (1)**
  21:22
**sought (2)**
  7:20;8:11
**sounds (1)**
  31:16
**sources (1)**
  22:23
**speak (3)**
  23:15,15,22
**spectacularly (1)**
  13:9
**speech (1)**
  27:8
**spent (2)**
  26:1,15
**stake (1)**
  12:22
**stand (1)**
  15:4
**standard (1)**
  14:17
**standing (1)**
  5:11
**start (1)**
  12:18
**state (2)**
  8:2;24:10
**stated (1)**
  25:25
**States (3)**
  7:12,13;11:11
**status (1)**
  30:13
**step (1)**
  20:5
**steps (1)**
  22:21
**Sterling (2)**
  8:15,20
**still (1)**
  13:24
**stood (1)**
  19:11

CHINA NATURAL GAS, INC.
Case No. 13-10419-jmp

November 13, 2013

**Street (1)**
6:1
**STROCHAK (15)**
5:13,16,16,20;
12:16,17;13:20,22;
14:8,19;16:16,21;
21:22;31:20;32:2
**structure (4)**
8:22,25;14:3;
18:22
**subject (1)**
28:13
**submission (1)**
6:21
**submitted (2)**
5:24;16:15
**substance (3)**
10:19;25:11;26:17
**substantial (1)**
7:15
**substantially (1)**
19:17
**substantive (2)**
6:8;12:10
**subtle (1)**
23:8
**successful (1)**
13:10
**suffice (1)**
17:2
**suggest (1)**
23:19
**suggested (1)**
11:5
**suggesting (1)**
20:3
**suggestion (2)**
20:25;23:21
**summer (1)**
20:23
**support (5)**
7:21;16:22;17:10;
20:15,18
**supported (4)**
6:19;9:1;18:22,24
**supposed (1)**
10:24
**sure (4)**
16:23;26:16;
27:19;31:2
**surface (1)**
27:22
**surprise (2)**
12:20;18:12
**surprised (1)**
18:5

**T**

**table (4)**
13:21,22;19:20;
24:7
**talk (5)**

**talking (3)**
10:25;16:24;25:11
**team (1)**
21:3
**technical (1)**
13:2
**teed (1)**
8:10
**telephone (1)**
30:14
**telling (3)**
17:7,11;27:10
**term (2)**
7:18;28:4
**terminating (1)**
29:23
**terminology (1)**
25:17
**terms (8)**
7:18;16:17,18;
18:20,21;19:17;
23:8;25:11
**theirs (1)**
26:22
**Thereafter (2)**
8:8;12:10
**therefore (1)**
6:3
**thereto (1)**
6:20
**thirty (3)**
28:3,18;30:15
**thirty-day (1)**
29:7
**thought (2)**
18:3;19:6
**threatened (1)**
20:8
**threw (1)**
13:13
**throw (2)**
16:7;29:15
**Thursday (1)**
31:24
**ticked (1)**
19:5
**tight (2)**
9:4;31:12
**Today (6)**
5:6;6:1;10:24;
29:9,11;30:14
**together (5)**
10:24;12:5;13:23;
14:3;15:7,15,23;
21:25;25:2;28:14,
21;29:25
**told (4)**
18:5;19:25;20:20,
23
**tomorrow (7)**
10:4;12:7,10;

14:1,2;21:3,4;
23:24
**tools (1)**
22:10
**toward (1)**
26:6
**towards (1)**
26:19
**transaction (1)**
19:9
**transactional (3)**
28:7,9,12
**transactions (1)**
28:6
**treat (2)**
30:1,16
**trouble (1)**
30:20
**true (3)**
9:10;25:18;30:18
**Trustee (3)**
9:20;16:8;20:11
**trustees (1)**
14:12
**try (7)**
8:17;9:2;15:22,25;
16:25;21:12,14
**trying (2)**
14:3;25:20
**turn (1)**
28:23
**turning (1)**
26:19
**twenty-eight (1)**
6:1
**two (6)**
5:6;6:14;7:17;
8:13;9:11,12

**U**

**ultimate (1)**
26:20
**uncontested (1)**
5:8
**under (12)**
6:21;8:24;10:7;
16:14,15;23:19;
24:18;26:3,3,4,23;
27:11
**undercurrent (1)**
25:22
**underlies (1)**
30:18
**underpinning (2)**
28:8,9
**understood (1)**
10:20
**unique (1)**
8:2
**United (3)**
7:12,13;11:11
**unproductive (1)**
28:23

**unsecured (1)**
24:16
**unsupported (1)**
19:7
**untrue (3)**
18:25;19:10,12
**unworkable (2)**
18:18;19:7
**up (7)**
8:10;13:14;16:7;
20:13;27:15;28:22;
31:15
**upon (6)**
7:22;9:11;10:3,3;
11:4;25:24
**USA (1)**
5:25
**used (4)**
10:16;22:11;
25:16;27:14
**using (1)**
7:5

**V**

**valuation (3)**
20:16,19;22:24
**value (11)**
14:6,23;15:1;16:6,
10;17:14;18:23;
19:17;20:18;22:3;
28:6
**valuing (1)**
20:21
**vetted (1)**
14:15
**VIE (2)**
15:3;17:15
**view (2)**
16:19;21:1
**voluntarily (1)**
14:24
**vote (2)**
26:23,25
**votes (1)**
26:22

**W**

**Wall (1)**
6:1
**warrant (1)**
27:16
**Washington (1)**
18:10
**waste (1)**
24:20
**wasting (1)**
24:5
**way (9)**
10:6;11:6;12:2,2,
4;13:11;14:17,23;
24:10

**ways (1)**
18:18
**weapon (1)**
25:16
**week (9)**
12:8;19:1,1,15;
30:11,14,15,16;
31:22
**WEIL (3)**
4:2;5:17;12:17
**welcome (1)**
30:6
**What's (5)**
19:24;20:14;
24:14;25:9;27:9,21,
22;29:19
**whatsoever (2)**
21:17,24
**Whereupon (1)**
32:4
**who's (1)**
25:20
**willing (2)**
20:10;21:13
**willingness (1)**
11:5
**win (2)**
13:12,19
**wish (1)**
5:10
**within (15)**
6:10;7:25;8:18;
10:11;11:10,19;
14:15;19:1,1;23:8;
24:5;28:3,17;30:15,
16
**without (3)**
10:18;11:16;16:24
**words (1)**
25:14
**work (16)**
13:24;14:4,14;
15:7;17:8;18:20,21;
19:3;22:2;24:22,25;
25:1,13;28:21;29:24,
25
**workable (1)**
26:21
**working (4)**
7:6;8:15;9:15;26:9
**world (2)**
9:10;26:13
**worth (1)**
15:1
**written (1)**
7:17
**wrong (1)**
18:1

**X**

**Xin (1)**
4:3

**Y**

**Yang (1)**
  6:14
**year (1)**
  19:10
**Years (1)**
  9:13
**yesterday (2)**
  6:21;11:25
**York (2)**
  4:5,5

**1**

**10153 (1)**
  4:5
**11 (1)**
  22:8
**11:21 (1)**
  32:4
**1121 (2)**
  6:12;24:18
**1129 (3)**
  7:9;26:23;27:5
**13th (1)**
  9:6

**2**

**2013 (1)**
  23:13
**2014 (2)**
  6:17,18

**4**

**4th (2)**
  6:17;9:9

**6**

**6th (4)**
  5:22;6:2;9:7,9

**7**

**767 (1)**
  4:4
**7th (1)**
  6:18

**8**

**8th (2)**
  23:13,23

**9**

**9 (1)**
  10:4